## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| F+W MEDIA, INC., *et al.*,[1] | Case No. 19- 10479(___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF GREGORY J. OSBERG IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

I, Gregory J. Osberg, hereby declare under penalty of perjury that the following is true and correct:

1.     I am the Chief Executive Officer ("CEO") of F+W Media, Inc. ("F+W Media") and its affiliated debtors and debtors in possession (collectively, the "Debtors," and collectively with their non-debtor affiliates, the "Company"). I was appointed as the interim CEO of F+W Media on January 9, 2018, and as its CEO on June 20, 2018.

2.     In my capacity as CEO, I am familiar with the Debtors' operations, day-to-day business affairs, and books and records. I submit this declaration (this "Declaration") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of these chapter 11 cases (collectively, the "Chapter 11 Cases"), and in support of the Debtors' petitions and motions requesting various types of "first day" relief (collectively, the "First Day Motions").

3.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  New Publishing Holdings, Inc. (4101); F+W Media, Inc. (5953); F+W Subscription Services, LLC (3663); F+W Trade Show & Events, LLC (0268); F+W OH e-Commerce, LLC (3762); Former Quilting Inc. (7854); The Writers Store, Inc. (6951); F & W Media International Limited (UK Registered No. 04003207); and F+W NH e-Commerce, LLC (9731).  The headquarters for the above-captioned Debtors is 1140 Broadway, 14th Floor, New York, New York 10001.

(the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  No trustee or examiner has been appointed in the Chapter 11 Cases.  As of the date hereof, no creditors' committee has been appointed.

4.    Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with members of the Debtors' senior management, and information provided to me by the Debtors' professional advisors, including Young Conaway Stargatt & Taylor, LLP, counsel to the Debtors, and FTI Consulting, Inc. ("FTI"), who will be providing the Debtors with a chief restructuring officer and certain additional personnel.  If I were called upon to testify, I would testify competently to the facts set forth herein.

5.    As described in further detail below, the Debtors have filed the Chapter 11 Cases to maximize the value of their estates for the benefit of all their stakeholders through the sale of their businesses.  Headquartered in New York City, New York and with operations in various other domestic and international locations, the Company is a leading publisher of specialized content - serving enthusiasts in various core vertical communities including crafts, art, writing, design, knitting, quilting, and outdoors.  The Company provides inspiration, instruction, and exclusive products and services for these enthusiasts through a diverse and growing portfolio.  This portfolio includes online education, print and digital books and magazines, subscription video sites, consumer and trade events, and highly-curated e-commerce stores.

6.      Unfortunately, due to the challenges discussed herein, the Debtors have found themselves unable to satisfy their obligations under the A&R Pre-Petition Credit Facility (as defined below) and are facing near-term liquidity issues.  To address these challenges, the Debtors and their professional advisors, after considering all available strategic options, have determined that the best course to maximize the value of the Debtors' estates is to sell their businesses through the Chapter 11 Cases.

7.      I am authorized by the Debtors to submit this Declaration.  I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe that the relief sought in each First Day Motion:  (i) will enable the Debtors to transition into chapter 11 without a deleterious effect on the value of the Debtors' business units; (ii) is critical to the Debtors' efforts to maximize value through the Chapter 11 Cases; and (iii) best serves the interests of the Debtors' estates and creditors.  It is my further belief that the relief sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve the goals identified above.

8.      Part I of this Declaration provides an overview of the Debtors' businesses. Part II provides a discussion of the events that compelled the commencement of the Chapter 11 Cases.  Part III provides a description of the Debtors' capital structure.  Part IV addresses the Debtors' strategy to maximize the value of their businesses and their efforts to obtain debtor-in-possession financing.  Part V affirms and incorporates the facts that support the relief requested in the First Day Motions.

Part I

## THE COMPANY'S BUSINESS

### A.    Overview

9.    Since it was founded approximately one hundred years ago, the Company has been engaged in the business of distributing content targeted at hobbyist niche audiences. These audiences include communities of individuals who are enthusiastic about their hobbies including, among other things, arts and crafts, outdoor interests, collectibles, writing and design, and lifestyle.

### B.    The Company's Business Lines

10.    The Company runs two business lines which it primarily operates through F+W Media - the Communities business line and the F+W Books business line. Each of F+W Media's subsidiaries was formed to handle distinct aspects of these businesses, as discussed below.

11.    **Communities.**    Communities is a diversified multi-media company owning and operating print and digital media platforms to provide content distribution and marketing channels to a variety of enthusiast audiences. Headquartered in New York, New York, Communities segments its media into ten enthusiast categories or "Communities," including Crafts, Artist's Network, Collectibles, Writing, Outdoors, Sky & Telescope, Woodworking, Family Tree, Construction, and Horticulture.

12.    In conjunction with its main business of print magazines, Communities utilizes websites, e-Commerce platforms, online video streaming, social media, membership platforms, eLearning, and other channels to distribute content and sell products and advertising corresponding to the Communities' interests. In 2018, Communities published, in magazines

and periodicals alone, over 400 unique issues of industry leading unique content circulated through over fifty titles weekly, monthly, quarterly, and annually. The Communities' print publications are collectively circulated to over thirteen million people annually and digital page views exceed seventeen million per month on average. Communities' annual revenue in 2018 was approximately $67.7 million.

13.     The Crafts Community is the largest community within F+W Media and represented approximately $32.5 million of Communities' revenue in 2018. It manages the most extensive list of media properties serving craft enthusiasts in the United States and the United Kingdom. Its portfolio includes magazines, books, websites, videos, podcasts, and e-commerce serving a variety of craft categories including interweave, sewing, scrapbooking, and quilting. Representative titles include *Beadwork*, *Love of Quilting*, and *Quiltmaker*.

14.     The Artist's Network is the second largest community within F+W Media and represented approximately $8.7 million of Communities' revenue in 2018. This Community covers two primary categories, art and design, through a suite of magazines, e-commerce stores, websites, videos, social media platforms, e-newsletters, and in-person events. Representative titles include *Artists Magazine* and *Watercolor Artist*.

15.     Other top-producing Communities include Collectibles, which covers antiques, automotive, collectibles, military, music, numismatics, and sports, Writing, which is built on resources that equip writers to hone their craft and assist readers in their pursuit of publication, Outdoors, which offers special interest hunting publications, Sky & Telescope, which publishes two brands focused on astronomy and the solar system, and Woodworking, which offers woodworking enthusiasts advice, tool reviews, and project guides.

16. **F+W Books.**  In September 2018, F+W Media established F+W Books as a new, separate subdivision to handle all of the book publishing across the Communities described above through its dedicated book team.  F+W Books is a leading publisher of illustrated non-fiction books in several categories, including art instruction, crafts, writing, genealogy, antiques and collectibles, woodworking, and the outdoors.  In 2018, F+W Books' revenue was approximately $22 million, approximately 80% of which was derived from its United States based business and approximately 20% of which was derived from its United Kingdom based business.

17.    F+W Books publishes approximately 120 new books a year across the United States and the United Kingdom and maintains a backlist of more than 2,100 titles.  The Company's well-established and respected imprints (*i.e.*, trade names used to identify lines of books or publishing arms within the Company that do not represent separate corporate entities) include the following: *Writer's Digest*; *Interweave*; *sewandso*; *The Quilting Company*; *North Light: Bringing Art to Life*; *Impact*; *familytree*; *Krause Publications*; and *Popular Woodworking Magazine*.  A brief description of the imprints is as follows:

- *Writer's Digest* includes leading publications on topics including writing inspiration, writing process, and getting published.

- *Interweave* publishes how-to art and craft books on areas such as knitting, crochet, and beading.

- *Sewandso* publishes informative books focused on needlecraft, knitting, crochet, and sewing.

- *North Light* publishes a highly curated and exclusive selection of painting and drawing resources for artists of all levels.

- *Impact* provides art instruction for creating manga, fantasy, cartoons, comics, and more.

- *Krause Publications* focuses on antiques and collectibles, including a long history of award winning numismatics titles.

- *Familytree* provides guidebooks and references to serve the fast-growing genealogy market.

- *Popular Woodworking* offers exclusive woodworking books for both traditional and advanced woodworkers.

18.     In North America, F+W Books relies upon a partnership with Ingram Publisher Services LLC for its sales and distribution efforts.  Outside of North America, the Company utilizes its longstanding United Kingdom business, F&W Media International Limited ("F&W UK"), to handle sales and distributions, as well as third-party distribution for Dover Books.

## C.     Corporate History and Structure

19.     **New Publishing Holdings, Inc.**     New Publishing Holdings, Inc. ("Holdings"), a Delaware corporation, is the direct or indirect parent of each of the other Debtors.  It was formed on June 3, 2005 as New Publishing Holdings, LLC and its name was changed to New Publishing Holdings, Inc. on June 9, 2010.  The majority of the stock in Holdings is owned by certain of its lenders as the result of a 2017 out-of-court restructuring, as discussed more fully in Part II(B) below.  Holdings is a non-operating holding company.

20.     **F+W Media, Inc.**     F+W Media, a Delaware corporation, is the direct subsidiary of Holdings and is the direct parent of each of the other Debtors excluding F+W NH e-Commerce, LLC ("F+W NH"), which is directly owned by Debtor Former Quilting Inc. ("Former Quilting").   F+W Media was initially formed on June 3, 2005 as New Publishing Acquisition, Inc.  On August 5, 2005, F+W Acquisition, Inc. was merged into New Publishing Acquisition, Inc. and on September 2, 2005, New Publishing Acquisition, Inc.'s name was

changed to F&W Publications, Inc. after two of its early publications: *Farm Quarterly* and *Writer's Digest*.

21.     In 2008, the Company began to shift away from publications and towards e-commerce, as discussed more fully in Part II(A) below.  In connection therewith, on September 8, 2008, F&W Publications, Inc.'s name was changed to F+W Media, Inc.  Since then, the Company has grown through a series of acquisitions, including Catalyst Aspire Holdings Corporation, Frontenac Aspire Holdings Corporation, Aspire Media, LLC, Aspire Media Operations, LLC, Interweave Press, LLC and New Track Media.

22.     **F+W Subscription Services, LLC.**  F+W Subscription Services, LLC ("F+W Subscription"), a Delaware limited liability company, was formed on October 5, 2009.  F+W Subscription manages the Company's approximately fifty periodical subscriptions, which cover diverse topics ranging from turkey hunting to horticulture.

23.     **F+W Trade Show & Events, LLC.**  F+W Trade Show & Events, LLC ("F+W Trade"), a Delaware limited liability company, was formed on or around January 17, 2014.  On July 1, 2014, an entity named Creative Crafts Group Expo, LLC was merged into F+W Trade.  F+W Trade manages the Company's various trade shows, approximately ten of which are held annually across ten states, and holds the employees, assets, and activity of the trade shows for tax purposes.

24.     **F+W OH e-Commerce, LLC.**  F+W OH e-Commerce, LLC ("F+W OH"), a Delaware limited liability company, was formed as KP Subscription Services, LLC on October 5, 2009.  On June 12, 2014, its name was changed to F+W OH e-Commerce, LLC in connection with the Company's shift to e-commerce.  F+W OH handles all of the Company's sales and commerce.

25. **Former Quilting Inc. and F+W NH e-Commerce, LLC.** Former Quilting, a Delaware corporation, was formed as Keepsake Quilting Inc. ("Keepsake Quilting") on May 31, 2000. On September 11, 2002, Knitting Acquisition, Inc. was merged into Keepsake Quilting. On December 31, 2007, Quilt Holding Company and Keepsake Acquisition Corp. were merged into Keepsake Quilting. On June 12, 2014, F+W NH, a Delaware limited liability company, was formed as a subsidiary of Keepsake Quilting to handle its e-commerce operations in New Hampshire.

26. In April of 2018, the Company sold the business of Keepsake Quilting, including its name, and thereafter changed the name to Former Quilting. Former Quilting has no operations and nominal assets. When Keepsake Quilting was sold, F+W NH ceased all operations.

27. **The Writers Store, Inc.** The Writers Store, Inc. ("The Writers Store"), a California corporation, was formed on September 5, 2008. It was acquired by F+W Media in July 2011 and was a premiere source for writing and filmmaking tools, specialized educational programs, and events. The Writers Store previously had a retail location based in Burbank, California; however, this branch of the Company's business is now operated as a digital division of F+W Media and The Writers Store is no longer operating.

28. **F&W Media International Limited.** On May 22, 2000, GAC No. 241 Limited was incorporated in the United Kingdom under the Companies Act of 1985 as a private limited company. On June 20, 2000, GAC No. 241 Limited's named was changed to F&W (UK) Ltd. and on December 31, 2013, the name was changed from F&W (UK) Ltd. to F&W Media International Limited. F&W UK operates two primary businesses - the sale and distribution of F+W imprints for F+W Books for markets outside of North America, and a

website, *SewandSo*, which sells craft materials to customers who are primarily located in the United Kingdom and continental Europe.

29.    A summary of the Company's organizational structure is attached hereto as <u>Exhibit A</u>.  This structure reflects that F+W Media is also the 50% owner of non-debtor, Burda FW Media, LLC ("<u>Burda</u>"), a Delaware limited liability company.  Burda publishes Burda Style USA, which provides a broad array of products (both digital and print) to its online community of sewing enthusiasts.

## Part II

## <u>EVENTS LEADING TO CHAPTER 11</u>

### A.    Declining Subscriptions and a Shift to E- Commerce

30.    Over the past decade, the market for subscription print periodicals of all kinds, including those published by the Company, has been in decline as an increasing amount of content has become available electronically at little or no cost to readers.[2]  In an attempt to combat this decline, the Company began looking for new sources of revenue growth and market space for its enthusiast brands.  On or around 2008, the Company decided to shift its focus to e-commerce upon the belief that its enthusiast customers would purchase items from the Company related to their passions besides periodicals, such as craft and writing supplies.  With its large library of niche information for its hobbyist customers, the Company believed it was well-positioned to make this transition.

31.    In connection with this new approach, the Company took on various additional obligations across its distribution channel, including purchasing the merchandise it would sell online, storing merchandise in leased warehouses, marketing merchandise on

---

[2] In the years since 2015 alone, the Company's subscribers have decreased from approximately 33.4 million to 21.5 million and the Company's advertising revenue has decreased from $20.7 million to $13.7 million.

01:24165872.12

websites, fulfilling orders, and responding to customer service inquiries.  Unfortunately, these additional obligations came at a tremendous cost to the Company, both in terms of monetary loss and the deterioration of customer relationships.

32.     As a consequence of this shift in strategic approach, the Company was required to enter into various technology contracts which increased capital expenditures by 385% in 2017 alone.  And, because the Company had ventured into fields in which it lacked expertise, it soon realized that the technology used on the Company's websites was unnecessary or flawed, resulting in customer service issues that significantly damaged the Company's reputation and relationship with its customers.  By example, in 2018 in the crafts business alone, the Company spent approximately $6 million on its efforts to sell craft e-commerce and generated only $3 million in revenue.

**B.     The 2017 Restructuring**

33.     On July 9, 2013, Holdings, F+W Media, and certain of F+W Media's subsidiaries, including F+W Subscription, F+W Trade, F+W OH, Former Quilting, The Writers Store, and F+W NH (collectively, the "Subsidiary Guarantors"), entered into a credit facility (the "Pre-Petition Credit Facility") that provided for a $125 million term loan to refinance certain debt and $10 million for revolving credit and letters of credit to fund operations (the "Loans"). F+W Media was the borrower under the Pre-Petition Credit Facility and the obligations under the Pre-Petition Credit Facility were guaranteed by Holdings and the Subsidiary Guarantors.  The Loans were secured by liens on all of the assets of Holdings, F+W Media, and the Subsidiary Guarantors.

34.     As a result of continued decline in revenues, F+W Media had to increase its borrowing under the Pre-Petition Credit Facility.  By spring 2017, the total principal amount

owed with respect to the Loans was approximately $99 million and F+W Media was in default of certain covenants and payments under the Pre-Petition Credit Facility.

35.    During November and December, 2016, the several lenders party to the Pre-Petition Credit Facility (collectively, the "Lenders") approached Holdings' board of directors to explore possible restructuring options.    As a result of discussions between Holdings' management and representatives of the Lenders over the next five months, the Lenders agreed to an out-of-court restructuring (the "Restructuring") of the Company, immediately after which the Lenders would hold approximately 97% of the equity interests of the new parent company of Holdings, New Publishing Holdings Parent, LLC ("Parent"), while Holdings' existing stockholders would hold approximately 3% of such equity interests.

36.    In order to effectuate the Restructuring, on May 24, 2017, the Pre-Petition Credit Facility was amended and restated (the "A&R Pre-Petition Credit Facility").    The Lenders received 97% of the equity interests in Parent as consideration for forgiving approximately $64 million of the outstanding amounts due under the Pre-Petition Credit Facility and the Lenders exchanged the remaining approximately $35 million of existing terms loans for new "last out" term loans pursuant to the A&R Pre-Petition Credit Facility (the "Tranche B-2 Term Loans").    In addition, under the A&R Pre-Petition Facility, certain of the Lenders agreed to provide $15 million of new "first out" terms loans (the "Tranche B-1 Term Loans") to F+W Media to enable the Company to pursue certain strategic options designed to streamline operations and increase revenue.

37.    Upon completion of the Restructuring, the Company's existing indebtedness was reduced from approximately $100 million to $35 million, which, when combined with the Tranche B-1 Term Loans, resulted in total Company indebtedness of

approximately $50 million.  The Tranche B-1 Term Loans and the Tranche B-2 Term Loans are secured by a lien on substantially all of the assets of F+W Media, Holdings, and the Subsidiary Guarantors, and 65% of F+W Media's equity interest in F&W UK.  The Lenders do not have a lien on the assets of F&W UK.

## C.    The Company's Prepetition Restructuring Efforts

38.    The Company utilized its improved liquidity position as a result of the Restructuring to continue its efforts to evolve from a legacy print business to an e-commerce business.  However, largely as a result of mismanagement, the Company exhausted the entire $15 million of the new funding it received in the six (6) months following the Restructuring.  In those six (6) months, the Company's management dramatically increased spending on technology contracts, merchandise to store in warehouses, and staffing while the Company was faltering and revenue was declining.  The Company's decision to focus on e-commerce and de-emphasize print and digital publishing accelerated the decline of the Company's publishing business, and the resources spent on technology hurt the Company's viability because the technology was flawed and customers often had issues with the websites.

39.    Ultimately, the board of directors determined that a change in the Company's leadership was needed.  On January 8, 2018, the board of directors terminated the former chief executive officer and various other officers.  The following day, I was appointed as the CEO.  At the same time, the Company retained FTI to capitalize on FTI's unmatched media and publishing industry expertise.

40.    Immediately following my appointment, I worked with FTI to create analytics and determined that the worst performing business channel of the Company was its e-commerce channel.  Of the Company's four (4) major channels, the only channel that did not

positively contribute to the Company was the channel responsible for physical products sold through e-commerce.

41.     Over the next few months, the Company began shifting away from e-commerce and evaluating alternative business models.  In connection therewith, the Company implemented two rounds of employee terminations resulting in a decrease of approximately 40% of its workforce, created a new, closely-monitored budget, and began re-negotiating the contracts it entered into in connection with its e-commerce business.

42.     Despite these efforts, the Company's 13-week cash flow model indicated that the cash flow would run out in April 2018.  In an effort to stabilize the Company and preserve operations, the Company sold two assets: (a) the Keepsake Quilting e-commerce business (as described above); and (b) Blade, a knife collector magazine and large trade show.  These assets sold for approximately $2.45 million and $4.34 million, respectively, and resulted in approximately $5.45 million in net proceeds after a payment was made to the Lenders.

43.     Unfortunately, the Company's revenue continued to decline through the summer and the 13-week cash flow model indicated cash would run out in October of 2018.  Accordingly, the Company again sold certain assets to increase liquidity, including certain sewing events and the Martha Pullen online business.  These sales resulted in approximately $1.54 million in net proceeds.

44.     In the fall of 2018, the Company reformed its e-commerce business model by migrating towards partnerships with third party vendors, instead of the previous model by which the Company satisfied its customers' orders directly.  Under the Company's new business model, customers are directed to third party vendors who fulfill their orders.  This new model has resulted in decreased costs and slight profits, but the majority of revenue goes to the third party

vendor fulfilling the merchandise order.  The Company also launched new digital advertising initiatives, including programmatic, native, and video advertising.  Despite the success of these new initiatives, the Company has not seen enough of an improvement to offset the continued decline in its magazine business.

45.     The Company has likewise continued to suffer from certain other effects of its failed e-commerce attempt.  Specifically, as a result of the Company's layoffs as it moved away from e-commerce, the majority of the Company's leased space is 50% or less occupied yet the Company has been unable to negotiate better lease terms.  And, despite its shift away from e-commerce, the Company also remained obligated to pay for certain merchandise it stored in warehouses.  While the Company was able to decrease the costs associated with such merchandise and storage with its largest vendor from $4.025 million in 2018 to less than $1 million in estimated costs in 2019, these lingering costs continue to have an effect on the Company's bottom line.  Thus, despite a promising new business model, the Company determined that cash flow would again run out in the first quarter of 2019.

46.     Realizing that periodic asset sales are not a long-term operational solution, the Company's board requested alternative strategies for 2019, ranging from a full liquidation to selling a significant portion of the Company's assets to help stabilize operations.  Ultimately, the Company determined that the only viable alternative, which would allow it to survive while providing relief from its obligations, was to pursue a sale transaction within the context of a chapter 11 filing.

### D.    Constrained Liquidity

47.     The Company's most significant sources of liquidity consist of cash generated from working capital and borrowings under the A&R Prepetition Credit Facility.

However, as a result of continued declines in sales, the Company's liquidity position has become severely constrained. As of the Petition Date, the Company's available cash and cash equivalents totaled approximately $2.5 million.[3] Moreover, the Company no longer has any availability under the A&R Prepetition Credit Facility.

**Part III**

**PREPETITION CAPITAL STRUCTURE**

48.    As of the Petition Date, the Debtors have approximately $105.2 million in outstanding secured and unsecured debt obligations. The Debtors' primary funded debt obligations consist of the Tranche B-1 Term Loans and the Tranche B-2 Term Loans. The significant liabilities of the Debtors are described in greater detail below.

A.    **Prepetition Funded Debt**

49.    <u>Tranche B-1 Term Loans</u>. Pursuant to the A&R Prepetition Credit Facility, certain of the Lenders provided F+W Media with a new "first-out" senior secured term loan facility in an aggregate principal amount of $15 million in the form of Tranche B-1 Term Loans. The current aggregate amount outstanding on account of the Tranche B-1 Term Loans, including accrued and unpaid interest, is $15,360,209.

50.    <u>Tranche B-2 Term Loans</u>. Pursuant to the A&R Prepetition Credit Facility, $35 million of the loans provided by the Lenders pursuant to the Prepetition Credit Facility, together with accrued and unpaid interest thereon, were exchanged for "last-out" term loans in the form of Tranche B-2 Term Loans. The current aggregate amount outstanding on account of the Tranche B-2 Term Loans, including accrued and unpaid interest, is $42,885,401.

---

[3] The Company has approximately $650,000 in additional cash and cash equivalents that is subject to restrictions.

51.    Pursuant to the A&R Prepetition Credit Facility, the Tranche B-1 Term Loans and the Tranche B-2 Term Loans are required to be paid on or before the Term Loan Maturity Date (as defined in the A&R Prepetition Credit Facility) of May 24, 2022.  The Company is not currently making debt service payments.

**B.    Unsecured Obligations**

52.    In the ordinary course of operating their businesses, the Debtors purchase goods and services from thousands of trade creditors.  As of the Petition Date, the Debtors estimate that they owe approximately $12.9 million to third-party trade creditors, landlords, contract counterparties, and other similar parties, approximately $8.6 million in accrued liabilities, and approximately $25.5 million in deferred subsidiary liability.

**Part IV**

**THE SALE OF THE BUSINESSES AND POST-PETITION FINANCING**

53.    In recent months, the Debtors have diligently evaluated, in consultation with their professionals, a number of options to address their operational and financial issues. These efforts have included sharing information and engaging in discussions with the Lenders with the goal of consensually restructuring the Debtors' balance sheet to bring it into line with the Debtors' current debt servicing capabilities.

54.    In January 2019, the Debtors retained Greenhill & Co., LLC ("Greenhill") to market F+W Books to viable parties who may be interested in purchasing the business line as a going-concern business.  Greenhill spent significant time with the Company's management team preparing historical and budgeted financial information for F+W Books, including revenue and direct expense details, to assist parties in their assessment of the business.  Greenhill also worked    with    the    Company's    management    to    prepare    a    confidential    information

memorandum. Commencing in February 2019, Greenhill initiated a sale process for F+W Books. As of February 20, 2019, Greenhill had contacted thirteen parties. Greenhill will continue its marketing process during the Chapter 11 Cases, and the Debtors hope to consummate a sale of F+W Books by the end of May.

55.     In February of 2019, the Company began working with FTI's investment banking team to focus on preparing and running the Communities sale process. Prior to the Petition Date, FTI's banking team, which specializes in sales of distressed businesses, spent significant time with the Company's management team, developed an executive summary for Communities, developed a financial model and forecast, created an initial buyer list from FTI's and the Company's relationships, prepared an electronic data site, and began working on a Confidential Information Memorandum and management presentation. FTI anticipates launching the sale process for Communities this week, and the Debtors hope to consummate a sale of Communities by the middle of June.

56.     To implement their planned sale process and preserve asset value during the pendency of the Chapter 11 Cases, the Debtors realized that they would require an infusion of new liquidity. The Debtors' critical financial situation required them to seek immediate access to credit to enable the continuation of normal business operations and the preservation of value of their estates for the benefit of all stakeholders until a going-concern sale of substantially all of the Debtors' assets could be completed. The absence of such immediate working capital would irreparably harm the Debtors, their estates, and stakeholders by compromising the Debtors' ability to finance basic operations, maintain business relationships, and pay employees while simultaneously pursuing efforts to maximize value for the estates.

57.    Prior to the Petition Date, the Debtors, with the assistance of their professional advisors, evaluated strategic and financial options to improve postpetition liquidity. Upon being made aware of the Debtors' restructuring efforts, a small subset of the Debtor's existing Lenders (the "DIP Lenders") offered to provide the Debtors with the DIP Facility (as defined below) to support the Debtors' sale process within the context of a chapter 11 proceeding.

58.    The Debtors and their advisors had considered potential sources of funding other than the DIP Lenders.  During our efforts to identify alternative financing, the Debtors' advisors, under my direction, contacted fifteen parties that are in the business of providing debtor in possession financing.  Non-disclosure agreements were provided to a sub-set of this group to further explore financing.  Due to, among other things, the current capital structure of the Company, the challenges of attempting to prime the liens of the Lenders, and the current state of the print media business, no other offers have been received.

59.    Accordingly, to finance the Chapter 11 Cases, and provide sufficient liquidity to preserve the value of the Debtors' businesses while the sale process is pending, the Debtors negotiated the terms of debtor-in-possession financing to be provided by the DIP Lenders.  After extensive arm's-length, good faith negotiations, the DIP Lenders agreed to provide the Debtors with the DIP Facility (defined below).  The DIP Lender's proposal should provide the Debtors with sufficient liquidity to conduct a fulsome and flexible sale process so that they may ultimately commence a competitive auction for the sale of the Debtors' businesses under section 363 of the Bankruptcy Code for the highest and best consideration, and thereby maximize the value of the Debtors' estates.

60.     With respect to DIP financing, the DIP Lenders have committed to enter into a senior secured priming debtor-in-possession credit facility (the "<u>DIP Facility</u>") that will consist of a $8 million senior secured, super-priority, debtor-in-possession term credit facility that will be used to provide the Debtors with sufficient funding to sustain their operations during the Chapter 11 Cases.  $2 million of this commitment will be available immediately upon entry of an order of the Court approving the DIP Facility on an interim basis.

61.     Given their challenging financial position, the Debtors' paramount goal is to maximize the value of their estates for the benefit of their creditor constituencies and other stakeholders.  Following careful consideration of all alternatives, the Debtors have determined that implementation of the sale process in accordance with the milestones and other terms set forth in the DIP Credit Agreement represents the best way to maximize the value of the Debtors' businesses.  The Debtors anticipate that they will close the sales of substantially all of their businesses within the next three to four months.  I believe that implementing these transactions, following additional market-testing during the Chapter 11 Cases, will maximize the value of the Debtors' estates for the benefit of all of their stakeholders.

## Part V

## <u>SUPPORT FOR RELIEF REQUESTED IN FIRST DAY MOTIONS</u>

62.     Concurrently with the filing of their chapter 11 petitions, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to maximize the value of their estates while the Chapter 11 Cases are pending.  The facts set forth in the First Day Motions are incorporated herein in their entirety.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring that value is preserved as they transition into chapter 11.

63.     I have reviewed each of the First Day Motions, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors.  The relief sought in each of the First Day Motions constitutes a critical element in the successful implementation of the Debtors' efforts to maximize creditor recoveries.  To this end, Debtors have filed the following First Day Motions:

i.   *Debtors' Motion for an Order, Pursuant to Bankruptcy  Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases*

ii.   *Debtors' Application for Entry of an Order Appointing Epiq Bankruptcy Solutions, LLC as Claims Agent Effective as of the Petition Date*

iii.   *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363, and 364 of the Bankruptcy Code, (I) Authorizing (A) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Broker Fees; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

iv.   *Debtors' Motion for Interim And Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Granting Related Relief, Including Setting a Final Hearing Related Thereto*

v.   *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a), and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

vi.   *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363, 1107(a) and 1108 of the Bankruptcy Code: (I) Authorizing the Debtors to Pay Certain Prepetition Critical Vendor Claims; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Certain Related Relief*

    vii.   *Debtors' Motion for Entry of Order Authorizing Payment of Prepetition Claims of Foreign Vendors*

    viii.   *Debtors' Motion for Entry of an Order Authorizing (A) the Debtors to (I) Pay Prepetition Employee Wages, Salaries, and Other Compensation, and Related Costs; (II) Pay Prepetition Employee Business Expenses; (III) Contribute to Prepetition Employee Benefit Programs and Continue Such Programs in the Ordinary Course; and (IV) Pay Workers' Compensation Obligations; and (B) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

    ix.   *Debtors' Motion for Entry of an Order Authorizing Debtors to Honor and Continue Certain Customer Programs and Customer Obligations in the Ordinary Course of Business*

    x.   *Debtors' Motion for Interim and Final Orders Authorizing (A) Continued Use of Cash Management System; (B) Maintenance of Existing Bank Accounts; (C) Continued Use of Existing Business Forms; (D) Continued Performance if Intercompany Transactions in the Ordinary Course of Business and Grant of Administrative Expense Status for Postpetition Intercompany Claims; and (E) Interim Suspension of Section 345(b) Deposit and Investment Requirements*

    xi.   *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Lenders; (III) Providing Superpriority Administrative Expense Status; (IV) Scheduling Final Hearing; and (V) Granting Related Relief*

64.    It is my belief that the relief sought in each of the First Day Motions is necessary for a successful sale process and to maximize creditor recoveries. It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, *i.e.* the First Day Motions seeking relief related to the Debtors' obligations to their employees, taxing authorities, vendors, service providers, customers, banks, and insurers, the relief requested is essential to the Debtors' sale efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates. The success of the Chapter 11 Cases depends upon the Debtors' ability to maintain their operations and maximize estate value. The relief requested in the First Day Motions is a critical component

of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful chapter 11 process.

**<u>CONCLUSION</u>**

65.    I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders and respectfully request that the Court grant all relief requested in the First Day Motions and such other further relief as may be just.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: <u>March 10</u>, 2019

_____

Gregory J. Osberg
Chief Executive Officer

**EXHIBIT A**

Corporate Organizational Chart

01:24165872.12

## *Company Structure*

