# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| F+W MEDIA, INC., *et al.*,[1] | Case No. 19-10479 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND
(B) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED LENDERS; (III) PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS; (IV) SCHEDULING FINAL HEARING; AND
(V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

submit this motion (this "Motion"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2),

364(c)(3), 364(d)(1), and 364(e) of title 11 of the United States Code (the "Bankruptcy Code")

and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") seeking entry of an interim order, substantially in the form attached hereto

as Exhibit A (the "Interim Order") and a final order (the "Final Order" and, together with the

Interim Order, the "Proposed Orders") (i) authorizing the Debtors, as borrowers (the

"Borrowers"), to (a) obtain a senior secured, super-priority, debtor-in-possession term credit

facility (the "DIP Facility") pursuant to that certain Debtor-in-Possession Credit Agreement (as

amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit

Agreement"), a copy of which is attached hereto as Exhibit B, by and among (a) the Borrowers,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: New Publishing Holdings, Inc. (4101); F+W Media, Inc. (5953); F+W Subscription Services, LLC (3663); F+W Trade Show & Events, LLC (0268); F+W OH e-Commerce, LLC (3762); Former Quilting Inc. (7854); The Writers Store, Inc. (6951); F & W Media International Limited (UK Registered No. 04003207); and F+W NH e-Commerce, LLC (9731). The headquarters for the above-captioned Debtors is 1140 Broadway, 14th Floor, New York, New York 10001.

(b) Fortress Credit Co. LLC as administrative agent (the "<u>DIP Agent</u>"), and (c) the lenders from time to time party thereto (the "<u>DIP Lenders</u>") on the terms described herein; (ii) granting adequate protection to the Debtors' prepetition secured lenders (the "<u>Prepetition Lenders</u>"); (iii) providing superpriority administrative expense status; (iv) permitting use of cash collateral; (v) scheduling a hearing to consider approval of this Motion on a final basis (the "<u>Final Hearing</u>"); and (vi) granting related relief.  The facts and circumstances supporting this Motion are set forth in the concurrently filed *Declaration of Gregory J. Osberg in Support of Chapter 11 Petitions and First-Day Motions* (the "<u>First Day Declaration</u>").[2]  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the First Day Declaration.

2.       The legal authority for the relief requested in this Motion is sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 4001-2 and 9013-1.

## BACKGROUND

### A.       General Background

3.       On the date hereof (the "<u>Petition Date</u>"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>").  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these Chapter 11 Cases and no request has been made for the appointment of a trustee or an examiner.

4.       Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

### B.       The Debtors' Prepetition Funded Debt

5.       On July 9, 2013, New Publishing Holdings, Inc. ("<u>Holdings</u>"), F+W Media, Inc. ("<u>F+W Media</u>"), and certain of F+W Media's subsidiaries, including F+W Subscription Services, LLC, F+W Trade Show & Events, LLC, F+W OH e-Commerce, LLC, Former Quilting Inc., The Writers Store, LLC, and F+W NH e-Commerce, LLC (collectively, the "<u>Subsidiary Guarantors</u>"), entered into a credit facility (the "<u>Pre-Petition Credit Facility</u>") that provided for a $125 million term loan to refinance certain debt and $10 million for revolving credit and letters of credit to fund operations (the "<u>Loans</u>").  F+W Media was the borrower under the Pre-Petition Credit Facility and the obligations under the Pre-Petition Credit Facility were guaranteed by

Holdings and the Subsidiary Guarantors.  The Loans were secured by liens on all of the assets of Holdings, F+W Media, and the Subsidiary Guarantors.

6.        As a result of continued decline in revenues, F+W Media had to increase its borrowing under the Pre-Petition Credit Facility.  By spring 2017, the total principal amount owed with respect to the Loans was approximately $99 million and F+W Media was in default of certain covenants and payments under the Pre-Petition Credit Facility.

7.        During November and December, 2016, the several lenders party to the Pre-Petition Credit Facility (collectively, the "Lenders") approached Holdings' board of directors to explore possible restructuring options.   As a result of discussions between Holdings' management and representatives of the Lenders over the next five months, the Lenders agreed to an out-of-court restructuring (the "Restructuring") of the Company, immediately after which the Lenders would hold approximately 97% of the equity interests of the new parent company of Holdings, New Publishing Holdings Parent, LLC ("Parent"), while Holdings' existing stockholders would hold approximately 3% of such equity interests.

8.        In order to effectuate the Restructuring, on May 24, 2017, the Pre-Petition Credit Facility was amended and restated (the "A&R Pre-Petition Credit Facility").   The Lenders received 97% of the equity interests in Parent as consideration for forgiving approximately $64 million of the outstanding amounts due under the Pre-Petition Credit Facility and the Lenders exchanged the remaining approximately $35 million of existing terms loans for new "last out" term loans pursuant to the A&R Pre-Petition Credit Facility (the "Tranche B-2 Term Loans").  In addition, under the A&R Pre-Petition Facility, certain of the Lenders agreed to provide $15 million of new "first out" terms loans (the "Tranche B-1 Term Loans") to F+W Media to enable

the Company to pursue certain strategic options designed to streamline operations and increase revenue.

9.     The Tranche B-1 Term Loans and the Tranche B-2 Term Loans are secured by a lien on substantially all of the assets of F+W Media, Holdings, and the Subsidiary Guarantors, and 65% of F+W Media's equity interest in F&W Media International Limited ("F&W UK"). The Lenders do not have a lien on the assets of F&W UK.  The current aggregate amount outstanding on account of the Tranche B-1 Term Loans, including accrued and unpaid interest, is $15,360,209.  The current aggregate amount outstanding on account of the Tranche B-2 Term Loans, including accrued and unpaid interest, is $42,885,401.

10.     Pursuant to the A&R Prepetition Credit Facility, the Tranche B-1 Term Loans and the Tranche B-2 Term Loans are required to be paid on or before the Term Loan Maturity Date (as defined in the A&R Prepetition Credit Facility) of May 24, 2022.  No current debt service payments are being made.

## C.     DIP Facility Overview

### I.     EFFORTS TO OBTAIN FINANCING

11.     As more fully described in the First Day Declaration, the Debtors are unable to maintain their normal operations based on operating cash flow and, in consultation with FTI Consulting, Inc. ("FTI"), who will be providing the Debtors with a chief restructuring officer and certain additional personnel, determined that additional funding would be necessary to finance postpetition operations, including payroll and other essential payments, as well as other administrative costs in a bankruptcy.

12.     The Debtors' critical financial situation required them to seek immediate access to credit to enable the continuation of normal business operations and the preservation of the value

of their estates for the benefit of all stakeholders until a going-concern sale of substantially all of the Debtors' assets could be completed.  The absence of such immediate working capital would irreparably harm the Debtors, their estates, and stakeholders by compromising the Debtors' ability to finance basic operations, maintain business relationships, and pay employees while simultaneously pursuing efforts to maximize value for the estates.

13.     Prior to the Petition Date, the Debtors, with the assistance of their professional advisors, evaluated strategic and financial options to improve postpetition liquidity.  Indeed, as set forth in greater detail in the First Day Declaration, before agreeing to enter into the DIP Credit Agreement with the DIP Lenders, the Debtors approached a number of potential debtor-in-possession financing lenders in the hopes of soliciting meaningful debtor-in-possession proposals.  However, financing on better terms was not available to the Debtors.  Following arm's length negotiations with the DIP Lenders, the Debtors reached an agreement on the terms set forth in the DIP Credit Agreement and described in this Motion.

14.     Throughout these efforts, the Debtors were unable to obtain the necessary financing on an unsecured, administrative expense basis under section 503(b)(1) of the Bankruptcy Code.  The Debtors have further been unable to obtain credit on an unsecured basis, but enjoying (a) "superiority" over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) secured solely by a lien on property of the Debtors' estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors' estates that is subject to other liens.  Although the Debtors attempted to secure financing on better terms, the DIP Lenders were unwilling to extend funding without obtaining superpriority claim status, perfected security interests in liens on the Debtors'

existing and after-acquired assets with the priorities set forth in the Interim Order, and the other protections set forth in the Interim Order.

15.     Without the DIP Facility and the authorized use of Cash Collateral, the Debtors do not have sufficient available sources of working capital to finance their business operations in the ordinary course of business or to fund other administrative expenses in the Chapter 11 Cases. The DIP Lenders have agreed to provide liquidity that the Debtors believe is an essential component of their efforts to preserve their business as a going concern, maximize the value of their estates in anticipation of a sale of substantially all of the Debtors' assets, and successfully administer the Chapter 11 Cases.  As a result, by this Motion, the Debtors seek authorization to obtain postpetition financing pursuant to the terms set forth in this Motion, the DIP Credit Agreement, the Interim Order, and the Final Order.

## II.     MATERIAL TERMS OF THE DIP FACILITY

16.     Pursuant to Bankruptcy Rule 4001(c)(1) and Local Rule 4001-2, the significant terms of the DIP Credit Agreement are as follows:[3]

| MATERIAL TERMS OF DEBTORS' POSTPETITION FINANCING | |
|---|---|
| **Borrowers**<br>DIP Credit Agreement, Preamble. | New Publishing Holdings, Inc., F+W Media, Inc., F+W Subscription Services, LLC, F+W NH e-Commerce, LLC, F+W OH e-Commerce, LLC, Former Quilting Inc., The Writers Store, Inc., F+W Trade Show & Events, LLC, and F&W Media International Limited |
| **DIP Lenders**<br>DIP Credit Agreement, Section 1.01. | Each of the Persons listed on Schedule 1.01 to the DIP Credit Agreement and each assignee that becomes a party to the DIP Credit Agreement as a Lender by assuming all or a portion of the Lending Commitments as set forth in Section 9.04(b) of the DIP |

---

[3] For a complete description of the terms and conditions of the DIP Facility, reference is made to the DIP Credit Agreement, the Interim Order, and the Final Order, the terms of which shall control in all respects.  This summary is qualified entirely by the provisions of the DIP Credit Agreement, the Interim Order, and the Final Order, and interested parties are strongly encouraged to read the operative documents and such orders.  Capitalized terms used, but not otherwise defined, in this summary shall be given the same meanings ascribed to them in the DIP Credit Agreement, the Interim Order, and the Final Order, as applicable.

| | |
|---|---|
| | Credit Agreement. |
| **DIP Administrative Agent**<br>DIP Credit Agreement, Preamble. | Fortress Credit Co. LLC |
| **Total Lending Commitments;**<br>**Making of Term Loans**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, definition of "Total Lending Commitments"; DIP Credit Agreement §2.01(a); Interim Order, ¶¶ I, 4(a) | The aggregate amount of the DIP Facility is $8.0 million.<br><br>The interim borrowing limit is $2.0 million. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii); DIP Credit Agreement, § 2.05 | Each Term Loan shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable) at a rate of Eurodollar Base Rate plus 10% per annum. |
| **Default Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii); DIP Credit Agreement, § 2.06 | DIP Interest Rate *plus* 2.00% per annum. |
| **Fees and Expenses**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>DIP Credit Agreement, §§ 2.07; 9.03; Interim Order, ¶ 4(d) | <u>Closing Fee</u>.  A Closing Fee of twenty percent (20%) of the Total Lending Commitment shall be fully earned and be capitalized and added to the principal balance of the Term Loans on the Effective Date; *provided, however*, that the Closing Fee, related interest and charges, shall not be included for purposes of determining whether the Borrowers have exceeded the Lending Commitment.<br><br><u>Unused Line Fee</u>.  An Unused Line Fee of 2.0% per annum would be charged on the average unused portion of the DIP Credit Facility, earned and payable monthly.<br><br>Section 9.03 of the DIP Credit Agreement provides that the Borrowers shall pay the reasonable out-of-pocket expenses incurred by the Agent, including the reasonable fees, charged, and disbursements of counsel for the Agent and the Lenders, among other things. |
| **Termination/Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B) | "<u>Termination Date</u>" means the earliest to occur of (i) thirty (30) days after the Effective Date unless a Final Borrowing Order has |

| | |
|---|---|
| *See* DIP Credit Agreement, definitions of "Termination Date" and "Maturity Date"<br><br>Interim DIP Order ¶8(c) | been entered by the Bankruptcy Court on or before the expiration of such thirty-day period; (ii) the Maturity Date; (iii) the Effective Date of a chapter 11 plan; and (iv) the occurrence of an Event of Default.<br><br>"Maturity Date" means the date that is 150 days after the Petition Date. |
| **Liens, Collateral, and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), (vii) & (xi)<br><br>Local Rule 4001-2(a)(i)(D), (G), (a)(ii)<br><br>DIP Credit Agreement §2.13; Interim Order, ¶ 6. | Subject to entry of the DIP Orders, the DIP Credit Agreement, the DIP Orders, and the other Loan Documents (a) will create in favor of the Agent, on account of the Lenders, a superpriority claim under section 364(c), 364(d), and 507(b) of the Bankruptcy Code that shall have priority over any and all administrative claims specified in Bankruptcy Code, including claims pursuant to sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Borrowing Order), 507(a), 507(b), 546(c), 546(d), 726, 1114, or otherwise, subject only to the Professional Fee Carve Out and (b) constitute a grant by the Borrowers to the Lenders of a fully perfected and unavoidable first priority Lien on, and security interest, in, all right, title, and interest of the Borrowers thereunder in all Collateral as security for the Obligations, in each case prior and superior in right to any other Person, other than (x) Permitted Prior Liens and (y) the Professional Fee Carve Out, and no further recording, filing, or other action of any kind will be required in connection with the creation, perfection or enforcement of such security interests and Liens. |
| **Carve-out**<br><br>Local Rule 4001-2(a)(i)(F)<br><br>DIP Credit Agreement, Section 1.01, Definition of "Professional Fee Carve Out"; Interim Order, ¶ 11 | "Professional Fee Carve Out" means an amount equal to: (i) quarterly fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6), plus interest, if applicable, at the statutory rate, and any fees payable to the clerk of the Bankruptcy Court; (ii) the claims of counsel to the Borrowers, whose retention is approved during the Chapter 11 Cases pursuant to sections 327 and 328 of the Bankruptcy Code, (collectively, the "Debtors' Professionals") for unpaid fees and expenses which were incurred at any time on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $125,000; plus the claims of the Debtors' Professionals for unpaid fees and expenses which were incurred at any time on and after the Petition Date and before the Carve-Out Trigger Date, but such claims shall not exceed the aggregate amounts for such Debtors' Professionals expressly set forth in the Approved Budget for such period; provided that, in each case, such fees and expenses of the Debtors' Professionals are ultimately allowed on a final basis by the Bankruptcy Court under sections |

| | |
|---|---|
| | 330 and 331 of the Bankruptcy Code and are not excluded from the Carve-Out under any DIP Order; and (iii) the claims of counsel to the Committee, whose retention is approved during the Chapter 11 Cases pursuant to sections 1103 of the Bankruptcy Code, (collectively, the "Committee's Professionals" and together with the Debtors' Professionals, the "Retained Professionals") for unpaid fees and expenses incurred at any time on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $25,000; plus the claims of the Committee's Professionals for unpaid fees and expenses which were incurred at any time on and after the Petition Date and before the Carve-Out Trigger Date, but such claims shall not exceed the aggregate amounts for such Committee's Professionals expressly set forth in the Approved Budget for such period; provided that, in each case, such fees and expenses of the Committee's Professionals are ultimately allowed on a final basis by the Bankruptcy Court under sections 330 and 331 of the Bankruptcy Code and are not excluded from the Carve-Out under and DIP Order. |
| **Events of Default** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> DIP Credit Agreement, § 7.01 | Section 7.01 of the DIP Credit Agreement sets forth the Events of Default thereunder, including, among others, failure to pay any Term Loan or the interest thereon when due. |
| **Adequate Protection** <br> Bankruptcy Rule 4001(c)(1)(B)(ii) <br><br> Local Rule 4001-2(a)(i)(E) <br><br> Interim Order, ¶ 12; DIP Credit Agreement § 5.14(b) | The Interim Order provides for the following adequate protection for the Pre-Petition Lenders: <br><br> As adequate protection to the Pre-Petition Lenders which are "Tranche B-1 Term Lenders" (as defined in the Pre-Petition Credit Agreement), they are hereby granted: <br> (i) replacement liens on all collateral granted under the DIP Facility, junior only to the liens granted under the DIP Facility (including, for the avoidance of doubt, the Prior Permitted Liens and the Carve-Out); <br> (ii) adequate protection payments equal to the amount of non-default contractual interest that accrues from and after the Petition Date under the Pre-Petition Debt held by such Pre-Petition Lenders and which shall be paid in kind by being capitalized and treated as principal on the first business day of each month; *provided, however*, that such adequate protection payments shall not constitute administrative claims against the estates and shall be treated as part of the Tranche B-1 obligations under the Pre-Petition Credit Agreement, and <br> (iii) a superpriority administrative expense claim, to the |

|  | extent of diminution of value of their collateral, junior only to the Super-Priority Claim and the Carve-Out.<br><br>As adequate protection to the Pre-Petition Lenders which are "Tranche B-2 Term Lenders" (as defined in the Pre-Petition Credit Agreement), they are hereby granted replacement liens on all collateral granted under the DIP Facility, to the extent of diminution of value of their collateral, junior only to the liens granted under the DIP Facility (including, for the avoidance of doubt, the Prior Permitted Liens and the Carve-Out) and the adequate protection liens granted to the Tranche B-1 Term Lenders. |
|---|---|
| **Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Interim Order, ¶ 8 | Paragraph 8 of the Interim Order provides that the automatic stay shall be vacated as to the DIP Agent and the DIP Lenders to permit such parties to perform such actions described in or permitted in the Interim Order. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)<br><br>Local Rule 4001-(2)(a)(i)(B) | There is no challenge period and pre-petition liens may be challenged at any point, subject to paragraph 16 of the Interim Order "Limitation on Use of DIP Financing and DIP Collateral". |
| **Limitation on Use of Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B), (B)(ii)<br><br>DIP Credit Agreement,<br>§ 5.11; Interim Order, ¶ 16 | The proceeds of the Borrowings under the DIP Credit Agreement may only be used (i) to finance working capital and general business purposes of the Borrowers, and (ii) for the payment of expenses arising in the Chapter 11 Cases as may be approved by the Bankruptcy Court (to the extent required) and, in all instances and subject to Section 5.13, shall be in accordance with the Approved Budget.<br><br>Section 5.11 of the DIP Credit Agreement sets forth certain other restrictions on the use of the proceeds of the Borrowings. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>DIP Credit Agreement § 5.13 | The use of Borrowings under the DIP Credit Agreement is limited in accordance with the terms of the Approved Budget. |
| **Conditions Precedent to Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | The Effective Date of the DIP Credit Agreement is subject to the satisfaction of usual and customary conditions precedent, including entry of the Interim Order. |

| | |
|---|---|
| DIP Credit Agreement, § 6.01<br><br>Interim DIP Order ¶4(e) | |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Local Rule 4001-2(a)(1)(C)<br><br>Interim Order, ¶ 9 | Subject to entry of the Final Order, no costs or expenses of administration or other charge, lien, assessment or claim incurred at any time (including, without limitation, any expenses set forth in the Approved Budget) by the Debtors or any other person or entity shall be imposed or charged against any or all of the DIP Agent, DIP Lenders, their respective claims, or their respective collateral under Section 506(c) of the Bankruptcy Code or otherwise, and the Debtors, on behalf of their estates, waive any such rights. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix)<br><br>DIP Credit Agreement, § 9.03(b) | The Borrowers are required to indemnify the Agent and each Related Party of the Agent in accordance with the terms of the DIP Credit Agreement. |
| **Sale Process Covenants**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, § 7.01(x) | Section 7.01(x) of the DIP Credit Agreements set forth certain sale milestones and a deadline by which the Debtors must file a plan. The Debtors' failure to achieve these milestones is considered an Event of Default. |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br><br>Local Rule 4001-2(a)(i)(D)<br><br>Interim Order, ¶6(a) | Subject to entry of the Interim Order, the DIP Lenders shall have liens on avoidance actions under section 549 of the Bankruptcy Code.<br><br>Subject to entry of the Final Order, the DIP Lenders shall have liens on all gross proceeds and recoveries from actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550, 552(b) and 553 of the Bankruptcy Code (collectively, the "Avoidance Actions") |

## III.    ADDITIONAL PROVISIONS

17.    In accordance with Local Rule 4001-2(a)(i), the following provisions of the DIP

Credit Agreement are highlighted below:

> **a. Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection to the prepetition secured creditors.**

12

There are no such provisions.

**b. Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five days (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters.**

There are no such provisions.

**c. Provisions that seek to waive, without notice, whatever rights the Debtors' estate may have under 11 U.S.C. § 506(c).**

As noted above, there is a section 506 waiver that is subject to entry of the Final Order.

**d. Provisions that immediately grant to the prepetition secured creditors liens on the Debtors' claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549.**

As noted, above, the DIP Lenders will have liens on the proceeds of actions under section 549 of the Bankruptcy Code upon entry of the Interim Order. The DIP Lenders will have liens on the proceeds of Avoidance Actions upon entry of the Final Order.

**e. Provisions that deem prepetition debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b).**

There are no such provisions.

**f. Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.**

As noted above, both the Debtors and any creditors' committee are subject to the Carve-Out, which is tied to the budget (which includes different budgeted amounts for each).

**g. Provisions that prime any secured lien absent consent of the affected lienor.**

The liens securing the DIP Facility will prime certain of the Prepetition Lenders' prepetition liens, but the Prepetition Lenders have consented to this priming.

**h. Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).**

There are no such provisions.

## **RELIEF REQUESTED**

18.     By this Motion, the Debtors request entry of the Interim Order and the Final Order.

(a)     authorizing the Debtors to obtain, as Borrowers, the DIP Facility pursuant to the terms of that certain DIP Credit Agreement by and among (a) the Borrowers, (b) the DIP Agent, and (c) the DIP Lenders;

(b)     authorizing the Debtors to execute and deliver the DIP Credit Agreement and all other related documents and agreements, including security agreements, deposit account control agreements, pledge agreements, guaranties, and promissory notes (collectively, the "DIP Loan Documents"), and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(c)     authorizing the Debtors, subject to the terms, conditions, and limitations set forth in the DIP Credit Agreement, the DIP Loan Documents, and the Interim Order, to borrow up to an aggregate principal amount of $2,000,000 upon entry of the Interim Order, and up to an aggregate principal amount of $8,000,000 upon entry of the Final Order.

(d)     authorizing the Debtors to use Cash Collateral as contemplated by section 363 of the Bankruptcy Code on the terms and conditions set forth in the DIP Credit Agreement, the DIP Loan Documents, and the Interim Order;

(e)     authorizing the Debtors to grant adequate protection to the Prepetition Lenders with the relative priorities set forth herein, consisting of replacement liens and superpriority claims, as well as various other benefits more fully described herein;

(f)     providing the DIP Agent (for the benefit of the DIP Lenders) with superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code;

(g)     granting to the DIP Agent (for the benefit of the DIP Lenders) perfected security interests in and liens on all of the DIP Collateral (as defined below), pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the

Bankruptcy Code, to secure all of the DIP Obligations (as defined below), subject only to Permitted Liens (as defined below) and prior payment of the Carve-Out (as defined below);

(h)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and the Interim Order (and, upon its entry, the Final Order);

(i)    scheduling a Final Hearing to consider the relief requested in this Motion on a final basis no later than 30 days following entry of the Interim Order;

(j)    granting related relief.

## BASIS FOR RELIEF REQUESTED

### I.    APPROVAL OF THE DIP FACILITY IS APPROPRIATE UNDER SECTION 364 OF THE BANKRUPTCY CODE

19.    Section 364 of the Bankruptcy Code gives bankruptcy courts the power to authorize postpetition financing for a chapter 11 debtor in possession.  To the extent a debtor requires credit, but is unable to obtain such credit on unsecured terms, the Bankruptcy Code offers a debtor in possession flexibility to provide various protections to induce a postpetition lender to extend credit to a debtor in possession.  Specifically, a postpetition lender can be granted a superpriority administrative expense claim, a lien on unencumbered property, a junior lien on encumbered property, and, if the court finds that the interests of the holders of existing liens are adequately protected, a priming lien on encumbered property.  11 U.S.C. § 364(c), (d). *See In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), *aff'd*, 146 B.R. 312 (B.A.P. 9th Cir. 1992) (quoting *Unsecured Creditors' Comm. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 603 (6th Cir. 1987)) ("Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend postpetition

credit.'"").  The DIP Credit Agreement satisfies applicable standards for approval under section 364 of the Bankruptcy Code.

      *(a)*      *The DIP Credit Agreement Satisfies Section 364(c) of the Bankruptcy Code*

     20.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether: (a) the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.  *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *In re The Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).  Section 364 of the Bankruptcy Code does not impose upon a debtor in possession the onerous duty to seek unsecured credit from every possible lender before concluding that such credit is not available.  *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  This is true especially when time is of the essence.  *See, e.g.*, *id.*; *In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987).

     21.     As described in this Motion and in the First Day Declaration, the Debtors are in critical need of postpetition debtor-in-possession financing.  Throughout the Chapter 11 Cases, the Debtors' operating expenses will exceed their cash generation from postpetition operations alone.  In order to continue paying for basic business operating expenses, the Debtors needed to search for postpetition financing.  The Debtors searched for such financing on the most favorable terms, including by marketing the debtor-in-possession financing to multiple lenders over a course of several weeks in an effort to solicit meaningful debtor-in-possession financing proposals.  The Debtors submit that the terms and conditions of the DIP Facility are fair and

reasonable.  Throughout these efforts, the Debtors were unable to obtain the necessary financing on an unsecured, administrative expense basis under section 503(b)(1) of the Bankruptcy Code. Although the Debtors attempted to secure financing on better terms, the DIP Lenders were unwilling to extend additional funding without obtaining superpriority claim status, perfected security interests in liens on the Debtors' existing and after-acquired assets with the priorities and protections set forth in the Interim Order.

22.     As a condition to extending the DIP Facility that the Debtors need, the DIP Lenders require the protections contained in sections 364(c) and 364(d) of the Bankruptcy Code. Specifically, the DIP Facility will be secured, in each case subject to the Carve-Out and the Permitted Prior Liens, by first priority, valid, binding, enforceable, unavoidable and fully perfected security interests and liens (collectively, the "DIP Liens") in, against, and upon the DIP Collateral, and excluding Avoidance Actions, but, subject to entry of the Final Order, including the Avoidance Actions Proceeds.  In addition to the DIP Liens, the DIP Lenders will be granted, for all DIP Obligations, an allowed super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code against the Debtors and their estates.  The Debtors submit that the terms and conditions of the DIP Facility presented herein was the most favorable financing available under the circumstances.

23.     The DIP Facility provides the funding necessary for the Debtors to sell substantially all of their assets as a going concern.  Without the DIP Facility, the Debtors may be required to cease payments to fund critical business operating expenses, such as payroll and vendor payments, which would destroy a substantial portion of the going concern value of the Debtors' estates.

*(b)      The DIP Credit Agreement Satisfies Section 364(d) of the Bankruptcy Code*

24.      The DIP Credit Agreement and the proposed Interim Order also provide that the DIP Liens shall have priming liens on all of the assets of the Debtors (except for Permitted Prior Liens) and shall have priority over the Pre-Petition Credit Liens and therefore is subject to approval under section 364(d) of the Bankruptcy Code.  Section 364(d)(1) of the Bankruptcy Code authorizes a debtor-in-possession to incur superpriority senior secured priming liens if: (a) the debtor is unable to obtain such credit otherwise, and (b) the interests of the secured creditors whose liens are being primed by the postpetition financing are adequately protected. *See* 11 U.S.C. §§ 364(d)(1).  As described above, the Debtors are unable to obtain viable financing on terms more favorable than the DIP Credit Agreement.  Further, as described below, the Interim Order contemplates a fair adequate protection package which was consented to by the Pre-Petition Lenders.  Accordingly, the Debtors submit that the proposed DIP Facility satisfies the requirements of section 364(d) of the Bankruptcy Code.

## II.      THE COURT SHOULD APPROVE THE DEBTORS' USE OF CASH COLLATERAL

25.      Section 363 of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral, providing, in pertinent part, that "[t]he trustee may not use, sell, or lease cash collateral . . . unless – (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtors to use cash collateral so long as the applicable secured creditor consents or is adequately protected.  *See In re McCormick*, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to that the secured creditor's interest in

the cash collateral is adequately protected); *see also In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 721 (Bankr. D. Del. 1996) (holding that creditors were adequately protected and allowing debtor to use cash collateral); *In re Atrium Corp.*, 2010 WL 2822131, at \*6 (Bankr. D. Del. Mar. 17, 2010) (authorizing debtor's use of cash collateral and granting creditor adequate protection).

26.     The Debtors have satisfied the requirements of section 363(c)(2) of the Bankruptcy Code and should be authorized to use the Cash Collateral.  The Prepetition Lenders have consented to the use of the Cash Collateral.  In addition, the Prepetition Lenders' interests in the Cash Collateral will be adequately perfected, as described further below.  Based upon the foregoing, the Debtors request that the Court authorize the Debtors to use of the Cash Collateral in accordance with the terms set forth in the Interim Order and the DIP Loan Documents.

### III.     THE COURT SHOULD AUTHORIZE THE DEBTORS TO PROVIDE ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS

27.     Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  The propriety of adequate protection is determined on a case-by-case basis.  *See Resolution Tr. Corp. v. Swedeland Dev. Grp (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*), 808 F.2d 1393, 1397 (10th Cir. 1987)); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Columbia Gas Sys., Inc.*, Nos. 91_803, 91_804, 1992 WL 79323, at \*2 (Bankr. D. Del. Feb. 18, 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

28.     Adequate protection shields a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631; *In re Beker Indus.*, 58 B.R. at 736.  Adequate protection is not expressly defined in the Bankruptcy Code.  Rather, section 361 of the Bankruptcy Code provides a non-exclusive list of examples of adequate protection.  The flexibility provided by section 363 provides the Court with discretion in fashioning the protection provided to a secured party.  *See In re Swedeland*, 16 F.3d at 564. Adequate protection may be provided through a "replacement lien" or "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property.  *See* 11 U.S.C. § 361(2), (3).

29.     The Debtors believe that the measures of protection set forth in the DIP Facility constitute adequate protection, both for the granting of priming liens and for the use of cash collateral, to protect the Prepetition Lenders from any diminution in value from the priming of their lines or use of their prepetition collateral.  The Debtors have obtained the consent of the Prepetition Lenders to the priming liens provided in the DIP Facility by offering the following adequate protection package:

30.     As adequate protection to the Pre-Petition Lenders which are "Tranche B-1 Term Lenders" (as defined in the Pre-Petition Credit Agreement), the Debtors agreed to provide (i) replacement liens on all collateral granted under the DIP Facility, junior only to the liens granted under the DIP Facility (including, for the avoidance of doubt, the Prior Permitted Liens and the Carve-Out), (ii) adequate protection payments equal to the amount of non-default contractual interest that accrues from and after the Petition Date under the Pre-Petition Debt held by such Pre-Petition Lenders and which shall be paid in kind by being capitalized and treated as

principal on the first business day of each month; provided, however, that such adequate protection payments shall not constitute administrative claims against the estates and shall be treated as part of the Tranche B-1 obligations under the Pre-Petition Credit Agreement, and (iii) a superpriority administrative expense claim, to the extent of diminution of value of their collateral, junior only to the Super-Priority Claim and the Carve-Out.

31.     As adequate protection to the Pre-Petition Lenders which are "Tranche B-2 Term Lenders" (as defined in the Pre-Petition Credit Agreement), the Debtors agreed to provide replacement liens on all collateral granted under the DIP Facility, to the extent of diminution of value of their collateral, junior only to the liens granted under the DIP Facility (including, for the avoidance of doubt, the Prior Permitted Liens and the Carve-Out) and the adequate protection liens granted to the Tranche B-1 Term Lenders.

32.     Preservation of value generally constitutes the "adequate protection" needed to prime existing liens. *See, e.g.,* Norton, et al., 2 *Norton Bankruptcy Law and Practice 2d.* § 38:7, p.38-17 (1994) (addressing the § 364(d) determination, "[f]actors influencing a court's decision will be the viability of the debtor's business and the need to protect assets against a sharp decline in value"); *Snowshoe*, 789 F.2d at 1087 (§ 364(d) order affirmed on appeal where "the trustee reported that the resort [the collateral] would lose from 50% to 90% of its fair market value if it ceased operations"); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (funds from lender given "priming" lien used to improve collateral is transferred into value. "This value will serve as adequate protection. . . ."); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); *In re Devlin*, 185 B.R. 376, 378 (Bankr. M.D. Fla. 1995) (chapter 11 debtor-motel operator authorized to incur debt with superpriority status to replace air-conditioning unit, boiler, and hot water heaters because such expenses were necessary to

preserve value and maintain operations).  In any event, the only parties that the Debtors are aware of whose liens are being primed are the Prepetition Lenders, who have consented to the priming lien to preserve the going-concern value of their collateral and have been provided with acceptable adequate protection, as discussed above.

33.     The Debtors believe that the foregoing adequate protection reasonably balances the Debtors' need to use the collateral of the estate and the Prepetition Lenders' right to adequate protection under the Bankruptcy Code.  As a result, the Debtors request authority to provide adequate protection to the Debtors' Prepetition Lenders in the form described above.

## IV.     APPROVAL OF THE DIP FACILITY IS SUPPORTED BY THE EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGMENT

34.     Generally, courts give broad deference to business decisions of a debtor in possession.  *See, e.g., Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, a bankruptcy court generally will respect a debtor in possession's business judgment regarding the need for and the proposed use of funds.  As the court noted in *In re Ames Dep't Stores, Inc.*:

> [T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest., 115 B.R. 34, 40 (Bankr. S.D.N.Y 1990).

Without the ability to incur secured debt, the debtor in possession would be placed at a competitive disadvantage and its efforts to reorganize could be seriously impaired.

35.     Here, the Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable.  The Debtors' decision to obtain financing pursuant to the terms of the DIP Facility represents an exercise of sound business judgment in the Debtors' continued effort to maximize the value of their estates as a going concern for all their stakeholders.  Absent such

postpetition financing, the Debtors' ability to continue business operations and maintain the value of their assets prior to closing on a sale of those assets would be severely compromised.

## V.     THE DIP LENDERS ARE ENTITLED TO THE PROTECTIONS OF SECTION 364(e) OF THE BANKRUPTCY CODE

36.     Section 364(e) of the Bankruptcy Code provides that the "reversal or modification on appeal of an authorization . . . to obtain credit or incur debt . . . does not affect the validity of any debt so incurred or any priority or lien so granted, to an entity that extended such credit in good faith." 11 U.S.C. § 364(e).  As previously discussed herein, the terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors and the DIP Lenders. Moreover, the terms and conditions of the DIP Facility are fair and reasonable, and the Debtors' entry into the DIP Credit Agreement is in the best interests of their estates and creditors. Accordingly, the DIP Lenders should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility are later modified, vacated, stayed or terminated by subsequent order of this or any Court, the DIP Lenders will be fully protected with respect to any amounts previously disbursed.

## VI.    THE SECTION 506(c) WAIVER SHOULD BE APPROVED IN THE FINAL ORDER

37.     Under the DIP Credit Agreement and the proposed Interim Order, the Debtors agree to waive any rights to charge costs and expenses against any or all of the DIP Agent, DIP Lenders, their respective claims, or their respective collateral under section 506(c) of the Bankruptcy Code.  The Debtors request that the Court approve the waiver, upon entry of the Final Order.  Such waivers and provisions are standard under financings between sophisticated parties.  As one court noted, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender

under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." *In re Molten Metal Tech., Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000). *See also In re Nutri/Sys. of Fla. Assocs.*, 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights (including 506(c) rights) against the lenders in exchange for valuable consideration).

### VII.    MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED

38.    The DIP Facility and proposed Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Agent and the DIP Lenders to foreclose on the security interests in and liens on any DIP Collateral granted under the Interim Order.

39.    Stay modification provisions of this sort are ordinary features of DIP facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Debtors request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order.

### VIII.    LIENS ON THE PROCEEDS OF AVOIDANCE ACTIONS SHOULD BE APPROVED

40.    The Interim Order, if approved by the Court, will grant the DIP Lenders liens on avoidance actions under section 549 of the Bankruptcy Code. The Final Order, if approved by the Court, will grant the DIP Lenders liens on the Avoidance Action Proceeds. The DIP Lenders required the granting of such liens as a necessary condition to extending financing under the DIP Credit Agreement. The Debtors require the financing under the DIP Credit Agreement to ensure

that their business operations are not interrupted.  Accordingly, it is appropriate to grant such liens for the limited purposes set forth above.

### IX.      IMMEDIATE RELIEF IS JUSTIFIED

41.      Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on a motion to use cash collateral or obtain postpetition financing may not be commenced earlier than fourteen days after service of such motion.  The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such fourteen-day period and to authorize the debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.  The Debtors' cash needs are immediate.  Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors therefore request that the Court (i) authorize the Debtors to obtain and use financing on an interim basis pursuant to the terms of the Interim Order and (ii) schedule a final hearing no later than 30 days from entry of the Interim Order to consider approval of the Debtors' request to obtain and use financing on a final basis pursuant to the terms of the Final Order.

42.      As described above and in the First Day Declaration, the Debtors submit that without access to the DIP Facility, the Debtors will be unable to maintain ongoing operations and will face immediate and irreparable harm to their estates.  In light of the foregoing, the Debtors submit that the requirements of Bankruptcy Rule 4001(b) and (c) have been satisfied and the immediate availability of the DIP Facility pending the entry of the Final Order is appropriate. Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

### X.      NOTICE PROCEDURES AND FINAL HEARING

43.      Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after notice and a hearing and the Debtors may not schedule a hearing to consider the Final Order until

at least seven (7) days after the organizational meeting of the committee contemplated by section 1102 of the Bankruptcy Code.

44.    The Debtors shall promptly mail copies of the Interim Order and notice of the Final Hearing, which fixes the time, date, and manner for the filing of objections, to any known party affected by the terms of the Interim Order and/or Final Order and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall (i) be made in writing setting forth with particularity the grounds thereof, and (ii) filed with the Court and served so as to be actually received no later than seven (7) days prior to the Final Hearing at 4:00 p.m. Eastern by the following: (i) proposed counsel for the Debtors, Young Conaway Stargatt and Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (Attn: Kenneth J. Enos and Elizabeth S. Justison (emails: kenos@ycst.com; ejustison@ycst.com); (ii) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov); and (iii) counsel for the Debtors' postpetition lenders, Halperin Battaglia Benzija, LLP, 40 Wall Street, 37th Floor, New York, New York 10005, Attn: Alan D. Halperin, Esq. (ahalperin@halperinlaw.net); and (iv) any creditors' committee appointed in the Chapter 11 Cases.

## WAIVER OF BANKRUPTCY RULE 6004(h) REQUIREMENTS

45.    Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the Debtors require immediate relief to avoid immediate irreparable harm and continue ordinary business operations for the benefit of all parties in interest.  Accordingly, the Debtors submit that ample cause exists to

justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## <u>RESERVATION OF RIGHTS</u>

46.     Nothing in this Motion: (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (iv) shall be construed as a promise to pay a claim or continue any applicable payments postpetition, which decision shall be in the discretion of the Debtors. Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## <u>NOTICE</u>

47.     The Debtors have provided notice of this Motion to: (a) the U.S. Trustee; (b) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (c) counsel to the Debtors' pre-petition and post-petition lenders; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the Office of the United States Attorney for the District of Delaware; (g) the Banks; (h) all parties known to have asserted a lien or security interest in the Debtors' property; and (i) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).

In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order granting the relief requested herein and granting such other relief as the Court deems just and proper.

Dated:    March 10, 2019
Wilmington, Delaware

/s/ Kenneth J. Enos
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Kenneth J. Enos (No. 4544)
Elizabeth S. Justison (No. 5911)
Allison S. Mielke (No. 5934)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| F+W MEDIA, INC., *et al.*,[1] | Case No. 19-_____ |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. ___** |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING AND USE CASH COLLATERAL; (II) MODIFYING THE AUTOMATIC STAY; AND (III) SCHEDULING A FINAL HEARING

Upon the motion (the "Motion"), of the   debtors and debtors-in-possession (the "Borrowers" or the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") commenced on March 10, 2019 (the "Petition Date"), for entry of an interim order (this "Order") and a final order under sections 105, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), seeking:

> (I)      authorization for the Borrowers to obtain up to $8,000,000 in principal amount of postpetition financing (the "DIP Financing") on the terms and conditions set forth in this Order and the Debtor-in-Possession Credit Agreement to be executed and delivered (as hereafter amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Agreement";[2] and together

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  New Publishing Holdings, Inc. (4101); F+W Media, Inc. (5953); F+W Subscription Services, LLC (3663); F+W Trade Show & Events, LLC (0268); F+W OH e-Commerce, LLC (3762); Former Quilting Inc. (7854); The Writers Store, Inc. (6951); F & W Media International Limited (UK Registered No. 04003207); and F+W NH e-Commerce, LLC (9731).  The headquarters for the above-captioned Debtors is 1140 Broadway, 14th Floor, New York, New York 10001.

[2]  Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the DIP Agreement.  Until the execution and delivery of, and occurrence of the effective date under, such Debtor-in-

with all agreements, documents and instruments delivered or executed in connection herewith or therewith, including, without limitation, the DIP Term Sheet and Approved Budget (as defined in <u>paragraph 3(e)</u> below), in each case as hereafter amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "<u>DIP Documents</u>"), among the Borrowers, the lenders from time to time party thereto (collectively, the "<u>DIP Lenders</u>"), and Cortland Capital Market Services LLC, as administrative agent and collateral agent for itself and the DIP Lenders (in such capacity, the "<u>DIP Agent</u>");

(II)    authorization for the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(III)    authorization for the Debtors to use the Cash Collateral (as defined in <u>paragraph 12</u> below) and all other DIP Collateral (as defined in <u>paragraph 6</u> below), in each case subject to the terms and conditions of this Order; and

(IV)    to schedule, pursuant to Bankruptcy Rule 4001, a final hearing for this Court to consider entry of a final order approving the Motion, which order shall be substantially in the form of this Order and otherwise contain terms and conditions acceptable to the DIP Agent (the "<u>Final Order</u>").

A hearing having been held by this Court on March 12, 2019 (the "<u>Interim Hearing</u>"), and upon the record made by the Debtors at the hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

**IT IS HEREBY FOUND, DETERMINED, ORDERED, AND ADJUDGED THAT**:

1.    *Jurisdiction*.  This Court has core jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

Possession Credit Agreement, the term "DIP Agreement" shall mean the term sheet attached hereto as <u>Exhibit A</u> (together with the exhibits thereto, the "<u>DIP Term Sheet</u>").

01:24256167.1

2.      _Notice_.  On the Petition Date, the Debtors filed the Motion with this Court and pursuant to Bankruptcy Rules 2002, 4001 and 9014, and the Local Bankruptcy Rules of this Court, the Debtors provided notice of the Motion and the Interim Hearing by electronic mail, facsimile, hand delivery or overnight delivery to the following parties and/or to their counsel as indicated below: (i) the Office of the United States Trustee for this District (the "U.S. Trustee"); (ii) the Debtors' twenty (20) largest unsecured creditors; (iii) the DIP Agent; (iv) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (v) the local office for the Internal Revenue Service, and (vi) all other parties requesting to receive notice prior to the date hereof (collectively, the "Notice Parties").  Given the nature of the relief sought in the Motion, this Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law, and no further notice relating to this proceeding is necessary or required.

3.      _Findings Regarding The DIP Financing; Approved Budget_.

(a)      _Good Cause_.  Good cause has been shown for the entry of this Order.  The Debtors have an immediate need to obtain the DIP Financing and to use the DIP Collateral, including the Cash Collateral, in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, make payroll and satisfy other working capital and general corporate purposes of the Debtors, and pay the costs of administering the Chapter 11 Cases.  The DIP Financing and the Debtors' use of the DIP Collateral (including the Cash Collateral) is necessary to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtors' estates.  Accordingly, the Debtors and their estates will suffer immediate and irreparable harm

Page 3

unless the Debtors are immediately authorized to obtain the DIP Financing and use Cash Collateral on the terms and conditions set forth in this Order.

(b)      _No Alternative Sources of Financing_.  The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, this Order and the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.   The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting the DIP Liens (as defined in paragraph 6 below) and the Super-Priority Claims (as defined in paragraph 7 below), in each case on the terms and conditions set forth in this Order and the DIP Documents.

(c)      _Reasonably Equivalent Value_.  The terms of the DIP Financing and the use of the DIP Collateral (including the Cash Collateral) pursuant to this Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.  The Debtors require both additional financing under the DIP Financing and the use of Cash Collateral under the terms of this Order in order to satisfy their postpetition liquidity needs.  After considering all of their alternatives, the Debtors have concluded, in an exercise of sound business judgment, that the financing to be provided by the DIP Agent and the DIP Lenders pursuant to the terms of this Order and the DIP Documents represents the best financing presently available to the Debtors.

(d)      _Good Faith_.  The DIP Documents and the use of the DIP Collateral (including the Cash Collateral) have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors and the DIP Lenders, and their respective

professionals.  All DIP Obligations (as defined in <u>paragraph 4(a)</u> below) have been, and shall be deemed to have been, extended by the DIP Agent and the DIP Lenders in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to, and are hereby granted, the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is stayed, vacated, reversed, amended or modified on appeal or otherwise.

(e)    *Approved Budget*.  Attached hereto as <u>Exhibit B</u> is a budget (the "<u>Initial Approved Budget</u>") setting forth on a line-item basis the Debtors' anticipated cumulative cash receipts and expenditures on a weekly basis and all necessary and required cumulative expenses which the Debtors expect to incur during each week of the Initial Approved Budget.  The Initial Approved Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) prepared by the Debtors and approved by the DIP Agent in writing (each such additional budget, a "<u>Supplemental Approved Budget</u>"), in each case without further notice, motion or application to, order of, or hearing before, this Court (but subject to the objection rights of the U.S. Trustee and the statutory committee of unsecured creditors appointed in the Chapter 11 Cases as provided in <u>paragraph 4(b)</u> below).  The aggregate, without duplication, of all items in the Initial Approved Budget and any Supplemental Approved Budgets shall constitute an "<u>Approved Budget</u>."  The Approved Budget is an integral part of this Order and has been relied upon by the DIP Lenders in deciding to consent, or not otherwise object, to entry of this Order.

(f)    *Immediate Entry of Order*.  The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the

interim relief set forth in this Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and the use of the DIP Collateral (including the Cash Collateral) in accordance with this Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

4.      *Authorization Of The DIP Financing And The DIP Documents.*

(a)      *Interim Amount.* The terms and conditions of the DIP Agreement are hereby approved on an interim basis. The Debtors are hereby authorized to enter into and perform the transactions contemplated by this Order and the DIP Documents and, in the case of the Borrowers, to borrow under the DIP Agreement up to an aggregate principal amount of $2,000,000 of the Loans (the "Interim Amount") for working capital and other general corporate purposes of the Debtors pursuant and subject to the terms and conditions of the Approved Budget, this Order, and the DIP Documents. For purposes of this Order, the term "DIP Obligations" shall mean and include all amounts owing under or in connection with the DIP Agreement or other DIP Documents (including, without limitation, all "Obligations" as defined in the DIP Agreement) and shall include the principal of, interest on, fees, costs, expenses and other charges owing in respect of, such amounts (including, without limitation, any reasonable attorneys', accountants', financial advisors' and other fees, costs and expenses that are chargeable or reimbursable by the DIP Agent or the DIP Lenders under this Order, the DIP Agreement or other DIP Documents), and any indemnity claims, in each case whether contingent or otherwise and whether arising before or after the Petition Date.

(b)      *Further Assurances.* In furtherance of the foregoing and without further notice, motion or application to, order of, or hearing before, this Court, the Debtors are

authorized and directed to perform all acts and to execute and deliver all instruments and documents that are reasonably required or necessary for the Debtors' performance of their obligations under the DIP Documents or this Order, including without limitation:

(i)    the execution and delivery of, and performance of the transactions contemplated by, the DIP Documents;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtors and the DIP Lenders may agree, and no further approval of this Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents; provided, however, that a copy of any material amendment or other modification shall be filed by the Debtors with this Court and served by the Debtors on the U.S. Trustee and the counsel to the statutory committee of unsecured creditors appointed in the Case (the "Committee"), if any, each of whom shall have five (5) business days from the date of such notice within which to object in writing to such material modification or amendment.  If any such party timely objects to such proposed material modification or amendment, then such modification or amendment shall only be permitted pursuant to an order of this Court;

(iii)    the payment to the DIP Agent and the DIP Lenders, as the case may be, of the DIP Obligations as and when due as set forth in this Order or the DIP Documents; and

(iv)    the prompt performance of all other acts required under or in connection with this Order or the DIP Documents, including, without limitation, prompt delivery to the DIP Agent or DIP Lenders (and their respective professionals) of such reporting and financial information and access to the Debtors' books and records, in each case, as may be reasonably requested by the DIP Agent or DIP Lenders from time to time.

(c)    *No Impairment*.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors and be enforceable against the Debtors in accordance with the terms hereof and thereof.  No obligation or liability owed, or payment, transfer or grant of security, to the DIP Agent or any DIP Lender under this Order or any DIP Document shall be stayed, restrained, impaired, disgorged, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law

(including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or be subject to any defense, reduction, setoff, recoupment or counterclaim, whether in the Chapter 11 Cases or any other subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 proceeding if these Chapter 11 Cases are converted to ones under Chapter 7 of the Bankruptcy Code (collectively, the "Successor Case").  The DIP Obligations, once paid by the Debtors, shall be non-refundable.

(d)      *Interest, Fees, Costs and Expenses*.  The DIP Obligations shall bear interest at the rates (including at the default rate after the occurrence of a Specified Event (as defined in paragraph 8 below)), and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Order and the DIP Documents, in each case without further notice, motion or application to, order of, or hearing before, this Court.  The Debtors shall pay on demand all reasonable fees, costs, expenses and other charges payable under the terms of the DIP Documents and subject to the limits set forth therein.  The Debtors shall defend, indemnify, and hold harmless the DIP Agent, the DIP Lenders, and the other Indemnitees (as defined in the DIP Agreement) to the extent set forth in the DIP Documents.  None of such fees, costs and expenses payable pursuant to this Order shall be subject to the guidelines of the U.S. Trustee or separate approval by this Court and no recipient of any such payment shall be required to file any interim or final fee application.  With respect to the professional fees, costs and expenses of the DIP Agent and DIP Lenders, the Debtors shall pay such fees, costs and expenses provided for in this Order promptly (but in any event, no later than twenty (20) days) after the invoices for such fees, costs, and expenses (which invoices may be

redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) shall have been submitted to the Debtors, the U.S. Trustee, and counsel to the Committee, if any.  If any of the Debtors, the U.S. Trustee or the Committee objects to the DIP Agent's or the DIP Lenders' entitlement to the amounts sought or the reasonableness of such amounts, the objecting party shall so notify the DIP Agent in writing within seven (7) days of the objecting party's receipt of the applicable invoice, and the dispute shall be resolved by this Court (if not consensually resolved by the DIP Agent and the objecting party).  In the event of an objection to any such amounts, the Debtors shall make payment of any portion of the amount that is not subject to dispute, with the balance payable upon consensual resolution or resolution by this Court.

(e)     _Conditions Precedent_.  In addition to any conditions precedent contained in the DIP Documents, it is a condition precedent to DIP Agent's and DIP Lenders' willingness to provide the DIP Financing that this Order shall have been entered by this Court (with the Initial Approved Budget) and such Order and Initial Approved Budget shall be in form and substance acceptable to DIP Agent.

(f)     _Authorized Signatories_.  The signature of Gregory A. Osberg and/or Michael Healy, officers of the Debtors, appearing on any one or more of the DIP Documents shall be sufficient to bind the Debtors and their estates thereto.  No board of directors, member, shareholder or other corporate approval or resolutions shall be necessary or required to

consummate, effect, or validate the transactions contemplated in the DIP Documents or in this Order.

5.     *Permitted Use*.

(a)     *Generally*.  Notwithstanding anything in this Order to the contrary, the Debtors may use the Cash Collateral and proceeds of the DIP Financing, and incur DIP Obligations, solely in accordance with and pursuant to the financial covenants and other terms and conditions set forth in the DIP Documents and this Order, including, without limitation, pursuant to the Approved Budget, but in all events only until the occurrence of the Termination Date (as defined in paragraph 8 below) and regardless of whether the Debtors have expended the entire amount of Cash Collateral or proceeds of the DIP Financing permitted by the terms of this Order prior to the Termination Date.  Notwithstanding the foregoing, if the DIP Agent or the DIP Lenders in their respective sole discretion advance funds, provide other extensions of credit to the Debtors or permit the use of Cash Collateral in excess of any financial covenants or other terms and conditions set forth in the DIP Documents and this Order (or any other limitations in the DIP Documents, including, without limitation, the Approved Budget), such advances and extensions of credit and uses of Cash Collateral shall be entitled to, and are hereby granted, the rights, priorities, benefits and protections of this Order; provided that the principal amount of the Term Loans shall not exceed the Interim Amount without further order of this Court.

(b)     *No Duty to Monitor Compliance*.  The DIP Agent and the DIP Lenders may assume the Debtors will comply with this Order, the Approved Budget and the DIP Documents and shall not (i) have any obligation with respect to the Debtors' use of Cash Collateral or the use of proceeds of the DIP Financing; (ii) be obligated to ensure or monitor the

Page 10

Debtors' compliance with any financial covenants, formulae, or other terms and conditions of this Order or any DIP Document, or (iii) be obligated to pay (directly or indirectly from the Cash Collateral or DIP Collateral) any expenses incurred or authorized to be incurred pursuant to this Order or any DIP Document or be obligated to ensure or monitor that sufficient Cash Collateral or proceeds of DIP Financing exists to pay such expenses.

(c)    *Restricted Payments*.  Except to the extent approved in writing by the DIP Agent or as expressly provided in this Order or the DIP Documents, the Debtors shall not use any Cash Collateral or proceeds of the DIP Financing to pay any administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code or any prepetition unsecured claims (including prepetition priority unsecured claims).  The Debtors are hereby authorized to make the payments authorized by Order of this Court in connection with the Debtors' "first day" motions, which are identified in the Declaration of Gregory A. Osberg in support of the first day motions.

(d)    *Budget Reports*.  Commencing on the third Thursday after the Petition Date, the Debtors shall provide to the DIP Agent, so as actually to be received on each Thursday, weekly line-by-line certified variance reports for the preceding weekly period and on a cumulative basis from third Thursday after the Petition Date to the report date, comparing actual cash receipts and disbursements to amounts projected in the Approved Budget, in form and scope reasonably acceptable to the DIP Lenders.  The Debtors shall, on Thursday of each week from the Petition Date until the Termination Date, deliver to the DIP Lenders an updated, "rolling" 13-week budget which sets forth by line item updated projected receipts and disbursements for the Debtors during the period commencing from the end of the previous week through and including thirteen weeks thereafter; provided that the Debtors shall still be subject to

Page 11

and be governed by the terms of the Approved Budget then in effect, and the DIP Agent and the DIP Lenders shall, as applicable, have no obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral with respect thereto to the extent that it exceeds the amounts set forth in the Approved Budget, except as expressly permitted in sub-paragraph (e) below.  The Debtors shall, by no later than seven (7) business days prior to the end of the period covered by the then applicable Approved Budget, deliver to the DIP Agent a Supplemental Approved Budget.

      (e)    *Permitted Budget Variance*.  The Debtors shall operate their  businesses in accordance with the applicable Approved Budget, subject to a permitted variance of 10% per line item as measured on a cumulative basis, and the requirements of the Bankruptcy Code and orders of this Court; provided, however, that nothing contained herein shall authorize the Debtors to exceed the total amount of the Interim Amount for the interim period; provided, further, that payment of professional fees set forth in the Approved Budget shall not be subject to the permitted variance or be used for purposes of calculating the permitted variances;[3] rather, the aggregate professional fees incurred during the periods set forth in the Approved Budget shall not exceed the total amount of professional fees for the total period set forth in the Approved Budget, notwithstanding which period set forth in the Approved Budget such professional fees are actually allowed and paid.  For the avoidance of doubt, in the event the aggregate professional fees incurred during the periods do exceed the amounts set forth in the Approved

---

[3] Provided, however that the permitted variance of 10% shall apply to the Debtors' Professional fee line items limited to only Young Conaway and FTI Consulting and solely for the months of March, April and May 2019.

01:24256167.1

Budget, nothing herein shall be deemed a waiver of the rights of such professionals to seek an allowed administrative claim against the Debtors' estates for such amounts.

6.     *DIP Liens*.

(a)     *Generally*.  As security for the full and timely repayment of all of the DIP Obligations, the DIP Lenders are hereby granted by the Debtors, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, first priority, valid, binding, enforceable, unavoidable and fully perfected security interests and liens (collectively, the "DIP Liens") (subject to sub-paragraph (b) hereof and the Carve-Out) in, against, and upon all real and personal, tangible and intangible property and assets of the Debtors of any kind or nature whatsoever, wherever located, whether now existing or hereafter acquired or arising, including, without limitation, all cash (including all Cash Collateral, wherever held), cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, goods, fixtures, real property interests, intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, capital stock of the Debtors' subsidiaries, if any, all inter-company notes held by the Debtors, trademarks, trade names, licenses, rights to payment including tax refund claims, and causes of action, and, upon entry of this Order, including avoidance actions under section 549 and related proceeds and recoveries under section 550 of the Bankruptcy Code in respect of the DIP collateral, and the proceeds, products, offspring, rents and profits of all of the foregoing, including insurance proceeds (all of the foregoing, collectively, the "DIP Collateral"), and excluding actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550, 552(b) and 553 of the

Page 13

Bankruptcy Code (the "Avoidance Actions"), but, subject to entry of the Final Order, including the proceeds and recoveries from the Avoidance Actions (the "Avoidance Action Proceeds").

(b)     *Other Priority Matters*.   Notwithstanding anything in this Order to the contrary, the DIP Liens: (a) shall, pursuant to section 364(c)(2) of the Bankruptcy Code, constitute first priority security interests in and liens on all DIP Collateral that is not otherwise subject to any Permitted Prior Lien (as defined below) and (b) shall, pursuant to section 364(c)(3) of the Bankruptcy Code, be immediately junior in priority to any and all Permitted Prior Liens and (c) shall, pursuant to section 364(d) of the Bankruptcy Code, have a priming lien against all assets of the Debtors except for Permitted Prior Liens (but in all cases the DIP Liens shall be subject and junior to the Carve-Out).   As used herein, the term "Permitted Prior Lien" shall mean any valid, enforceable, and non-avoidable liens on and security interests in the DIP Collateral that (i) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), (ii) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) are senior in priority to the DIP Liens under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements; *provided, however*, that the DIP Liens shall have priority over the Pre-Petition Credit Liens.   As used herein, the term "Pre-Petition Credit Liens" means those liens in all of the Debtors' real and personal property granted pursuant to that certain Amended and Restated Credit Agreement dated as of July 9, 2013 and Amended and Restated as of May 24, 2017 among New Publishing Holdings, Inc., as Holdings, F+W Media, Inc., as Borrower, the lender parties thereto and Cortland Capital Market Services LLC as Administrative Agent (as amended thereafter from

time to time, the "Pre-Petition Credit Agreement") to the Collateral Agent and Investors (as each

is defined therein), which secured loans to the Debtors in the original aggregate principal amount

of $50,000,000 (the "Pre-Petition Secured Debt").   Any claim held by the Collateral Agent

and/or any of the lenders under the Pre-Petition Credit Agreement (the "Pre-Petition Lenders")

on account of the Pre-Petition Secured Debt or under the Pre-Petition Credit Agreement is

referred to herein as the "Pre-Petition Secured Claim."   The DIP Liens shall at all times be senior

to (i) any security interest or lien which secures any inter-company claim of the Debtors or any

subsidiary or affiliate of the Debtors, and (ii) any security interest or lien which is avoided or

disallowed or otherwise preserved for the benefit of the Debtors' estates under section 551 or any

other provision of the Bankruptcy Code.   Upon entry of this Order, the DIP Liens shall be

deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination

(except as expressly provided in this Order), impairment or avoidance, for all purposes in the

Chapter 11 Cases and any Successor Case, in each case without the necessity of the execution or

delivery by the Debtors (or recordation or other filing) of security agreements, control

agreements, pledge agreements, financing statements, mortgages or other similar documents, or

the possession or control by the DIP Agent or any DIP Lenders of any DIP Collateral.   Other

than the Carve-Out and the Prior Permitted Liens, no other liens or security interests, whether for

post-petition financing, adequate protection or otherwise, whether arising pursuant to sections

363 or 364 of the Bankruptcy Code or otherwise, shall be senior or equal to or pari passu with

the DIP Liens in this Chapter 11 Case or any Successor Case without the express written consent

of the DIP Lenders (which consent may be withheld in their sole discretion).   Notwithstanding

anything herein to the contrary, all parties retain and reserve all their rights to dispute the

Page 15

validity, priority, enforceability and perfection of the Permitted Prior Liens and/or the liens relevant to the Pre-Petition Secured Debt.

7.      *Super-Priority Claims*.  In addition to the DIP Liens, the DIP Lenders are hereby granted, for all DIP Obligations, an allowed super-priority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code (the "Super-Priority Claim") against the Debtors and their estates.  The Super-Priority Claim shall have priority over all other costs and expenses of administration of any kind or nature whatsoever (and no cost or expense of administration shall be senior to, equal to, or pari passu with, the Super-Priority Claim), in each case whether incurred in these Chapter 11 Cases or any Successor Case, whether for adequate protection, the lack of, or failure to provide, adequate protection, or otherwise, and whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; *provided, however*, that the Super-Priority Claim shall be subject to and junior to the Carve-Out.  The Super-Priority Claim shall at all times be senior to any inter-company claim of the Debtors or any subsidiary or affiliate of the Debtors.  The Super-Priority Claims shall be deemed legal, valid, binding, and enforceable claims and expenses against the Debtors and their estate, and not subject to subordination (except as expressly provided in this Order), impairment or avoidance, for all purposes in the Chapter 11 Cases and any Successor Case.  The Super-Priority Claim shall be payable from, and have recourse to, any and all of the DIP Collateral.

8.      *Modification of Automatic Stay; Termination Date*.

    (a)      Except as set forth in sub-paragraph (b) of this paragraph, which sub-paragraph exclusively governs the applicability of the automatic stay to any action by the DIP Agent and the DIP Lenders to foreclose on the security interests in and liens on any DIP

Page 16

Collateral granted hereunder, the Court hereby orders that (x) the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby vacated as to the DIP Agent and the DIP Lenders to permit such parties to perform the actions described in or permitted by this Order, in each case without further notice, application or motion to, or order from the Court, and (y) neither section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit such party's exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies regardless of any change in circumstances (whether or not foreseeable).  Consistent with the foregoing sentence, the DIP Agent and the DIP Lenders are hereby granted leave to (i) receive and apply payments of the DIP Obligations and proceeds of the DIP Collateral, as applicable, (ii) file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral provided by this Order, (iii) charge and collect any interest (including at the default rate to the extent authorized herein), fees, costs and other expenses accruing at any time under this Order or the DIP Documents, as applicable and to the extent authorized herein, (iv) give the Debtors and other parties in interest any notice provided for in this Order or the DIP Documents, as applicable, and (v) upon the Termination Date (as defined below), and in each case without further notice, motion or application to, order of, or hearing before, this Court: (A) terminate the DIP Agreement and/or the other DIP Documents, (B) cease making Loans and/or suspend or terminate its lending commitments to the Debtors, (C) accelerate any or all of the DIP Obligations and declare such DIP Obligations immediately due and payable in cash, and/or (D) revoke the Debtors' right, if any, to use the DIP Collateral, the Cash Collateral, and/or the proceeds of the DIP Financing.

01:24256167.1

(b)    The Court hereby orders that upon five (5) days' notice of the occurrence of the Termination Date, absent any objection thereto (which objection shall be resolved by the Court), the automatic stay pursuant to section 362 of the Bankruptcy Code shall be vacated without further relief of this Court as to the DIP Agent and the DIP Lenders to permit such parties to, and the DIP Agent and DIP Lenders shall be entitled to, foreclose or otherwise enforce their security interests in and liens on any or all of the DIP Collateral and/or to exercise any other default-related remedies under the DIP Documents, this Order or applicable law in seeking to recover payment of the DIP Obligations.

(c)    As used in this Order, the term "Termination Date" means the earliest date on which any of the following events (each, a "Specified Event") occurs during the Chapter 11 Cases (unless the DIP Lenders otherwise agree in writing in their sole discretion):

(i)    This Court has not entered the Final Order within thirty (30) days after the Petition Date or the Debtors have not executed and delivered to the DIP Agent the Debtor-in-Possession Credit Agreement, which agreement shall be in form and substance acceptable to the DIP Agent;

(ii)    the dismissal of the Chapter 11 Cases or the conversion of the Chapter 11 Cases to ones under Chapter 7 of the Bankruptcy Code (or the Debtors apply for, consents to, or acquiesces in, any such relief);

(iii)    the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner in the Cases with expanded powers relating to the operation or management of the financial affairs, the business, or reorganization of the Debtors (or the Debtors apply for, consents to, or acquiesces in, any such relief);

(iv)    the dissolution of the Debtors;

(v)    the occurrence of the Termination Date under the DIP Agreement, including, for the avoidance of doubt, the required sale milestones detailed in the DIP Term Sheet and/or DIP Agreement;

(vi)     any failure by the Debtors to comply with the Approved Budget, except in conformity with the permitted variance described in Paragraph 5(e) above or as otherwise permitted by the DIP Lenders in writing;

(vii)     the entry of an order by this Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a security interest or lien with respect to any portion of the DIP Collateral having a value, individually or in the aggregate, in excess of $200,000;

(viii)     the filing of a plan of reorganization or related disclosure statement by the Debtors that does not propose to satisfy the DIP Obligations in full in cash on the effective date of such plan; or

(ix)     150 days after the Petition Date.

9.     _Waiver of Section 506(c) Surcharge_.  Subject to entry of the Final Order, no costs or expenses of administration or other charge, lien, assessment or claim incurred at any time (including, without limitation, any expenses set forth in the Approved Budget) by the Debtors or any other person or entity shall be imposed or charged against any or all of the DIP Agent, DIP Lenders, their respective claims, or their respective collateral under Section 506(c) of the Bankruptcy Code or otherwise, and the Debtors, on behalf of their estates, waive any such rights. It is expressly understood by all parties that in making all such undertakings and proceeding in compliance with this Order, each of the DIP Agent and the DIP Lenders has relied on the foregoing provisions of this paragraph.  Notwithstanding any approval of or consent to an Approved Budget, nothing in this Order shall constitute or be deemed to constitute the consent by any of the DIP Agent or the DIP Lenders to the imposition of any costs or expense of administration or other charge, lien, assessment or claim (including, without limitation, any amounts set forth in the Approved Budget) against such party, its claims or its collateral under

01:24256167.1

section 506(c) of the Bankruptcy Code or otherwise, and no such consent shall be implied from any other action or inaction by such parties.

10.    _Right to Credit Bid_.  The DIP Lenders shall have the right, pursuant to applicable law, to credit bid the face amount of all accrued and unpaid DIP Obligations during any sale of the DIP Collateral (which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code, whether or not included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or otherwise.

11.    _Carve-Out_.

(a)    _Generally_.  Notwithstanding anything to the contrary contained in this Order, the liens and claims granted to the DIP Lenders in this Order and the DIP Documents shall be subject to the payment, without duplication, of the following fees and expenses (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out");

(i)    quarterly fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6), plus interest, if applicable, at the statutory rate, and any fees payable to the clerk of the Bankruptcy Court;

(ii)    the claims of counsel to the Debtors, whose retention is approved by this Court during the Chapter 11 Cases pursuant to Sections 327 and 328 of the Bankruptcy Code, (collectively, the "Debtors' Professionals") for unpaid fees and expenses which were incurred at any time on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $125,000; plus the claims of the Debtors' Professionals for unpaid fees and expenses which were incurred at any time on and after the Petition Date and before the Carve-Out Trigger Date, but such claims shall not exceed the aggregate amounts for such Debtors' Professionals expressly set forth in the Approved Budget for such period; provided that, in each case, such fees and expenses of the Debtors' Professionals are ultimately allowed on a final basis by this Court

Page 20

under sections 330 and 331 of the Bankruptcy Code and are not excluded from the Carve-Out under <u>paragraph 16</u> of this Order; and

(iii)    the claims of counsel to the Committee, whose retention is approved by this Court during the Chapter 11 Cases pursuant to Sections 1103 of the Bankruptcy Code, (collectively, the "<u>Committee's Professionals</u>" and together with the Debtors' Professionals, the "<u>Retained Professionals</u>") for unpaid fees and expenses which were incurred at any time on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $25,000; <u>plus</u> the claims of the Committee's Professionals for unpaid fees and expenses which were incurred at any time on and after the Petition Date and before the Carve-Out Trigger Date, but such claims shall not exceed the aggregate amounts for such Committee's Professionals expressly set forth in the Approved Budget for such period; <u>provided</u> that, in each case, such fees and expenses of the Committee's Professionals are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code and are not excluded from the Carve-Out under <u>paragraph 16</u> of this Order.

(b)    *Carve-Out Trigger Date*.  As used herein, the term "<u>Carve-Out Trigger Date</u>" means the date on which the DIP Agent or the DIP Lenders provides written notice to the Debtors (i) of the occurrence and continuation of a Specified Event beyond any applicable cure period (if any) or the Termination Date and (ii) that the Carve-Out Trigger has occurred.

(c)    *Reduction of Amounts*.  Subject to the terms and conditions of this Order and the DIP Documents, the Debtors shall be permitted to pay compensation and reimbursement of reasonable fees and expenses of the Retained Professionals allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and such payments shall not, prior to the Carve-Out Trigger Date, reduce or be deemed to reduce the Carve-Out.  The dollar amounts available to be paid under the Carve-Out shall be reduced, dollar-for-dollar, by the aggregate amount of payments made on and after the Carve-Out Trigger Date to the Retained Professionals on account of their allowed fees and expenses (whether from Cash Collateral, any proceeds of the DIP Financing, or otherwise).  Pending final approval of the fees and expenses of the Retained Professionals, the amounts budgeted for the Retained

Page 21

Professionals in the Approved Budget shall, at the option of the applicable Retained Professional, either (i) be funded by the Debtors to each applicable professional or (ii) subject to the Interim Amount, be wired by the DIP Agent to each applicable professional, in each case on a weekly basis to be held (and unapplied) in such professional's retainer/escrow account until such time as such fees and expenses may be approved by this Court for application to such retainer/escrow.

(d)  *Reservation of Rights*.  Payment of any fees and expenses of the Retained Professionals pursuant to the Carve-Out shall not, and shall not be deemed to, (i) reduce the Debtors' obligations owed to any of the DIP Agent or DIP Lenders or (ii) modify, alter or otherwise affect any of the liens and security interests of such parties in the DIP Collateral (or their respective claims against the Debtors), except in the fact that such liens and security interests are junior to the Carve-Out.  Nothing herein shall impair, or be construed to impair, the ability of any party to object to any of the fees, expenses, reimbursement or compensation of the Retained Professionals in these Chapter 11 Cases.

12.  *Cash Collateral; Adequate Protection*.  For purposes of this Order, the term "Cash Collateral" shall mean and include all "cash collateral" as defined by section 363(a) of the Bankruptcy Code and shall include all of the cash proceeds of the DIP Collateral in which any of the DIP Agent or the DIP Lenders has an interest, whether such interest existed as of the Petition Date, or arises thereafter pursuant to this Order, any other order of this Court, the DIP Documents, applicable law or otherwise.  The Pre-Petition Lenders are entitled to adequate protection on account of the Pre-Petition Secured Claims as set forth herein.  As adequate protection to the Pre-Petition Lenders which are "Tranche B-1 Term Lenders" (as defined in the

Page 22

Pre-Petition Credit Agreement), they are hereby granted (i) replacement liens on all collateral granted under the DIP Facility, junior only to the liens granted under the DIP Facility (including, for the avoidance of doubt, the Prior Permitted Liens and the Carve-Out), (ii) adequate protection payments equal to the amount of non-default contractual interest that accrues from and after the Petition Date under the Pre-Petition Debt held by such Pre-Petition Lenders and which shall be paid in kind by being capitalized and treated as principal on the first business day of each month; provided, however, that such adequate protection payments shall not constitute administrative claims against the estates and shall be treated as part of the Tranche B-1 obligations under the Pre-Petition Credit Agreement, and (iii) a superpriority administrative expense claim, to the extent of diminution of value of their collateral, junior only to the Super-Priority Claim and the Carve-Out.  As adequate protection to the Pre-Petition Lenders which are "Tranche B-2 Term Lenders" (as defined in the Pre-Petition Credit Agreement), they are hereby granted replacement liens on all collateral granted under the DIP Facility, to the extent of diminution of value of their collateral, junior only to the liens granted under the DIP Facility (including, for the avoidance of doubt, the Prior Permitted Liens and the Carve-Out) and the adequate protection liens granted to the Tranche B-1 Term Lenders.  For the avoidance of doubt, all adequate protection granted to the Pre-Petition Lenders is subject to the priorities agreed to in the Pre-Petition Credit Agreement.

13.     _Covenants_.  Except as expressly provided in this Order, the DIP Documents or as approved in writing by the DIP Agent or the DIP Lenders, the Debtors (i) shall not transfer any Cash Collateral or proceeds of the DIP Financing to any of their non-Debtor affiliates or subsidiaries, and (ii) shall not sell, lease, transfer, or otherwise dispose of any DIP Collateral

01:24256167.1

other than in the ordinary course of the Debtors' business and/or as authorized by this Court in connection with the Debtors' "first day" motions; provided that should the Debtors sell, lease, transfer, or otherwise dispose of DIP Collateral consisting of a Qualifying Collateral Sale (as defined in the DIP Agreement), the DIP Lenders (or the DIP Agent) may require a prepayment of the outstanding Obligations in the amount of the proceeds of such sale(s) or any subset thereof.  For the avoidance of doubt, the proceeds of any Qualified Collateral Sale shall be subject to the Carve-Out.

       14.     *Perfection of DIP Liens*.

       (a)     The DIP Liens shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the entry of this Order without any further notice, act or action of or by any person or entity, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, filings with the U.S. Copyright Office, or other documents.  If the DIP Lenders hereafter request that the Debtors execute and deliver to them any financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by such party to be reasonably necessary or desirable to further evidence the perfection of the liens and security interests provided under this Order, then the Debtors shall, at their sole cost and expense, promptly execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Lenders (directly or through the DIP Agent) are hereby authorized to file or record such documents in their discretion, in which

event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Order, but with the priorities as set forth herein.

(b)     DIP Lenders (directly or through the DIP Agent) may, but shall not be required to, file a certified copy of this Order in any filing or recording office in any state, county or other jurisdiction in which the Debtors have real or personal property and such filing or recording shall be accepted and shall constitute sufficient evidence of perfection of their interests in the DIP Collateral at the time and on the date of entry of this Order, but with the priorities as set forth herein.

(c)     To the extent that any applicable non-bankruptcy law would otherwise restrict the grant, scope, enforceability, attachment or perfection of the security interests and liens authorized or created under or in connection with this Order or the DIP Documents, or otherwise would impose filing or registration requirements or fees and charges with respect thereto, such law is hereby pre-empted to the maximum extent permitted by the United States Constitution, the Bankruptcy Code, applicable federal law, and the judicial power of this Court.

(d)     Except as otherwise expressly provided herein, notwithstanding anything to the contrary contained in any prepetition or post-petition agreement, contract, lease, document, note or instrument to which the Debtors are a party or under which the Debtors are obligated or bound, any provision therein that restricts, conditions, prohibits, limits or impairs in any way the Debtors from granting the DIP Agent and DIP Lenders the post-petition claims, security interests or liens upon any of their assets, properties or other DIP Collateral or otherwise entering into and complying with all of the terms, conditions and provisions of this Order and DIP Documents shall not adversely affect the validity, priority, perfection or enforceability of the liens, security

01:24256167.1

interests, claims, rights, priorities and/or protections granted to such parties pursuant to this Order and DIP Documents.

15.     _Preservation of Rights Granted Under This Order; 364(e) Protection_.

(a)     _Survival_.  The provisions of this Order and any actions taken pursuant hereto: (a) shall survive the occurrence of the Termination Date and/or the entry of any order: (i) converting the Chapter 11 Cases to ones under chapter 7 of the Bankruptcy Code; (ii) substantively consolidating the Debtors or their estates, or substantively consolidating the Debtors or their estates with any affiliate or subsidiary; (iii) dismissing or closing the Chapter 11 Cases or (iv) confirming a plan of reorganization in the Chapter 11 Cases (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors hereby waive any discharge as to the DIP Obligations); and (b) shall continue in full force and effect notwithstanding the occurrence of the Termination Date and/or the entry of any such order described above.  The claims, liens, and security interests granted pursuant to this Order shall maintain their priority, validity and perfection as provided by this Order until all of the DIP Obligations are indefeasibly paid in full in cash and discharged (and all lending commitments terminated under the DIP Financing) in accordance with the respective terms and conditions of this Order and the DIP Documents.

(b)     _Section 364(e); Effect of Modification or Appeal_.  Based on the findings set forth in this Order, in consideration for the financing provided under DIP Financing, the DIP Agent and the DIP Lenders are entitled to, and hereby are granted, the full rights, benefits, privileges and protections of, and provided by, section 364(e) of the Bankruptcy Code with respect to the DIP Obligations (and related liens, claims, rights, remedies and benefits) created or authorized by this Order in the event that this Order or any authorization or approval contained

01:24256167.1

herein is subsequently stayed, vacated, reversed, amended or modified on appeal.   Any subsequent stay, modification, reversal, amendment or vacation of this Order shall not alter, modify or affect the validity, priority, perfection or enforceability of any claim, lien, or security interest of the DIP Agent or the DIP Lenders authorized, created or granted pursuant to this Order or the DIP Documents and outstanding immediately prior to the actual receipt of written notice by the DIP Agent of the effective date of such stay, modification, reversal, amendment or vacation.   Notwithstanding any such stay, modification, reversal, amendment or vacation, all obligations and other financial accommodations made or incurred pursuant to this Order or the DIP Documents, all DIP Obligations incurred and uses of Cash Collateral by the Debtors pursuant hereto prior to the actual receipt of written notice by the DIP Agent of the effective date of such stay, modification, reversal, amendment or vacation, shall be governed in all respects by the original provisions of this Order and the DIP Agent and the DIP Lenders shall be entitled to all of the rights, privileges, remedies, protections and benefits contained or granted in section 364(e) of the Bankruptcy Code, the DIP Documents, and this Order, including, without limitation, the DIP Liens and Super-Priority Claims.

16.   *Limitation on Use of DIP Financing and DIP Collateral*.   Notwithstanding anything herein to the contrary, no portion or proceeds of the DIP Financing, the DIP Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the Approved Budget, shall be used in connection with: (a) objecting, contesting or raising any defense to the validity, perfection, priority, or enforceability of any amount due under the DIP Documents or any security interests, liens or claims granted under this Order or the DIP Documents to secure such amounts; (b) asserting any claims, actions or causes of action against any of the DIP Agent or the

DIP Lenders or any of their respective affiliates or subsidiaries; (c) preventing, hindering or otherwise delaying any of the DIP Agent's or the DIP Lender's assertion, enforcement or realization on the DIP Collateral in accordance with the terms and conditions of this Order and the DIP Documents; (d) seeking to amend or modify any of the rights granted to the DIP Agent or the DIP Lenders under this Order or the DIP Documents, in each case without such party's prior written consent given in its sole discretion; or (e) for any other purpose prohibited under Section 5.11(b) of the DIP Agreement.  For the avoidance of doubt, and in accordance with Section 5.11(b) of the DIP Agreement, nothing herein shall be interpreted to deny that an amount up to but not exceeding $25,000 may be used by any Creditors' Committee to conduct an investigation of the propriety or effectiveness of the liens granted in connection with the Pre-Petition Credit Agreement.

17.     *No Marshaling*.  In no event shall the DIP Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

18.     *No Subrogation*.  In no event shall any Person who pays (or through the extension of credit to the Debtors, causes to be paid) any of the DIP Obligations be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted in favor of, or conferred upon, the DIP Agent or any DIP Lender by the terms of the DIP Documents or this Order, unless and until such time as all of the DIP Obligations have been indefeasibly paid in full in cash and all lending commitments have been terminated under the DIP Financing.

19.     *No Implied Waiver*.  The failure, at any time or times hereafter, of the DIP Agent or the DIP Lenders to require the strict performance by the Debtors of any term or provision of this Order shall not waive, affect or diminish any right of such parties thereafter to demand the

Page 28

strict compliance and performance therewith. No delay on the part of any party in the exercise of any right or remedy under this Order or the DIP Documents shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy. None of the rights or remedies of any party under this Order or the DIP Documents shall be deemed to have been amended, modified, suspended or waived unless such amendment, modification, suspension or waiver is in writing and signed by the party against whom such amendment, modification, suspension or waiver is sought. None of the DIP Agent or the DIP Lenders waives, and each expressly reserves, any and all claims, causes of action, defenses, rights and remedies it has or may have pursuant to any or all of the DIP Documents, the Bankruptcy Code and/or under applicable law against or with respect to the Debtors and any other Person. Except as expressly provided in this Order, the obligations of the Debtors, and the rights, remedies, and priorities of the DIP Agent and the DIP Lenders arising under or in connection with this Order, are in addition to, and are not intended as a waiver or substitution for, those granted to, or contained in favor of, such parties under any or all of the DIP Documents, the Bankruptcy Code and/or under applicable law.

20.    *Order Governs*. In the event of any conflict between the provisions of this Order and any of the DIP Documents, the provisions of this Order shall control and govern to the extent of such conflict.

21.    *Successors and Assigns*. The provisions of this Order and the DIP Documents shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Debtors and their estates, and their respective successors and assigns, including, without limitation, any

trustee or other fiduciary hereafter appointed as a legal representative of any of the Debtors or their estates, whether in these Chapter 11 Cases or any Successor Case.

22.    _No Liability to Third Parties_.    In making decisions to advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash Collateral, in approving any budget or in taking any actions permitted by this Order or the DIP Documents, as applicable, the DIP Agent and the DIP Lenders shall not (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute), and/or (ii) owe any fiduciary duty to the Debtors, their creditors or their estates, and their relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership with the Debtors.

23.    _No Consent to Plan of Reorganization_.    Nothing in this Order is, or shall be deemed to be, the consent to, or agreement to support, any plan of reorganization filed by the Debtors or any other party in these Chapter 11 Cases.  The rights, defenses and objections of all parties in connection therewith are hereby reserved.

24.    _No Third Party Rights_.  Except as expressly provided for herein, this Order does not create any rights for the benefit of any third party, whether as direct, indirect, or incidental beneficiary.

25.    _Effectiveness_.  This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof, and there shall be no stay of execution

Page 30

of effectiveness of this Order.  Any objections and reservations of rights to the Motion with respect to the entry of this Order that have not been withdrawn, waived, or resolved are hereby denied and overruled.  Pursuant to Bankruptcy Rule 7052, any findings of fact contained herein that may be construed as matters of law shall be treated as conclusions of law as if set forth below, and vice versa.

26.     _Final Hearing_.  The Motion is set for a final hearing (the "Final Hearing") to be held on _____, 201_ at _:__ _.m. (Eastern time), before the Honorable _____, United States Bankruptcy Court for the District of Delaware, 824 North Market Street, th Floor, Courtroom #__, Wilmington, Delaware 19801 with an objection deadline of 4:00 p.m. (Eastern time) on _____, 2019 (the "Objection Deadline").   Any objection to entry of the Final Order shall be filed with this Court, and served upon the respective counsel to the Debtors, the U.S. Trustee, the Committee, (if any), and the DIP Agent so as to be actually received, on or before the Objection Deadline.  The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing) to the Notice Parties and to the Committee after the same has been appointed, or Committee counsel, if the same shall have been hired.

Dated:   _____ __, 2019

_____

United States Bankruptcy Judge

**Exhibit A**

**DIP Term Sheet**

**TERM SHEET AND SUMMARY OF INDICATIVE TERMS AND CONDITIONS**

**NEW PUBLISHING HOLDINGS, INC., F+W MEDIA, INC., F+W SUBSCRIPTION SERVICES, LLC, THE WRITERS STORE, INC., F+W NH E-COMMERCE, LLC, F+W OH E-COMMERCE, LLC AND F+W TRADE SHOW & EVENTS, LLC, FORMER QUILTING, INC. AND F&W MEDIA INTERNATIONAL LIMITED** (collectively, the "**Borrowers**")

**$8,000,000**
**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT FACILITY**
**Dated: March 8, 2019**

THESE PROPOSED TERMS AND CONDITIONS ARE PROVIDED FOR DISCUSSION PURPOSES ONLY AND DO NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT TO LEND. THE ACTUAL TERMS AND CONDITIONS UPON WHICH THE LENDERS MIGHT EXTEND CREDIT TO THE BORROWERS ARE SUBJECT TO SATISFACTORY COMPLETION OF DUE DILIGENCE, SATISFACTORY REVIEW OF DOCUMENTATION, AND SUCH OTHER TERMS AND CONDITIONS AS ARE DETERMINED BY THE LENDERS AND THEIR COUNSEL.

| | |
|---|---|
| **BORROWERS** | New Publishing Holdings, Inc., F+W Media, Inc., F+W Subscription Services, LLC, The Writers Store, Inc., F+W NH e-Commerce, LLC, F+W OH e-Commerce, LLC, F+W Trade Show & Events, LLC, Former Quilting Inc., and F&W Media International Limited as Debtors and Debtors-in-Possession. |
| **LENDERS** | Drawbridge Special Opportunities Fund LP, New F&W Media M Holdings Corp LLC, PBB Investments III, LLC, CION Investment Corporation, Ellington Management Group, or affiliates thereof to be determined. |
| **DIP FACILITY** | A senior secured, superpriority term loan credit facility (the "**DIP Facility**") in the aggregate amount not to exceed $8,000,000.  It is contemplated that there will be an initial draw upon approval of the Bankruptcy Court in the amount of up to $2,000,000 upon entry of the Interim Order, up to an additional $2,500,000 upon entry of the Final Order, and up to the balance to be drawn, as appropriate, no earlier than 13-weeks post-petition, provided there are no Events of Default (including, for the avoidance of doubt, sale milestones and budget compliance). |
| **PRE-PETITION CREDIT FACILITY** | The $50 million Amended and Restated Credit Agreement dated as of May 24, 2017 as has been amended from time to time. |
| **PURPOSE** | At Closing, an initial DIP Facility advance will be made, subject to and as set forth in the Budget as approved by the Lenders, for the following: (i) to finance working capital and general business purposes of the Borrowers, and (ii) for the payment of expenses arising in the Borrowers' Chapter 11 cases as may be approved by the Bankruptcy Court (to the extent required).  Thereafter, upon entry of a Final Order, the DIP Facility will be used for the foregoing purposes, subject to and as set forth in the Budget. |
| **PETITION DATE** | Date the Borrowers filed their petitions for relief under Chapter 11 of the Bankruptcy Code (the "**Petition Date**"): **March 11, 2019**. |

**CLOSING DATE**    Subject to satisfaction of the Conditions Precedent set forth below, upon entry of an Interim Order approving the DIP Facility on an interim basis and satisfaction of the conditions precedent (the "**Closing**").

**TERMINATION DATE**    All obligations under the DIP Facility, accrued or otherwise, would be due and payable in full within thirty (30) days from Closing, unless a Final Order has been entered approving the DIP Facility on a final basis.  Upon entry of a Final Order, the Termination Date would be the earliest of (i) 26 weeks from Closing; (ii) the Effective Date of any chapter 11 plan (which plan and all associated documents, if proposed by the Borrowers, shall be in a form acceptable to the Lenders); or (iii) an event of default by one or more of the Borrowers as specified under the proposed DIP Facility documents.  The Final Order must be final within 15 days of its entry, and not be subject to any stay, and in a form acceptable to Lenders.

**PROFESSIONAL EXPENSE CARVE OUT**    The Carve Out shall mean a carve out for: (i) all fees required to be paid to the Clerk of the Bankruptcy Court; (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c); (iii) all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals retained by the Debtor or a Committee, if any, (the "Case Professionals"), to the extent allowed at any time, through the date of service by the Lenders' agent of a Carve Out Trigger Notice (as defined below), as limited by the respective Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $150,000 (the "**Post-Trigger Amount**").  The Carve-Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals.  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by the Lenders or their agent to the Borrowers and their counsel, the U.S. Trustee, and lead counsel to any Committee, which notice may be delivered at any time following the occurrence and continuance of any Event of Default.

**SECURITY**    To secure all obligations of the Borrower under the DIP Facility, the Lenders will receive, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, through the final DIP Facility documents and Bankruptcy Court orders, a fully perfected first priority security interest subject to valid, enforceable, non-avoidable liens disclosed to the Lenders and acceptable to the Lenders, in all of the existing and after acquired real and personal, tangible and intangible, assets of the Borrowers, including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, licensing agreements, securities (whether or not marketable), equipment, fixtures, proceeds of leasehold interests (but not the leaseholds themselves), real property interests, franchise rights, patents, trademarks, tradenames, copyrights, intellectual property, general intangibles, recoveries on avoidance actions pursuant to Section 549 of the Bankruptcy Code, proceeds and recoveries from other avoidance power claims under sections 544, 545, 547, 548, 550, 552(b) and 553 of the Bankruptcy Code (subject to final order).

All borrowings under the DIP Facility shall at all times be entitled to superpriority claim status under Section 507(b) of the Bankruptcy Code and have priority over any and all administrative claims specified in Bankruptcy Code, including claims pursuant to Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1114,  or otherwise, subject only to the Carve Out (referred to above).

**INTEREST RATE**    The rate of interest for all Obligations will be Eurodollar Base Rate + 10% and shall PIK until the Maturity Date.

**FEES**    A Closing Fee of twenty percent (20%) of the DIP commitment shall be fully earned at closing and shall PIK until the Maturity Date.

An Unused Line Fee of 2.0% per annum would be charged on the average unused portion of the DIP Credit Facility, earned and payable monthly.

**DEFAULT RATE**    2% per annum over the applicable interest rate.

**DOCUMENTATION**    The final DIP Facility documents will be in form and substance mutually acceptable to the Lenders and the Borrowers and will contain representations and warranties; conditions precedent; affirmative, negative and financial covenants; indemnities; and events of default and remedies in form and substance acceptable to the Lenders.  All relevant documents, such as transaction documents, security agreements, pledge agreements, subordination agreements, intercreditor agreements, equity or stockholder agreements, incentive and employment agreements, tax agreements, and other material agreements, will be in form and substance reasonably acceptable to the Lenders.  All orders of the Bankruptcy Court approving or authorizing the DIP Facility, and all motions relating thereto, will be in form and substance reasonably acceptable to the Lenders.

**FINANCIAL COVENANTS**    The Borrowers shall strictly perform in accordance with the Budget subject to the following:

(A)    The Borrowers' actual operating receipts shall not be less than 85% of the projected amounts set forth in the Budget, as calculated on a rolling three-week basis.

(B)    The Borrowers' actual aggregate cash expenditures shall not be greater than 115% of the projected amount set forth in the Budget, as calculated on a rolling three-week basis.

(C)    The Borrowers may only incur expenses and make cash expenditures for the categories set forth in the Budget.

(D)    Permitted variance of 10% per line item as measured on a cumulative basis (inapplicable to professional fees; provided, however that the permitted variance of 10% shall apply to the Debtors' Professional fee line items limited to only Young Conaway and FTI Consulting and solely for the months of March, April and May 2019).

Each of the foregoing covenants shall be tested on Thursday of each week as of the end of the prior week commencing with the first (1st) week after the Petition Date pursuant to the variance report delivered by the Borrowers to the Lenders.

**COVENANTS**    The following covenants shall apply:

a)    On the Petition Date, the Borrower will be required to file a motion to approve the DIP Facility. The hearing on the Interim Order shall occur within three (3) Business Days following the Petition Date.

b)    The Borrower shall deliver to the Lenders on Thursday of each week commencing with the first (1st) week after the Petition Date, a weekly variance report showing the Borrowers' actual performance compared to the Budget for the immediately preceding week and on a cumulative basis on and after the Petition Date.

c)    The Lenders will have the right to conduct reasonable commercial finance examinations, inventory appraisals and machinery and equipment appraisals as it deems reasonable, each at the Borrowers' expense.

**CASH MANAGEMENT**    It is anticipated that all existing cash management arrangements will stay in place.

**EVENTS OF DEFAULT**    Usual and customary events of default and notice provisions for facilities of this type, including but not limited to, failure to pay any interest or principal when due, failure to comply with covenants, inaccurate or false representations or warranties, cross defaults, change of control, judgment defaults,  ERISA, appointment of a trustee or conversion of one or more of the Borrowers' Chapter 11 cases to one under Chapter 7, the filing by Borrowers or an affiliate of a motion challenging the pre-petition security interest of the Lenders' pre-petition agent or any other similar challenge under Chapter 5 of the Bankruptcy Code, the entry of an order granting relief from stay to any other creditor which could have a material adverse effect on the Borrowers, Borrowers' failure to file a plan by the 120th day after the order for relief, or the termination or commencement of liquidation of the Borrowers' business without the approval of the Lenders.

**EVENTS OF DEFAULT RE SALE PROCESS**    It is contemplated that the Debtors' assets may be sold in more than one grouping.  Though the groups may be further subdivided, the DIP Facility contemplates triggers tied to timing of the sale of the "books" assets (the "**Books Assets**") separate from all other assets (the "**Other Assets**" together with the Books Assets, "**All Assets**").  Accordingly, it shall be an event of default if:

(A) A sale motion establishing procedures for the sale of All Assets, and reasonably acceptable to the Lenders, is not filed with the Bankruptcy Code by March 27, 2019;

(B) An Order of the Bankruptcy Court establishing bidding procedures for the sale of All Assets that are reasonably acceptable to the Lenders (the "Bidding Procedures") is not entered on or before April 17, 2019;

(C) One more qualified bids has not been received for the Books Assets on or before the bid deadline established in the Bidding Procedures, which date shall be no later than May 20, 2019;

(D) An Order of the Bankruptcy Court approving the sale of the Books Assets, reasonably acceptable to the Lenders, is not entered on or before May 24, 2019;

(E) Closing of the sale on the Books Assets does not occur on or before May 30, 2019;

(F) One more qualified bids has not been received for the Other Assets (or in the alternative, a portion of the Other Assets otherwise reasonably acceptable to the Lenders) on or before the bid deadline established in the Bidding Procedures, which date shall be no later than May 28, 2019;

(G) An Order of the Bankruptcy Court approving the sale of the Other Assets, reasonably acceptable to the Lenders, (or in the alternative, a portion of the Other Assets otherwise reasonably acceptable to the Lenders) is not entered on or before June 4, 2019;

(H) Closing of the sale on the Other Assets (or in the alternative, a portion of the Other Assets reasonably acceptable to the Lenders) does not occur on or before June 10, 2019;

**ASSET SALES**

If at any time any of the Collateral is sold (individually or collectively) resulting in cash proceeds in excess of $1,000,000 (a "**Qualifying Collateral Sale**"), the Lenders (or their Agent) may require a prepayment of the outstanding Obligations in the amount of the proceeds of such sale(s) or any subset thereof (the "**Prepayment Amount**").  In the event of a Qualifying Collateral Sale, the Agent may notify the Borrowers of the Prepayment Amount, which shall be paid to the Agent no more than five (5) Business Days after receipt of the written notice.

**CONDITIONS PRECEDENT**

The Closing on the DIP Facility shall be conditioned upon satisfaction of the following conditions precedent as well as other conditions customary of transactions of this type:

• All necessary consents and approvals to the financing shall have been obtained.

• Receipt of an acceptable Debtor-in-Possession weekly Budget for twenty-six weeks.

• Subject to and to the extent available pursuant to the Budget on cash-pay basis, the Bankruptcy Court shall grant adequate protection with respect to the B-1 Tranche of the Pre-Petition Credit Agreement, which adequate protection shall include payments with respect to interest payable under the Existing Credit Agreement, replacement liens on collateral, a superpriority administrative expense claim, and indemnity payments.  All such adequate protection payments shall PIK until the Maturity Date and be junior only to the DIP Obligations.

- Any other information (financial or otherwise) reasonably requested by the Lenders shall have been received by the Lenders and shall be in form and substance reasonably satisfactory to the Lenders.

- Execution and delivery of such documentation (to include financing statements, security agreements, non-offset letters, tax lien, litigation searches, good standing certificates, customary representations, warranties, covenants, events of default, indemnification, instruments, insurance, and opinions of counsel and such other acts as the Lenders may request in order to obtain the Lenders' legal approval to effect the completion of the financing arrangements herein contemplated) satisfactory in form and substance to Lenders and its counsel.

The Closing on the DIP Facility is expressly subject to the entry of all necessary and appropriate court orders by the United States Bankruptcy Court having jurisdiction over the pending Chapter 11 cases of the Borrowers, including an Interim Order, which order or orders must be not subject to any stay and acceptable to the Lenders in their sole and exclusive discretion.

Without limiting in any way the Lenders' sole and exclusive discretion, such order or orders shall provide for the following, among other things:

a) That adequate notice has been given to all necessary parties of the hearing pursuant to which the Court has entered the orders.

b) That all indebtedness, liabilities and obligations of the Borrowers to the Lenders whenever and however arising, including without limitation, the loans and all fees, charges, and expenses contemplated by this Term Sheet or otherwise incurred, including, but not by way of limitation, fees and expenses of attorneys and other professionals, shall be secured by a first priority lien and security interest in all Collateral subject to valid, enforceable, non-avoidable liens disclosed to Lenders and acceptable to Lenders; provided, that the liens and security interest shall be senior to the liens and security interest granted to the Lenders to secure the obligations under the Pre-Petition Credit Agreement, subject in all events to the Carve-Out.

c) That, subject to the entry of the Final Order, no costs, expenses, or other charges may be assessed or attributed to the Collateral pursuant to Section 506(c) of the United States Bankruptcy Code or otherwise.

d) A finding that the Lenders have acted in good faith.

**CONFIDENTIALITY**   Since this Term Sheet is not a commitment to make a loan, it may not be relied upon by the Borrowers or by any third party. The Borrowers agree to hold this proposal confidential and not disclose the contents of this Term Sheet to any third party other than its accountants, legal or outside advisors retained in connection with the evaluation of the proposed financing, without the Lenders' prior written consent; provided, however, that subject to the execution of an NDA provided by the Borrowers, the Term Sheet may be shared with other prospective DIP Lenders.

**INDEMNIFICATION**   The Borrowers agree to indemnify and hold the Lenders, their agent and their directors, agents, officers, representatives, attorneys, subsidiaries, and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or cause of action, and costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party by reason of or resulting from the transactions contemplated hereby, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party.  In all such litigation, or the preparation therefor, the indemnified parties shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Borrowers agree to pay promptly the reasonable fees and expenses of such counsel.

**EXPENSES**   In connection with the request for this arrangement, the Borrowers understand that the Lenders have made certain preliminary financial, legal, and collateral investigations and determinations.  The Borrowers agrees to pay for all reasonable costs and expenses incurred by the Lenders, their employees and agents, in connection with the proposed financing transaction and the preparation of definitive legal documentation, even if the proposed DIP Facility does not close or is not approved by the Bankruptcy Court on terms and conditions acceptable to the Lenders, in their sole and exclusive discretion.  In connection with the foregoing, prior to the Petition Date, the Borrowers will pay all fees and expenses then due and owing under the Pre-Petition Credit Agreement.

[remainder of page intentionally blank; signature pages follow]

IN WITNESS WHEREOF, the parties hereto have caused this TERM SHEET AND SUMMARY OF INDICATIVE TERMS AND CONDITIONS FOR THE SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT FACILITY to be duly executed by their respective authorized officers as of the day and year first above written.

DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LP,
as a DIP Lender

By:  Drawbridge Special Opportunities GP LLC, its general partner

By:_____
      Name:    CONSTANTINE M. DAKOLIAS
      Title:          PRESIDENT

NEW F&W MEDIA M HOLDINGS CORP LLC,
as a DIP Lender

By: _____

Name: _Terrence m. O'Tool_    Terrence M.O'Toole
Title: _Manager_    Manager

New F&W Media M Holdings Corp Signature Page to F+W DIP Term Sheet

PBB INVESTMENTS III, LLC, as a DIP Lender

By:_____

      Name:    Joshua Peck
      Title:     Vice President

CION INVESTMENT CORPORATION, as a DIP Lender

By: _____

Name:

Title:      Gregg Bresner
            Chief Investment Officer

**ELLINGTON MANAGEMENT GROUP**, as a DIP _LLC., on behalf of certain_
_funds and_
_accounts it_
Lender _manages or advises_

By: _____

    Name: DANIEL MARGOLIS

    Title: GENERAL COUNSEL

**Exhibit B**

**Initial Approved Budget**

**F+W Media, Inc.**
**13-Week DIP Budget**
*$ in thousands*

| Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | 13 Week |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Postpetition Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| *$ in thousands* | 03/15/19 | 03/22/19 | 03/29/19 | 04/05/19 | 04/12/19 | 04/19/19 | 04/26/19 | 05/03/19 | 05/10/19 | 05/17/19 | 05/24/19 | 05/31/19 | 06/07/19 | |
| Total Receipts | $ 980 | $ 912 | $ 926 | $ 992 | $ 832 | $ 1,029 | $ 1,377 | $ 1,034 | $ 2,399 | $ 1,078 | $ 1,382 | $ 835 | $ 2,286 | $ 16,062 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll | $ 0 | $ (651) | $ (84) | $ (714) | $ (466) | $ (978) | $ - | $ (957) | $ (159) | $ (771) | $ - | $ (723) | $ - | $ (5,503) |
| Payables | (600) | (600) | (600) | (600) | (1,232) | (1,086) | (1,045) | (995) | (1,032) | (1,029) | (1,042) | (905) | (1,027) | (11,793) |
| Rent & Utilities | - | - | - | (298) | - | - | - | (298) | - | - | - | - | (298) | (895) |
| Other | (119) | (119) | (119) | (114) | (114) | (114) | (114) | (114) | (114) | (114) | (114) | (91) | (125) | (1,482) |
| Total Operating Disbursements | $ (719) | $ (1,370) | $ (803) | $ (1,726) | $ (1,812) | $ (2,178) | $ (1,159) | $ (2,363) | $ (1,304) | $ (1,914) | $ (1,156) | $ (1,719) | $ (1,450) | $ (19,674) |
| **Operating Cash Flow** | **$ 261** | **$ (459)** | **$ 123** | **$ (734)** | **$ (980)** | **$ (1,149)** | **$ 219** | **$ (1,329)** | **$ 1,095** | **$ (836)** | **$ 226** | **$ (884)** | **$ 836** | **$ (3,611)** |
| Capex | - | - | - | - | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (47) | (52) | (450) |
| Other Non-Operating | - | - | (15) | - | - | - | (15) | - | - | - | - | (15) | - | (45) |
| **Restructuring Related** | | | | | | | | | | | | | | |
| Professional Fees | (25) | - | - | - | - | (198) | - | - | (612) | (198) | - | - | (862) | (1,895) |
| DIP Fees | - | - | - | - | - | (10) | - | - | - | - | - | - | - | (10) |
| DIP Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Restructuring Related | (403) | (375) | - | - | - | - | - | - | - | - | - | - | - | (778) |
| Total Restructuring Related | $ (428) | $ (375) | $ - | $ - | $ - | $ (208) | $ - | $ - | $ (612) | $ (198) | $ - | $ - | $ (862) | $ (2,683) |
| **Net Cash Flow** | **$ (167)** | **$ (834)** | **$ 108** | **$ (734)** | **$ (1,030)** | **$ (1,407)** | **$ 153** | **$ (1,379)** | **$ 433** | **$ (1,084)** | **$ 176** | **$ (946)** | **$ (78)** | **$ (6,789)** |
| **Cash Roll Forward** | | | | | | | | | | | | | | |
| Beginning Book Cash | 2,744 | 4,577 | 3,743 | 3,851 | 3,117 | 2,086 | 3,179 | 3,333 | 1,954 | 2,387 | 1,303 | 1,478 | 533 | 2,744 |
| Net Cash Flow | (167) | (834) | 108 | (734) | (1,030) | (1,407) | 153 | (1,379) | 433 | (1,084) | 176 | (946) | (78) | (6,789) |
| DIP Term Loan | 2,000 | - | - | - | - | 2,500 | - | - | - | - | - | - | 3,500 | 8,000 |
| Ending Book Cash | $ 4,577 | $ 3,743 | $ 3,851 | $ 3,117 | $ 2,086 | $ 3,179 | $ 3,333 | $ 1,954 | $ 2,387 | $ 1,303 | $ 1,478 | $ 533 | $ 3,955 | $ 3,955 |
| Restricted Cash | (640) | (640) | (640) | (640) | (640) | (640) | (640) | (640) | (640) | (640) | (640) | (640) | (640) | (640) |
| Available Book Cash Balance | $ 3,937 | $ 3,103 | $ 3,211 | $ 2,477 | $ 1,446 | $ 2,539 | $ 2,693 | $ 1,314 | $ 1,747 | $ 663 | $ 838 | $ (107) | $ 3,315 | $ 3,315 |

## **Exhibit B**

**DIP Credit Agreement**

# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of
**MARCH [__], 2019**

among

**NEW PUBLISHING HOLDINGS, INC., F+W MEDIA, INC., F+W SUBSCRIPTION SERVICES, LLC, THE WRITERS STORE, INC., F+W NH E-COMMERCE, LLC, F+W OH E-COMMERCE, LLC, F+W TRADE SHOW & EVENTS, LLC, FORMER QUILTING INC., AND F&W MEDIA INTERNATIONAL LIMITED,**

as Borrowers,

**The LENDERS Party Hereto**,

and

**FORTRESS CREDIT CO. LLC**
as Agent

_____

ARTICLE I DEFINITIONS ...................................................................................................1

SECTION 1.01    Defined Terms. ..................................................................................1
SECTION 1.02    Terms Generally. .............................................................................13
SECTION 1.03    Accounting Terms; GAAP................................................................13

ARTICLE II AMOUNT AND TERMS OF CREDIT; SECURITY INTEREST GRANT AND
SUPERPRIORITY CLAIM ...............................................................................13

SECTION 2.01    Commitment of the Lenders. ...........................................................13
SECTION 2.02    Reserves; Changes to Reserves.......................................................14
SECTION 2.03    Making of the Term Loans. .............................................................14
SECTION 2.04    Notes; Repayment of Term Loan......................................................14
SECTION 2.05    Interest on Term Loans. ..................................................................15
SECTION 2.06    Default Interest. ...............................................................................15
SECTION 2.07    Certain Fees. ....................................................................................15
SECTION 2.08    Nature of Fees..................................................................................16
SECTION 2.09    Mandatory Prepayment; Lending Commitment Termination;
Cash Collateral. ...............................................................................16
SECTION 2.10    Maintenance of Loan Account; Statements of Account. ...................17
SECTION 2.11    Payments; Sharing of Setoff. ...........................................................17
SECTION 2.12    Taxes.................................................................................................18
SECTION 2.13    Grant of Security Interest and Superpriority Claim.............................19
SECTION 2.14    Single Loan. .....................................................................................19

ARTICLE III REPRESENTATIONS AND WARRANTIES ...............................................20

SECTION 3.01    Organization; Powers........................................................................20
SECTION 3.02    Authorization; Enforceability. ..........................................................20
SECTION 3.03    Governmental Approvals; No Conflicts. ............................................20
SECTION 3.04    Financial Condition. .........................................................................20
SECTION 3.05    Properties. .........................................................................................21
SECTION 3.06    Litigation and Environmental Matters................................................21
SECTION 3.07    Compliance with Laws and Agreements. ...........................................21
SECTION 3.08    Taxes.................................................................................................21
SECTION 3.09    Disclosure. ........................................................................................21
SECTION 3.10    Subsidiaries.......................................................................................21
SECTION 3.11    Insurance...........................................................................................22
SECTION 3.12    Labor Matters....................................................................................22

ARTICLE IV CONDITIONS .............................................................................................22

SECTION 4.01    Conditions Precedent to Effective Date.............................................22
SECTION 4.02    Conditions Precedent to Each Term Loan. .........................................24

ARTICLE V AFFIRMATIVE COVENANTS .....................................................................24

SECTION 5.01    Financial Statements and Other Information. .....................................24

{00285576.8 / 1280-001 }

ii

SECTION 5.02        Notices of Material Events. ...................................................................25

SECTION 5.03        Information Regarding Collateral. ..........................................................25

SECTION 5.04        Existence; Conduct of Business. ...........................................................26

SECTION 5.05        Payment of Obligations. .......................................................................26

SECTION 5.06        Maintenance of Properties. ...................................................................26

SECTION 5.07        Insurance. ..............................................................................................26

SECTION 5.08        Casualty and Condemnation. ................................................................27

SECTION 5.09        Books and Records; Inspection and Audit Rights; Appraisals. ............27

SECTION 5.10        Compliance with Laws. .........................................................................28

SECTION 5.11        Use of Proceeds. ...................................................................................28

SECTION 5.12        Further Assurances. ...............................................................................29

SECTION 5.13        Performance Within Approved Budget. .................................................29

SECTION 5.14        Additional Bankruptcy Related Affirmative Covenants.......................29

ARTICLE VI NEGATIVE COVENANTS .................................................................................30

SECTION 6.01        Indebtedness and Other Obligations. .....................................................30

SECTION 6.02        Liens. .....................................................................................................31

SECTION 6.03        Fundamental Changes............................................................................31

SECTION 6.04        Investments, Loans, Advances, Guarantees and Acquisitions..............31

SECTION 6.05        Asset Sales. ............................................................................................32

SECTION 6.06        Certain Payments of Indebtedness.........................................................32

SECTION 6.07        Transactions with Affiliates...................................................................32

SECTION 6.08        Restrictive Agreements..........................................................................32

SECTION 6.09        Amendment of Material Documents.......................................................33

SECTION 6.10        Additional Subsidiaries. ........................................................................33

SECTION 6.11        Fiscal Year. ............................................................................................33

SECTION 6.12        Bankruptcy Related Negative Covenants. .............................................33

ARTICLE VII EVENTS OF DEFAULT.....................................................................................34

SECTION 7.01        Events of Default. ..................................................................................34

SECTION 7.02        When Continuing...................................................................................38

SECTION 7.03        Remedies on Default..............................................................................38

SECTION 7.04        Application of Proceeds.........................................................................38

ARTICLE VIII THE AGENT......................................................................................................38

SECTION 8.01        Administration by Agent. ......................................................................38

SECTION 8.02        Agreement of Required Lenders.............................................................39

SECTION 8.03        Liability of Agent. .................................................................................39

SECTION 8.04        Notice of Default....................................................................................40

SECTION 8.05        Lenders' Credit Decisions. ....................................................................40

SECTION 8.06        Reimbursement and Indemnification.....................................................41

SECTION 8.07        [Intentionally Omitted]..........................................................................41

SECTION 8.08        Notice of Transfer..................................................................................41

SECTION 8.09        Successor Agent. ....................................................................................41

SECTION 8.10        Reports and Financial Statements..........................................................42

ARTICLE IX MISCELLANEOUS .............................................................................................42

| | | |
|---|---|---|
| SECTION 9.01 | Notices. | 42 |
| SECTION 9.02 | Waivers; Amendments. | 43 |
| SECTION 9.03 | Expenses; Indemnity; Damage Waiver. | 44 |
| SECTION 9.04 | Successors and Assigns. | 45 |
| SECTION 9.05 | Survival. | 47 |
| SECTION 9.06 | Counterparts; Integration; Effectiveness. | 47 |
| SECTION 9.07 | Severability. | 48 |
| SECTION 9.08 | Right of Setoff. | 48 |
| SECTION 9.09 | Governing Law; Jurisdiction; Consent to Service of Process. | 48 |
| SECTION 9.10 | WAIVER OF JURY TRIAL. | 49 |
| SECTION 9.11 | Headings. | 49 |
| SECTION 9.12 | Interest Rate Limitation. | 49 |
| SECTION 9.13 | Additional Waivers. | 49 |
| SECTION 9.14 | Press Releases and Related Matters. | 50 |
| SECTION 9.15 | Patriot Act. | 50 |
| SECTION 9.16 | Foreign Asset Control Regulations. | 51 |
| SECTION 9.17 | Relationship with DIP Orders. | 51 |

**<u>EXHIBITS</u>**

A.          Form of Term Note
B.          Form of Notice of Credit Extension

Annex A     Agent's Wire Transfer Information

## SCHEDULES

1.01        Lenders and Term Loan Credit Commitments
1.01A       Approved Budget
3.06        Disclosed Matters
3.10        Subsidiaries
3.11        Insurance
6.02        Liens
6.07        Affiliate Transactions

DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of March [__], 2019 among New Publishing Holdings, Inc., F+W Media, Inc., F+W Subscription Services, LLC, F+W NH e-Commerce, LLC, F+W OH e-Commerce, LLC, The Writers Store, Inc., F+W Trade Show & Events, LLC, Former Quilting Inc., and F&W Media International Limited, each as a debtor and debtor-in-possession (a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"); and the Lenders (as defined below) party hereto; and Fortress Credit Co. LLC, as administrative agent and Agent for the Lenders, (in such capacity, the "<u>Agent</u>") for its own benefit and the ratable benefit of the Lenders.

## RECITALS

WHEREAS, on March 11, 2019, the Borrowers each filed petitions for relief under Chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").  The Borrowers continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have requested that Lenders provide a senior secured, super-priority, debtor-in-possession term credit facility to the Borrowers on the terms and conditions set forth herein; and

WHEREAS, the Borrowers have agreed to secure all of their obligations under the Loan Documents (as defined below) by granting to the Agent herein, for the benefit of the Agent and the Lenders, a security interest in and lien upon substantially all of Borrowers' existing and after-acquired property and superpriority administrative claim status with respect to all obligations and indebtedness hereunder.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01     <u>Defined Terms</u>.

As used in this Agreement, the following terms have the meaning specified below:

 "<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Agent</u>" has the meaning provided in the preamble to this Agreement.

"Agreement" means this Debtor-in-Possession Credit Agreement, as modified, amended, supplemented, or restated, and in effect from time to time.

"All Assets" means Book Assets and Other Assets.

"Applicable Law" means as to any Person: (a) all statutes, rules, regulations, orders, or other requirements having the force of law and applicable to such Person, and (b) all court orders and injunctions, or similar rulings applicable to such Person, in each instance ((a) and (b)) of or by any Governmental Authority, court, or tribunal that has jurisdiction over such Person, or any property of such Person, including but not limited to, the Bankruptcy Code.

"Approved Budget" means the Borrowers' twenty-six (26) week cash flow projection reflecting on a line-item basis anticipated operating receipts, operating disbursements, and other relevant financial information for the subject period, in form and substance satisfactory to the Lenders, in the Lenders' sole and exclusive discretion and annexed hereto as Schedule 1.01A, together with such supporting documentation as reasonably requested by the Lenders.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lenders and an assignee, and accepted by the Agent, in such form as may be approved by the Agent.

"Bankruptcy Code" means Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" has the meaning provided in the recitals to this Agreement.

"Bidding Procedures Order" has the meaning provided therefor in SECTION 7.01(x)(ii).

"Books Assets" means assets relating to or associated with Borrowers' trade book sales, direct-to-consumer book sales, and e-book sales.

"Borrower" and "Borrowers" has the meaning provided in the recitals to this Agreement.

"Borrowing" means an advance under the Term Loan.

"Borrowing Request" means a request by the Borrowers for a Borrowing in accordance with SECTION 2.03(b).

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in the State of New York are authorized or required by law to remain closed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out Trigger Notice" means a written notice delivered by the Agent to the Borrowers and their counsel, the U.S. Trustee, and lead counsel to any Creditors' Committee, which notice may be delivered at any time following the occurrence and continuance of any Event of Default.

"Cash Management Order" means the order dated March [__], 2019, entered by the Bankruptcy Court, in form and substance reasonably satisfactory to the Lenders, authorizing the Borrowers to, among other things, continue Borrowers' cash management systems, as such order may be amended, modified, or supplemented from time to time with the express written consent of the Lenders and approval of the Bankruptcy Court.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*

"Change in Law" means (a) the adoption of any law, rule, or regulation after the date of this Agreement, (b) any change in any law, rule, or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement, or (c) compliance by any Lender with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority that has become effective and is made or issued after the date of this Agreement.

"Chapter 11 Cases" has the meaning provided in the recitals to this Agreement.

"Charges" has the meaning provided therefor in SECTION 9.12.

"Collateral" means all real and personal, tangible and intangible property and assets of any of the Borrowers of any kind or nature whatsoever, wherever located, whether now existing or hereafter acquired or arising, including, without limitation, all cash (including all cash collateral, wherever held), cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, goods, fixtures, real property interests, intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, capital stock of the Borrowers' subsidiaries, if any, all inter-company notes held by the Borrowers, trademarks, trade names, copyrights, patents, domain names, other intangibles, licenses, rights to payment including tax refund claims, and causes of action, and the proceeds, products, offspring, rents and profits of all of the foregoing, including insurance proceeds, and avoidance actions under section 549 and related proceeds and excluding actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550, 552(b) and 553 of the Bankruptcy Code (the "Avoidance Actions"), but including all gross proceeds and recoveries from the Avoidance Actions, and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds.

"Commitment Fee" has the meaning provided therefor in SECTION 2.07(b).

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, refers to the application or preparation of such term, test, statement, or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Consummation Date" means the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Plan of Reorganization confirmed by a Final Order.

"Control" means the possession, directly or indirectly, of the power (a) to vote 10% or more of the securities having ordinary voting power for the election of directors of a Person, or (b) to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract, or otherwise.  The terms "Controlling" and "Controlled" have meanings correlative thereto.

"Creditors' Committee" means any official committee of creditors formed, appointed, or approved in the Chapter 11 Cases pursuant to the Bankruptcy Code.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time, or both would, unless cured or waived, become an Event of Default.

"DIP Motion" has the meaning provided therefor in SECTION 5.14(a).

"DIP Orders" means and refers to the Interim Borrowing Order and the Final Borrowing Order.

"Disclosure Statement" means a disclosure statement filed in the Chapter 11 Cases in connection with a Plan of Reorganization.

"dollars" or "$" refers to lawful money of the United States of America.

"Effect of Bankruptcy" means, with respect to any contractual obligation, contract, or agreement to which any Borrower is a party, any default, unenforceability, or other legal consequences arising solely on account of the commencement of the Chapter 11 Cases (including by the implementation of the automatic stay) or, as a result of any order of the Bankruptcy Court, the rejection of any such contractual obligation, contract, or agreement.

"Effective Date" means the date on which the conditions specified in SECTION 4.01 are satisfied (or waived in accordance with SECTION 9.02).

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices, or binding agreements issued, promulgated, or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, handling, treatment, storage, disposal, release or threatened release of any Hazardous Material, or to health matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, natural resource damage, costs of environmental remediation, administrative oversight costs, fines, penalties, or indemnities), of any Person directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment, or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment, or (e) any contract, agreement, or other consensual

arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Eurodollar Base Rate" means with respect to any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person which takes over the administration of that rate) for dollars and period as appearing on the applicable Bloomberg LIBOR screen page (or on any successor or substitute page on such screen, or on the appropriate page of such other information service which publishes that rate from time to time in place of Reuters; a "Screen Rate") at approximately 11:00 A.M., London time, two Business Days prior to the commencement of such Interest Period. In the absence of a period comparable to the Interest Period being available as a Screen Rate, (a "Discontinued Interest Period"), then (provided there are Screen Rates for other Interest Periods for dollars) the Eurodollar Rate shall mean the Interpolated Screen Rate as of approximately 11:00 A.M., London time, two Business Days prior to the commencement of such Interest Period. "Interpolated Screen Rate" means the rate per annum determined by the Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate which results from interpolating on a linear basis between: (a) the Screen Rate for the longest period (for which that Screen Rate is available for dollars) which is less than the relevant Discontinued Interest Period and (b) the Screen Rate for the shortest period (for which that Screen Rate is available for dollars) which exceeds the relevant Discontinued Interest Period, each as of approximately 11:00 A.M. (London time) two Business Days prior to the commencement of the Discontinued Interest Period; or, if such Screen Rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Agent from three investment banks of recognized standing selected by it.

"Event of Default" has the meaning provided therefor in SECTION 7.01. An "Event of Default" shall be deemed to have occurred and to be continuing unless and until that Event of Default has been duly waived or cured as provided herein.

"Excluded Taxes" means, with respect to the Agent or any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) Agent's or Lender's gross or net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which such recipient's principal office is located or, in the case of any Lender, in which its applicable lending office is located and (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight federal funds transactions with members of the Federal Reserve System as determined by the Lenders in their reasonable discretion which determination shall be final, binding, and conclusive (absent manifest error).

"Final Borrowing Order" means an order of the Bankruptcy Court in form, scope, and substance acceptable to the Lenders, which, among other matters but not by way of limitation, authorizes the Borrowers to obtain credit, incur the Obligations, grant Liens under this

01:24256166.1

Agreement and the other Loan Documents, as the case may be, and provides for the super priority of the Agent's and the Lenders' claims, which order has become a Final Order within 15 days after entry by the Bankruptcy Court.

"Final Order" means an order or judgment of the Bankruptcy Court as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, petition for certiorari, reargue, or seek rehearing has expired and no proceeding for certiorari, reargument, or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Financial Officer" means, with respect to the Borrowers, the chief restructuring officer, chief financial officer, vice president of finance, director of finance, controller, or assistant controller of the Borrower.

"GAAP" means principles that are (a) consistent with those promulgated or adopted by the Financial Accounting Standards Board and its predecessors (or successors) in effect and applicable to that accounting period in respect of which reference to GAAP is being made, and (b) consistently applied with past financial statements of the Borrowers and its Subsidiary adopting the same principles.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, certificate of formation, by-laws, limited liability company agreement, or other organizational or governing documents of such Person currently in effect.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of or pertaining to government, in each case having jurisdiction over any of the Borrowers.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes, or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, and all other substances or wastes of any nature regulated pursuant to any Environmental Law, including any material listed as a hazardous substance under Section 101(14) of CERCLA.

"Initial Draw" has the meaning provided for in SECTION 2.03(a).

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money (including any obligations that are without recourse to the credit of such Person) or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes, or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person,

(e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding any accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning provided therefor in SECTION 9.03(b).

"Initial Funding" has the meaning provided therefor in SECTION 2.03(a).

"Interest Period" means, (a) initially, the period commencing on the borrowing date and ending one, two, or three months thereafter, as selected by the Borrowers in their Notice of Credit Extension, and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such loan and ending one, two, or three months thereafter, as selected by the Borrowers in a Notice of Credit Extension; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following: (i) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day; (ii) the Borrowers may not select an Interest Period that would extend beyond the Maturity Date; and (iii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"Interest Payment Date" means the last day of each Interest Period and the Maturity Date.

"Interim Borrowing Order" means an order entered by the Bankruptcy Court approving, on an interim basis, the Borrowers' entering into and performing its obligations under this Agreement and the other Loan Documents, as such order may be amended, modified or supplemented from time to time with the express written consent of the Lenders and the Borrowers and with the approval of the Bankruptcy Court.

"Investment" means (a) any stock, evidence of Indebtedness, or other security of another Person, (b) any loan, advance, contribution to capital, or extension of credit (except for current trade and customer accounts receivable for inventory sold or services rendered in the ordinary course of business and payable in accordance with customary trade terms) to another Person, (c) any purchase of (i) stock or other securities of another Person or (ii) any business or undertaking of any Person (whether by purchase of assets or securities)and any commitment or option to

make any such purchase, or (d) any other investment, in all cases whether now existing or hereafter made.

"Knowledge of the Borrowers" or any other similar knowledge qualification, means the actual knowledge of Gregory Osberg, Chief Executive Officer and Michael Healy, Chief Restructuring Officer.

"Lenders" means the Persons identified on Schedule 1.01 hereto and each assignee that becomes a party to this Agreement as a Lender by assuming all or a portion of the Lending Commitments as set forth in SECTION 9.04(b).

"Lending Commitment" means, with respect to each Lender, the commitment of such Lender hereunder set forth as its Lending Commitment opposite its name on Schedule 1.01 hereto or as may subsequently be set forth in the Register from time to time.

"Lending Commitment Percentage" means, at any time, with respect to each Lender, the percentage obtained by dividing its Lending Commitment at such time by all Lending Commitments at such time.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge, or security interest in, on, or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease, or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call, or similar right of a third party with respect to such securities.

"Loan Account" has the meaning provided therefor in SECTION 2.10(a).

"Loan Documents" means this Agreement, the Notes, the DIP Orders, and any other instrument or agreement now or hereafter executed and delivered in connection herewith, or in connection with any transaction arising out of any cash management, depository, investment, letter of credit, equipment leasing, or other banking or financial services provided by the Agent or any of its respective Affiliates, each as amended, supplemented, restated, or otherwise modified and in effect from time to time.

"Material Adverse Effect" means a material adverse effect on (a) the businesses, operations, property, assets, or condition, financial or otherwise, of the Borrowers taken as a whole, (b) the ability of the Borrowers to perform any material obligation or to pay any Obligations under this Agreement or any of the other Loan Documents, or (c) the validity or enforceability of this Agreement or any of the other Loan Documents or any of the material rights or remedies of the Agent or the Lenders hereunder or thereunder.  In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then-existing events would result in a Material Adverse Effect.  The filing of the Chapter 11 Cases or any Effect of Bankruptcy as a result thereof or the effect of any action required to be taken hereunder or under the DIP Orders shall not constitute a Material Adverse Effect.

"<u>Material Indebtedness</u>" means Indebtedness (other than the Term Loans and the Pre-Petition Liabilities) of the Borrowers in an aggregate principal amount exceeding $50,000.

"<u>Maturity Date</u>" means the date that is 150 days after the Petition Date.

"<u>Maximum Rate</u>" has the meaning provided therefor in SECTION 9.12.

"<u>Notes</u>" means the promissory notes of the Borrowers substantially in the form of <u>Exhibit A</u>, each payable to the order of a Lender, evidencing the Term Loan, as each may be amended, supplemented, or modified from time to time.

"<u>Notice of Credit Extension</u>" has the meaning provided therefor in SECTION 2.03(a).

"<u>Obligations</u>" means (a) the due and punctual payment by the Borrowers of (i) the principal of, and interest on, the Term Loan, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment, or otherwise, and (ii) all other monetary obligations, including fees, costs, expenses, and indemnities, whether primary, secondary, direct, contingent, fixed, or otherwise, of the Borrowers to the Lenders and the Agent under this Agreement and the other Loan Documents, and (b) the due and punctual payment and performance of all the covenants, agreements, obligations, and liabilities of the Borrowers under or pursuant to this Agreement, and the other Loan Documents.

"<u>Other Assets</u>" means all assets of the Borrowers excluding Book Assets.

"<u>Other Taxes</u>" means any and all current or future stamp or documentary taxes or any other excise or property taxes, charges, or similar levies arising from any payment made under any Loan Document or from the execution, delivery, or enforcement of, or otherwise with respect to, any Loan Document.

"<u>Overadvance</u>" means a Term Loan, advance, or providing of credit support to the extent that, immediately after its having been made, Unused Line is less than zero.

"<u>Permitted Encumbrances</u>" means:

(a) to the extent created Post-Petition, Liens imposed by law for taxes that are not yet due or are being contested in compliance with SECTION 5.05;

(b) to the extent created Post-Petition, carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with SECTION 5.05;

(c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance, and other social security laws or regulations;

(d) deposits to secure the performance of leases, statutory obligations, surety and appeal bonds, performance bonds, and other obligations of a like nature, in each

case in the ordinary course of business;

(e)     judgment liens in respect of judgments that do not constitute an Event of Default under SECTION 7.01(g);

(f)     easements, zoning restrictions, rights-of-way, and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrowers or any Subsidiary;

(g)     Liens securing the Pre-Petition Liabilities; and

(h)     Permitted Prior Liens;

provided that, except as provided in clause (h), above, the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Prior Liens" has the meaning provided in the Interim Borrowing Order.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority, or other entity.

"Petition Date" means the date the Borrowers filed their petitions for relief under Chapter 11 of the Bankruptcy Code.

"Plan of Reorganization" means a plan filed in the Chapter 11 Cases pursuant to Chapter 11 of the Bankruptcy Code, whether such plan contemplates a reorganization or a liquidation.

"Post-Petition" means the time period commencing immediately upon the occurrence of the Petition Date.

"Prepayment Amount" shall have the meaning provided therefor in SECTION 2.09(b).

"Pre-Petition Indebtedness" means any or all Indebtedness incurred prior to the Petition Date.

"Pre-Petition" means the time period ending immediately prior to the Petition Date.

"Pre-Petition Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of May 24, 2017, among New Publishing Holdings, Inc., F+W Media, Inc., as the Borrower, the several banks and other financial institutes or entities from time to time parties thereto, as lenders, and Fortress Credit Co. LLC, as administrative agent, including any amendments thereto.

"Pre-Petition Liabilities" means the "Obligations" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the Pre-Petition Credit Agreement together with

all instruments, documents and agreements executed or delivered in connection therewith, in each case, as amended to the date hereof.

"Professional Fee Carve Out" means an amount equal to: (i) quarterly fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6), plus interest, if applicable, at the statutory rate, and any fees payable to the clerk of the Bankruptcy Court; (ii) the claims of counsel to the Borrowers, whose retention is approved during the Chapter 11 Cases pursuant to Sections 327 and 328 of the Bankruptcy Code, (collectively, the "Debtors' Professionals") for unpaid fees and expenses which were incurred at any time on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $125,000; plus the claims of the Debtors' Professionals for unpaid fees and expenses which were incurred at any time on and after the Petition Date and before the Carve-Out Trigger Date, but such claims shall not exceed the aggregate amounts for such Debtors' Professionals expressly set forth in the Approved Budget for such period; provided that, in each case, such fees and expenses of the Debtors' Professionals are ultimately allowed on a final basis by the Bankruptcy Court under sections 330 and 331 of the Bankruptcy Code and are not excluded from the Carve-Out under any DIP Order; and (iii) the claims of counsel to the Committee, whose retention is approved during the Chapter 11 Cases pursuant to Sections 1103 of the Bankruptcy Code, (collectively, the "Committee's Professionals" and together with the Debtors' Professionals, the "Retained Professionals") for unpaid fees and expenses incurred at any time on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $25,000; plus the claims of the Committee's Professionals for unpaid fees and expenses which were incurred at any time on and after the Petition Date and before the Carve-Out Trigger Date, but such claims shall not exceed the aggregate amounts for such Committee's Professionals expressly set forth in the Approved Budget for such period; provided that, in each case, such fees and expenses of the Committee's Professionals are ultimately allowed on a final basis by the Bankruptcy Court under sections 330 and 331 of the Bankruptcy Code and are not excluded from the Carve-Out under and DIP Order.

"Professional Fee Carve Out Reserve" means a reserve equal to the maximum possible amount of the Professional Fee Carve Out.

"Professional Fees and Expenses" means (a) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and (b) professional fees and expenses of attorneys, accountants, financial advisors, consultants, and other professionals retained by the Borrowers or the Creditors' Committee or other statutory committee appointed in the Chapter 11 Cases pursuant to §§ 327 and 1103 of the Bankruptcy Code or any Chapter 11 or Chapter 7 trustees appointed in the Chapter 11 Cases.

"Qualifying Collateral Sale" has the meaning provided therefor in SECTION 2.09(b).

"Register" has the meaning provided therefor in SECTION 9.04(c).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents, representatives, attorneys, and advisors of such Person and such Person's Affiliates.

"Replacement Credit Facility" means a credit facility provided to the Borrowers that provides for repayment in full of all Obligations (other than contingent indemnification

Obligations to the extent no claim giving rise thereto has been asserted) upon the closing of such credit facility.

"Required Lenders" means the Lenders having Lending Commitments at least equal to 51% of the Total Lending Commitments, or, if the Lending Commitments have been terminated, the Lenders whose percentage of the outstanding Obligations aggregate not less than 51% of all such Obligations.

"Secured Parties" shall mean (a) the Lenders, (b) the Agent, and (c) any other Person to whom Obligations under the Pre-Petition Credit Agreement are owing, and (d) the permitted successors and assigns of each of the foregoing.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association, or other entity the accounts of which would be consolidated with those of the parent in the parent's Consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association, or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled, or held, or (b) that is, as of such date, otherwise Controlled, by either or both the parent and one or more subsidiaries of the parent.

"Taxes" means any and all current or future taxes, levies, imposts, duties, deductions, charges, or withholdings imposed by any Governmental Authority.

"Term Loan" means the aggregate Borrowings made by the Lenders to Borrowers pursuant to SECTION 2.03.

"Termination Date" means the earliest to occur of (i) thirty (30) days after the Effective Date unless a Final Borrowing Order has been entered by the Bankruptcy Court on or before the expiration of such thirty-day period; (ii) the Maturity Date; (iii) the Effective Date of a chapter 11 plan; and (iv) the occurrence of an Event of Default.

"Total Lending Commitment" means, at any time, the sum of the Lending Commitments at such time. As of the Effective Date, the Total Lending Commitment is $8,000,000. For the avoidance of doubt, Total Lending Commitment refers to the amounts committed, not the amounts drawn.

"U.S. Trustee" shall mean the Office of the United States Trustee for Region 3, the District of Delaware.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of Delaware.

"Unused Line" means, on any day, the then Total Lending Commitments minus the principal amount of Borrowings then outstanding.

"Variance Report" means a 13-week rolling cash flow projection prepared by the Borrowers' management reflecting, on a line-item basis, the Borrowers' actual performance compared to the Approved Budget for the immediately preceding week and on a cumulative basis for the period after the Petition Date and the percentage variance of the Borrowers' actual results from those reflected in the Approved Budget, along with management's explanation of such variance.

SECTION 1.02    Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof," and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights.

SECTION 1.03    Accounting Terms; GAAP.

Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect on the Effective Date, provided that, if the Borrowers notify the Agent that the Borrowers request an amendment to any provision hereof to reflect the effect of any change in GAAP occurring after the date hereof or in the application thereof on the operation of such provision (or if the Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such provision shall have been amended in accordance herewith.

ARTICLE II

Amount and Terms of Credit; Security Interest Grant and Superpriority Claim

SECTION 2.01    Commitment of the Lenders.

(a)    Each Lender severally agrees, upon the terms and subject to the conditions herein set forth, to extend credit to the Borrowers in an amount not to exceed such Lender's Lending

Commitment; provided, however, the aggregate outstanding amount of the Term Loans shall not at any time exceed $8,000,000. Amounts paid or prepaid, in whole or in part, in respect of the Term Loans may not be reborrowed.

(b)      Each Term Loan shall be made by the Lenders pro rata in accordance with their respective Lending Commitment Percentages.  The failure of any Lender to make any Term Loan shall neither relieve any other Lender of such other Lender's obligation to fund its Term Loan in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

SECTION 2.02      Reserves; Changes to Reserves.

(a)      The initial reserves as of the Effective Date are the following:

(i)      Professional Fee Carve Out Reserve.

SECTION 2.03      Making of the Term Loans.

(a)      Upon entry of the Interim Borrowing Order and Borrowers' delivery of written notice to Agent in the form of Exhibit B a "Notice of Credit Extension"), Borrowers shall be permitted to draw up to $2,000,000 of the Total Lending Commitments in a single draw (the "Initial Draw"). Upon entry of the Final Borrowing Order and a Notice of Credit Extension, the Borrowers shall be permitted to draw up to an additional $2,500,000 of the Total Lending Commitments.  The balance of the Unused Line (or any portion thereof) may be drawn in or after week number 13 of the Approved Budget, provided there are no Events of Default (including, for the avoidance of doubt, sale milestones and budget compliance).

Borrowers shall deliver a Notice of Credit Extension for any requested Borrowings.  With the exception of any Notice of Credit Extension delivered in connection with the Initial Draw (which Notice of Credit Extension shall be effective upon delivery) any Notice of Credit Extension, to be effective, must be received by the Agent not later than 1:00 p.m., New York Time, three (3) Business Days prior to a proposed Borrowing.  Such Notice of Credit Extension shall be irrevocable and shall specify the amount of the proposed Borrowing and the date thereof (which shall be a Business Day) and shall contain disbursement instructions.  The Agent shall promptly notify each Lender of its proportionate share of such Borrowing and the date of such Borrowing.  On the borrowing date specified in such notice, each Lender shall make its share of the Borrowing available at the office of the Agent or as otherwise instructed by the Agent, Fortress Credit Co. LLC, c/o Fortress Investment Group, 1345 Avenue of Americas, 46th Fl., New York, NY 10105, Attention: General Counsel – Credit Funds, Facsimile No.: 917-639-9672, Email: gc.credit@fortress.com, no later than 1:00 p.m., New York Time, in immediately available funds.

SECTION 2.04      Notes; Repayment of Term Loan.

(a)      The Term Loans made by the Lenders shall be evidenced by Notes duly executed by the Borrowers, in substantially the form attached hereto as Exhibit A, payable to the order of

each such Lender in an aggregate principal amount equal to such Lender's Lending Commitment.

(b)    The outstanding principal balance of all Obligations shall be payable in immediately available funds on the Termination Date (subject to earlier repayment as provided below). Each Note shall bear interest from the date thereof on the outstanding principal balance thereof as set forth in this ARTICLE II. Each Lender is hereby authorized by the Borrowers to endorse on a schedule attached to each Note delivered to such Lender (or on a continuation of such schedule attached to such Note and made a part thereof), or otherwise to record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Term Loan from such Lender, each payment and prepayment of principal of any such Term Loan, each payment of interest on any such Term Loan and the other information provided for on such schedule; provided, however, that the failure of any Lender to make such a notation or any error therein shall not affect the obligation of the Borrowers to repay the Term Loan made by such Lender in accordance with the terms of this Agreement and the applicable Notes.

(c)    Upon receipt of an affidavit of a Lender as to the loss, theft, destruction, or mutilation of such Lender's Note (which affidavit shall include an indemnity in favor of the Borrowers) and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

SECTION 2.05    Interest on Term Loans.

(a)    Subject to SECTION 2.05, each Term Loan shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable) at the Eurodollar Base Rate plus 10% per annum.

(b)    Each Note shall bear interest from the date thereof on the outstanding principal balance thereof as set forth in this Article II.

(c)    All interest shall be paid in kind on each Interest Payment Date by being capitalized and added to the principal of the Indebtedness hereunder; provided that accrued interest on all Term Loans shall be payable in immediately available funds in arrears at maturity (whether by acceleration or otherwise) and after such maturity on demand.

SECTION 2.06    Default Interest.

Effective upon the occurrence of any Event of Default and at all times thereafter while such Event of Default is continuing, at the option of the Agent or upon the direction of the Required Lenders, interest shall accrue on all outstanding Term Loans and other Obligations (after, as well as before, judgment, as and to the extent permitted by Applicable Law) at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 360 days) equal to the rate in effect from time to time plus 2.00% per annum (the "Default Rate"), and such interest shall be payable on demand.

SECTION 2.07    Certain Fees.

The Borrower shall pay to the Agent, for the benefit of the Lenders, the following fees:

(a)     A closing fee of twenty percent (20%) of the Total Lending Commitment shall be fully earned and be capitalized and added to the principal balance of the Term Loans on the Effective Date (the "Closing Fee") and payable on the Termination Date; provided, however, that the Closing Fee, related interest and charges, shall not be included for purposes of determining whether the Borrowers have exceeded the Lending Commitment.

(b)     An unused line fee ("Unused Line Fee") for the account of the Lenders, equal to 2% per annum (on the basis of actual days elapsed in a year of 360 days) of the average daily balance of the Unused Line for each day commencing on and including the Effective Date and ending on but excluding the Termination Date, earned and payable monthly in immediately available funds.

SECTION 2.08     Nature of Fees.

All fees shall be due and payable on the Termination Date due, in immediately available funds, to the Agent, for the respective accounts of the Agent and the Lenders, as provided herein. All fees shall be fully earned on the date when due and shall not be refundable under any circumstances.

SECTION 2.09     Mandatory Prepayment; Lending Commitment Termination; Cash Collateral.

The outstanding Obligations shall be subject to mandatory prepayment as follows:

(a)     If at any time the amount of the Term Loans (A) exceeds $8,000,000, or (B) causes the Unused Line to become less than zero, the Borrowers will immediately upon notice from the Agent pay the Agent immediately available funds in an amount necessary to eliminate such excess.

(b)     If at any time any of the Collateral is sold (individually or collectively) resulting in cash proceeds in excess of $1,000,000 (a "Qualifying Collateral Sale"), the Lenders may require a prepayment of the outstanding Obligations in the amount of the proceeds of such sale(s) or any subset thereof (the "Prepayment Amount").  In the event of a Qualifying Collateral Sale, the Lenders may notify the Borrowers of the Prepayment Amount, which shall be paid to the Agent, for the benefit of the Lenders, no more than five (5) Business Days after receipt of the written notice.

(c)     The Term Loan shall be repaid in accordance with (and to the extent required under) the provisions of SECTION 2.04 hereof.

(d)     All amounts required to be applied to the Term Loan hereunder shall be applied ratably in accordance with each Lender's Lending Commitment Percentage.  If any item credited to the Loan Account is dishonored or returned unpaid for any reason, whether or not such return is rightful or timely, the Agent shall have the right to reverse such credit and charge the amount of such item to the Loan Account and the Borrowers shall indemnify the Lenders against all claims and losses resulting from such dishonor or

return.

(e)       Upon the Termination Date, the Lending Commitments and the credit facility provided hereunder shall be terminated in full and the Borrowers shall pay, in full and in cash, the outstanding amount of the Term Loan and all other outstanding Obligations.

SECTION 2.10    Maintenance of Loan Account; Statements of Account.

(a)       The Agent shall maintain an account on its books in the name of the Borrowers (the "Loan Account") which will reflect (i) all Term Loans and other advances made by the Lenders to the Borrowers or for the Borrowers' account, and (ii) any and all other Obligations that have become payable.  All entries in the Loan Account shall be made in accordance with the Agent's customary accounting practices as in effect from time to time.

(b)       Any statement rendered by the Agent or any Lender concerning the Obligations shall, absent manifest error, be an account stated, that is final, conclusive and binding on the Borrowers.  The Loan Account and the Agent's books and records concerning the loan arrangement contemplated herein shall be prima facie evidence and proof of the items described therein.  Any failure to so record or any error in so recording shall not limit or otherwise affect the Borrowers' duty to pay the Obligations.

(c)       All credits against the Obligations shall be conditional upon final payment to the Agent for the account of each Lender of the items giving rise to such credits.  The amount of any item credited against the Obligations that is charged back against the Agent or any other Lender or is disgorged for any reason or is not so paid shall be an Obligation and shall be added to the Loan Account or otherwise recorded by the Agent, as applicable, whether or not the item so charged back or not so paid is returned.

(d)       The Agent, without the request of the Borrowers, may advance  any interest, fee, service charge, or other payment to which any Lender is entitled pursuant hereto, when due, and may charge the same to the Loan Account notwithstanding that advances exceeding Total Lending Commitments may result thereby.  Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and, except to the extent so charged, the Borrowers' obligations to pay the Obligations. Any amount that is added to the principal balance of the Loan Account as provided in this SECTION 2.10(d) shall bear interest at the interest rate then and thereafter applicable to the Term Loans.

SECTION 2.11    Payments; Sharing of Setoff.

(a)       The Borrowers shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees, or of other amounts payable hereunder) prior to 12:00 noon, New York time, on the date when due, in immediately available funds, without setoff or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Agent at its offices at Fortress Credit Co. LLC, c/o Fortress Investment Group, 1345 Avenue of Americas, 46th Fl., New York, NY 10105, Attention: General Counsel – Credit Funds, Facsimile

No.: 917-639-9672, Email: gc.credit@fortress.com.   The Agent shall distribute any such payments received by the Agent for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars.

(b)     All funds received by and available to the Agent to pay principal, interest, and fees then due hereunder, shall be applied ratably among the parties entitled thereto in accordance with the amounts of principal, interest, and fees then due to such parties.  Funds received by and available to the Agent shall first be applied to fees, then to interest, and then to principal.  For purposes of calculating interest due to a Lender, that Lender shall be entitled to receive interest on the actual amount contributed by that Lender towards the principal balance of the Term Loan outstanding during the applicable period covered by the interest payment made by the Borrowers.  Any net principal payments to the Term Loan received by the Agent in accordance with the Loan Documents during such period shall not reduce such actual amount contributed by a Lender for purposes of calculation of interest due to that Lender until the Agent has distributed to the applicable Lender its Lending Commitment Percentage.

(c)     If any Lender shall fail to make any payment required to be made by it pursuant to this Agreement, then the Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Agent for the account of such Lender to satisfy such Lender's obligations until all such unsatisfied obligations are fully paid.

SECTION 2.12   Taxes.

(a)     Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes, provided that if the Borrowers shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this SECTION 2.12) the applicable Lender receives an amount equal to the sum such Lender would have received had no such deductions been made, (ii) the Borrowers shall make such deductions, and (iii) the Borrowers shall pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)     In addition, the Borrowers shall pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)     The Borrowers shall indemnify the Agent and each Lender, within fifteen (15) Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by either or both the Agent and a Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrowers hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this SECTION 2.12) and any penalties, interest, and

reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender or by the Agent on Agent's own behalf or on behalf of a Lender setting forth in reasonable detail the manner in which such amount was determined, shall be conclusive absent manifest error.

(d)      As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the Borrowers shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment, or other evidence of such payment reasonably satisfactory to the Agent.

(e)      Should a Lender become subject to Taxes because of its failure to deliver a form required hereunder, the Borrowers shall, at such Lender's expense, take such steps as such Lender shall reasonably request to assist such Lender to recover such Taxes.

SECTION 2.13    Grant of Security Interest and Superpriority Claim.

Subject to entry of the DIP Orders, this Agreement, the DIP Orders, and the other Loan Documents (a) will create in favor of the Agent, on account of the Lenders, a superpriority claim under Section 364(c), 364(d), and 507(b) of the Bankruptcy Code that shall have priority over any and all administrative claims specified in Bankruptcy Code, including claims pursuant to Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Borrowing Order), 507(a), 507(b), 546(c), 546(d), 726, 1114,  or otherwise, subject only to the Professional Fee Carve Out and (b) constitute a grant by the Borrowers to the Lenders of a fully perfected and unavoidable first priority Lien on, and security interest, in, all right, title, and interest of the Borrowers thereunder in all Collateral as security for the Obligations, in each case prior and superior in right to any other Person, other than (x) Permitted Prior Liens and (y) the Professional Fee Carve Out, and no further recording, filing, or other action of any kind will be required in connection with the creation, perfection or enforcement of such security interests and Liens. The Liens created hereunder shall be first, for the benefit of the Agent in such amounts necessary to reimburse Agent for the amount of the Professional Fee Carve Out, if any, used to finance the pursuit of recoveries on avoidance actions under Section 549 of the Bankruptcy Code, and second, for the ratable benefit of the Lenders. No other claims having a priority superior or *pari passu* to that granted to or on behalf of the Agent or the Lenders shall be granted or approved while any of the Obligations or the Lending Commitments remain outstanding.

SECTION 2.14    Single Loan.

All Term Loans to the Borrowers and all of the other Obligations of the Borrowers arising under this Agreement and the other Loan Documents shall constitute one general obligation of the Borrowers secured, until the Termination Date, by all of the Collateral.

ARTICLE III

Representations and Warranties

The Borrowers each represent and warrant to the Agent and the Lenders that:

SECTION 3.01    Organization; Powers.

Each Borrower is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02    Authorization; Enforceability.

The transactions contemplated hereby and by the other Loan Documents to be entered into by the Borrowers are within each of the Borrower's corporate, limited liability company, and other powers and, upon the entry of the Interim Borrowing Order, will be duly authorized by all necessary corporate or limited liability company, and, if required, stockholder or member action.  This Agreement has been duly executed and delivered by the Borrowers and, upon the entry of the Interim Borrowing Order, constitutes, and each other Loan Document to which each of the Borrowers is a party, when executed and delivered by the Borrowers will constitute, a legal, valid and binding obligation of each of the Borrowers, enforceable in accordance with its terms, subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03    Governmental Approvals; No Conflicts.

Subject to entry of the Interim Borrowing Order and the Final Borrowing Order, the transactions to be entered into contemplated by the Loan Documents (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except for such as have been obtained or made and are in full force and effect except filings and recordings necessary to perfect Liens created under the Loan Documents, (b) will not violate any Applicable Law or the charter, certificate of formation, bylaws, limited liability company agreement, or other organizational documents of each of the Borrowers, (c) subject to any Effect of Bankruptcy, will not violate or result in a default under any indenture, agreement, or other instrument binding upon the Borrowers or their assets, or give rise to a right thereunder to require any payment to be made by the Borrowers, and (d) will not result in the creation or imposition of any Lien on any asset of the Borrowers, except Liens created under the Loan Documents.

SECTION 3.04    Financial Condition.

Since the Petition Date, there have been no changes in the assets, liabilities, financial condition, or business of the Borrowers other than changes (a) in the ordinary course of business or (b) those which have not had a Material Adverse Effect.

SECTION 3.05    Properties.The Borrowers have good title to, or valid leasehold interests in, all its real and personal property interests material to Borrowers' business, except for defects that could not reasonably be expected to have a Material Adverse Effect.

(b)    The Borrowers own, or are licensed to use, all trademarks, trade names, copyrights, patents and other intellectual property material to its business, and, to the Knowledge of Borrowers, the use thereof by the Borrowers does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.06    Litigation and Environmental Matters.With the exception of the Chapter 11 Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the Knowledge of the Borrowers, threatened against or affecting the Borrowers (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than those set forth on Schedule 3.06) or (ii) that involve any of the Loan Documents.

SECTION 3.07    Compliance with Laws and Agreements.

The Borrowers are in compliance with all Applicable Law and all indentures, material agreements, and other instruments binding upon the Borrowers or the Borrowers' property, except as an Effect of Bankruptcy and, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

SECTION 3.08    Taxes.

The Borrowers have timely filed or caused to be filed all tax returns and reports required to have been filed and has paid or caused to be paid all taxes required to have been paid by it, in each case, to the extent arising Post-Petition, except (a) taxes that are being contested in good faith by appropriate proceedings, for which the Borrowers have set aside on its books adequate reserves, and as to which no Lien has been filed, or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.09    Disclosure.

The Borrowers have disclosed to the Lenders all matters known to Borrowers, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  To the Knowledge of the Borrowers, no reports, financial statements, certificates, or other information furnished by or on behalf of the Borrowers to the Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder (including, but not limited to, the Approved Budget) or thereunder (each as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect.

SECTION 3.10    Subsidiaries.

(a)      Schedule 3.10 sets forth the name of, and the ownership interest of the Borrowers in any Subsidiary that are not Borrowers.  There is no other capital stock or ownership interest of any class outstanding in any Subsidiaries.  Except as set forth on Schedule 3.10, the Borrowers are not party to any joint venture, general or limited partnership, or limited liability company, agreements or any other business ventures or entities.

(b)      The Borrowers and their Subsidiaries, if any, have received the consideration for which the capital stock and other ownership interests was authorized to be issued and have otherwise complied with all legal requirements relating to the authorization and issuance of shares of stock and other ownership interests and all such shares and ownership interests are, to the extent applicable, validly issued, fully paid, and non-assessable.

SECTION 3.11    Insurance.

Schedule 3.11 sets forth a description of all insurance maintained by or on behalf of the Borrowers.  Each of such policies is in full force and effect.  All premiums in respect of such insurance that are due and payable have been paid.

SECTION 3.12    Labor Matters.

There are no strikes, lockouts, or slowdowns against any of the Borrowers pending or, to the Knowledge of the Borrowers, threatened.  The hours worked by and payments made to employees of the Borrowers have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local, or foreign law dealing with such matters to the extent that any such violation could reasonably be expected to have a Material Adverse Effect.  All payments due from the Borrowers, or for which any claim may be made against the Borrowers, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of each Borrower.  The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any of the Borrowers is bound.

ARTICLE IV
Conditions

SECTION 4.01    Conditions Precedent to Effective Date.

This Agreement shall not become effective until the date on which each of the following conditions precedent have been satisfied or waived by the Agent upon the authorization of the Required Lenders:

(a)      The Agent (or its counsel) shall have received from each party hereto other than the Lenders either (i) a counterpart of this Agreement and all other Loan Documents signed on behalf of such party or (ii) written evidence reasonably satisfactory to the Agent (which may include an electronic or telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and all other Loan Documents.

(b)     The Agent shall have received the Governing Documents of each of the Borrowers, and such other documents and certificates as the Agent or its counsel may reasonably request relating to the organization, existence, and good standing of the Borrowers, the authorization of the transactions contemplated by the Loan Documents and any other legal matters relating to the Borrowers, the Loan Documents, or the transactions contemplated thereby, all in form and substance reasonably satisfactory to the Agent and its counsel.

(c)     All first day motions and other documents filed with and submitted to the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Lenders.

(d)     The Interim Borrowing Order shall have been entered, shall be in full force and effect and not have been stayed and all other necessary consents and approvals to the transactions contemplated hereby shall have been obtained and shall be reasonably satisfactory to the Lenders.

(e)     The Agent shall have received the Approved Budget for a twenty-six (26) week period, which shall be in form and substance satisfactory to the Lenders.

(f)     The Agent shall have received and reviewed evidence of the Borrowers' insurance and such insurance shall be in full force and effect; and the Borrowers shall have delivered to the Agent such endorsements as required by the Loan Documents, each in form and substance reasonably satisfactory to the Lenders.

(g)     Except for the filing of the Chapter 11 Cases, there shall not be pending any litigation or other proceeding, the result of which could reasonably be expected to have a Material Adverse Effect.

(h)     Any fees due at or immediately after the Effective Date and all reasonable costs and expenses incurred by the Agent in connection with the establishment of the credit facility contemplated hereby (including the fees and expenses of counsel to the Agent) shall have been paid in full.

(i)     The consummation of the transactions contemplated hereby shall not (a) violate any Applicable Law or (b) subject to any Effect of Bankruptcy, conflict with, or result in a default or event of default under, any material agreement of any of the Borrowers.

(j)     No material changes in governmental regulations or policies affecting the any of the Borrowers, the Agent, or any Lender involved in this transaction shall have occurred prior to the Effective Date.

(k)     All representations and warranties contained in this Agreement and the other Loan Documents or otherwise made in writing in connection herewith or therewith shall be true and correct in all material respects.

(l)     The Borrowers shall each be in compliance with all of the terms and provisions set forth herein and in the other Loan Documents to be observed or

performed and no Default or Event of Default shall have occurred and be continuing.

(m)     There shall have been delivered to the Agent such additional information and instruments and documents as the Agent reasonably may require or request in such form and substance reasonably acceptable to the Lenders.

The Agent shall notify the Borrowers and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

SECTION 4.02     Conditions Precedent to Each Term Loan.

In addition to those conditions described in SECTION 4.01 (other than conditions that relate solely to an earlier date), the obligation of the Lenders to make each Term Loan is subject to the following conditions precedent:

(a)     Notice.  The Agent shall have received a Notice of Credit Extension with respect to such Borrowing as required by SECTION 2.03.

(b)     Representations and Warranties.  All representations and warranties contained in this Agreement and the other Loan Documents or otherwise made in writing in connection herewith or therewith shall be true and correct in all material respects on and as of the date of each Borrowing hereunder with the same effect as if made on and as of such date, other than representations and warranties that relate solely to an earlier date.

(c)     No Default.  On the date of each Borrowing hereunder, the Borrowers shall be in compliance with all of the terms and provisions set forth herein and in the other Loan Documents to be observed or performed and no Default or Event of Default shall have occurred and be continuing.

The request by the Borrowers for, and the acceptance by the Borrowers of, each extension of credit hereunder shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in this SECTION 4.02 have been satisfied at that time.  The conditions set forth in this SECTION 4.02 are for the sole benefit of the Agent and each Lender and may be waived by the Agent (upon the authorization of the Required Lenders), in whole or in part, without prejudice to the Agent or any Lender.

ARTICLE V

Affirmative Covenants

Until the Lender Commitments have expired or been terminated and the principal of and interest on each Term Loan and all fees payable hereunder and other Obligations shall have been paid in full, the Borrowers covenant and agree with the Agent and the Lenders that:

SECTION 5.01     Financial Statements and Other Information.

The Borrowers will furnish to the Agent:

(a)    Beginning on the third Thursday after the Effective Date and weekly thereafter on Thursday of each week, for the immediately preceding week, a Variance Report;

(b)    promptly after the furnishing or filing thereof, copies of any statement, report, or pleading furnished to or filed with the Bankruptcy Court in connection with the Chapter 11 Cases and relating to the Loan Documents; and

(c)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrowers, or compliance with the terms of any Loan Document, as the Agent or any Lender may reasonably request.

SECTION 5.02    Notices of Material Events.

 The Borrowers will furnish to the Agent prompt written notice of the following:

(a)    the occurrence of any Default or Event of Default;

(b)    the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrowers or any Affiliate thereof that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect;

(d)    any change in any of Borrowers' executive officers;

(e)    any material adverse change in the business, operations, or financial affairs of the Borrowers;

(f)    any collective bargaining agreement or other labor contract to which the Borrowers become a party, or the application for the certification of a collective bargaining agent; and

(g)    the filing of any Lien for unpaid taxes incurred or arising Post-Petition against any of the Borrowers.

Each notice delivered under this SECTION 5.02 shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrowers setting forth the details of the event or development requiring such notice and, if applicable, any action taken or proposed to be taken with respect thereto.

SECTION 5.03    Information Regarding Collateral.

(a)    The Borrowers will furnish to the Agent prompt written notice of any change (i) in any of the Borrower's corporate names or in any trade name used to identify Borrowers in

the conduct of Borrowers' business or in the ownership of Borrowers' properties (except for any such changes occurring in the ordinary course of Borrowers' business), (ii) in the location of any of the Borrower's chief executive office, principal place of business, any office in which it maintains books or records relating to Collateral owned by it, or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility), (iii) in any Borrower's corporate structure or jurisdiction of organization, or (iv) in any of Borrower's federal taxpayer identification number or organizational identification number assigned to it by its state of organization.  The Borrowers also agrees promptly to notify the Agent if any material portion of the Collateral is damaged or destroyed.

SECTION 5.04    Existence; Conduct of Business.

Subject to the Bankruptcy Code, the Borrowers will do or cause to be done all things necessary to comply with their respective charters, certificates of incorporation, certificates of formation, articles of organization, limited liability company agreements, and other organizational documents, as applicable; and bylaws and other instruments that deal with corporate or limited liability company governance, and to preserve, renew, and keep in full force and effect each Borrower's legal existence and the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks, and trade names material to the conduct of such Borrower's business, provided that the foregoing shall not prohibit any merger, consolidation, liquidation, or dissolution permitted under SECTION 6.03.

SECTION 5.05    Payment of Obligations.

Subject to the Effect of Bankruptcy, the Borrowers will pay their Indebtedness and other obligations, including tax liabilities, and claims for labor, materials, or supplies, in each case, to the extent incurred Post-Petition, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) a Borrower has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (d) no Lien has been filed with respect thereto, and (e) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.  Nothing contained herein shall be deemed to limit the rights of the Agent under SECTION 2.02(b) hereof.

SECTION 5.06    Maintenance of Properties.

The Borrowers will keep and maintain all property material to the conduct of Borrowers' business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.07    Insurance.

(a)    The Borrowers shall (i) maintain insurance with financially sound and reputable insurers reasonably acceptable to the Lenders (or, to the extent consistent with prudent business practice, a program of self-insurance for workman's compensation insurance the terms of which have been disclosed to and approved by the Lenders) on such of its property and in at least such amounts and against at least such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against

claims for personal injury or death occurring upon, in or about or in connection with the use of any properties owned, occupied or controlled by it (including the insurance required pursuant to the Loan Documents); (ii) maintain such other insurance as may be required by Applicable Law; and (iii) furnish to the Agent, upon written request, full information as to the insurance carried.

(b)    Fire and extended coverage policies maintained with respect to any Collateral shall, within 30 days of the Petition Date, be endorsed or otherwise amended to include (i) a lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to any Borrower under the policies directly to the Agent (for the benefit of the Lenders), (ii) a provision to the effect that the Borrower, the Agent, or any other party shall not be a coinsurer, and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Lenders.  Commercial general liability policies shall be endorsed to name the Agent as loss payees for the benefit of the Lenders. Business interruption policies shall name the Agent, for the benefit of the Lenders, as loss payees and shall be endorsed or amended to include (i) a provision that, from and after the Effective Date, the insurer shall pay all proceeds otherwise payable to any Borrower under the policies directly to the Agent, (ii) a provision to the effect that the Borrowers, the Agent, and  any other party shall not be a co-insurer, and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Lenders.  Each such policy referred to in this paragraph also shall provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.  All such insurance that covers the Collateral shall include an endorsement in favor of the Agent, which endorsement shall provide that the insurance, to the extent of the Agent's interest therein, shall not be impaired or invalidated, in whole or in part, by reason of any act or neglect of the Borrowers or by the failure of the Borrowers to comply with any warranty or condition of the policy.  The Borrowers shall deliver to the Agent, prior to the cancellation, modification, or nonrenewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent) together with evidence reasonably satisfactory to the Agent of payment of the premium therefor.

SECTION 5.08    Casualty and Condemnation.

The Borrowers will furnish to the Agent and the Lenders prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or any part thereof or interest therein under power of eminent domain or by condemnation or similar proceeding.

SECTION 5.09    Books and Records; Inspection and Audit Rights; Appraisals.

(a)    The Borrowers will, at their own expense, keep proper books of record and account consistent with past practices previously disclosed to the Agent and in which full, true and correct entries are made of all dealings and transactions in relation to Borrowers' business

and activities, if any.  The Borrowers will permit any representatives designated by the Agent, upon reasonable prior notice, to visit and inspect their properties, to examine and make extracts from their books and records, and to discuss its affairs, finances, and condition with their officers and independent accountants, all at such reasonable times and as often as reasonably requested.

(b)    The Borrowers will, from time to time upon the request of the Agent or the Lenders, through the Agent, permit the Agent or professionals (including investment bankers, consultants, accountants, lawyers, and appraisers) retained by the Agent to conduct appraisals, commercial finance examinations, and other evaluations, and pay the reasonable fees and expenses of the Agent or such professionals with respect to such evaluations and appraisals; provided, however, that such appraisals, commercial finance examinations, and other evaluations shall be limited to once every six (6) months.

SECTION 5.10    Compliance with Laws.

The Borrowers will comply with all Applicable Laws, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.11    Use of Proceeds.

(a)    Proceeds of the Initial Draw shall be used only (i) to finance working capital and general business purposes of the Borrowers, and (ii) for the payment of expenses arising in the Chapter 11 Cases as may be approved by the Bankruptcy Court (to the extent required) and, in all instances and subject to SECTION 5.13, shall be in accordance with the Approved Budget. After the Initial Draw, the Agent and the Lenders will be under no obligation to make any additional Term Loan or any other advance or loan hereunder unless and until the Bankruptcy Court enter a Final Borrowing Order.

(b)    The proceeds of any Borrowings made hereunder after entry of the Final Borrowing Order will be used only (i) to finance the working capital  and general business purposes of the Borrowers, including the purchase of inventory and equipment, in each case in the ordinary course of business and in accordance with the Approved Budget, and (ii) for the payment of expenses arising in the Chapter 11 Cases as may be approved by the Bankruptcy Court (to the extent required) and, in all instances and subject to SECTION 5.13, in accordance with the Approved Budget, all to the extent permitted herein and by the DIP Orders.  No part of the proceeds of any Term Loan will be used, whether directly or indirectly: (i) to finance in any way any action, suit, arbitration, proceeding, application, motion, or other litigation of any type adverse to the interests of any Secured Party or their rights and remedies under this Agreement, the other Loan Documents, or any of the DIP Orders, including, without limitation, for the payment of any services rendered by the professionals retained by the Borrowers or the Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration, or similar relief (w) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Obligations or the Liens securing the Obligations, (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the obligations or the

liens under the Pre-Petition Credit Agreement; (y) for monetary, injunctive or other affirmative relief against any Secured Party or their respective rights and interests in the Collateral, or (z) preventing, hindering, or otherwise delaying the exercise by  any Secured Party of any rights and remedies under any of the DIP Orders, the Loan Documents, or Applicable Law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court, or otherwise) by the Agent or any Lender upon any of the Collateral; provided, however, that an amount up to but not exceeding $25,000 may be used by any Creditors' Committee to conduct an investigation of the propriety or effectiveness of the liens granted in connection with the Pre-Petition Credit Agreement; (ii) to make any distribution under a Plan of Reorganization in the Chapter 11 Cases; (iii) to make any payment in settlement of any claim, action, or proceeding, before any Governmental Authority without the prior written consent of the Agent (upon the authorization of the Required Lenders); or (iv) to pay any fees or similar amounts to any Person who has proposed or may propose to purchase interests in the Borrower without the prior written consent of the Agent (upon the authorization of the Required Lenders).

SECTION 5.12    Further Assurances.

The Borrowers will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any Applicable Law, or that the Agent or the Lenders may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect, or perfect the Liens created or intended to be created by the Loan Documents and the DIP Orders or the validity or priority of any such Lien, all at the expense of the Borrowers.

SECTION 5.13    Performance Within Approved Budget.

The Borrowers shall strictly perform in accordance with the Approved Budget subject to the following: (a) the Borrowers' actual sales receipts shall not be less than 85% of the projected amount of operating receipts, (b) the Borrowers' actual expenditures shall not be more than 115% of the projected amount of expenditures, (c) the Borrowers may only incur expenses and make cash expenditures for the categories set forth in the Approved Budget, and (d) the Borrowers shall have a permitted variance of 10% per line item as measured on a cumulative basis (professional fees shall not be included in the calculation of (b) for purposes of the Variance Report; further, professional fees shall not be permitted the variance in (d); provided, however, that the permitted variance of 10% shall apply to the Debtors' Professional fee line items limited to only Young Conaway and FTI Consulting and solely for the months of March, April and May 2019).  The foregoing shall be tested on Thursday of each week pursuant to the Variance Report for the immediately preceding week, on a cumulative rolling three (3) week basis.

SECTION 5.14    Additional Bankruptcy Related Affirmative Covenants.

(a)    On the Petition Date, the Borrowers shall file a motion in the Chapter 11 Cases seeking entry of the Interim Borrowing Order and the Final Borrowing Order (the "DIP Motion").  The DIP Motion shall all be in form and substance reasonably acceptable to the Lenders.  A hearing to consider the DIP Motion shall occur within three (3) Business Days

following the Petition Date.

(b)        The DIP Motion shall provide for, and the Interim Borrowing Order and Final Borrowing Order shall grant, (1) adequate protection with respect to the "Tranche B-1 Term Lenders" (as defined in the Pre-Petition Credit Agreement) under the Pre-Petition Credit Agreement, in the form of (A) replacement liens on all Collateral, junior only to the liens granted in favor of the Agent and the Lenders, (B) adequate protection payments equal to the amount of non-default contractual interest that accrues from and after the Petition Date under the Pre-Petition Debt held by such Tranche B-1 Term Lenders and which shall be paid in kind by being capitalized and treated as principal on the first business day of each month, provided, however, that such adequate protection payments shall not constitute administrative claims against the estates and shall be treated as part of the Tranche B-1 obligations under the Pre-Petition Credit Agreement and (C) a superpriority administrative expense claim, to the extent of diminution of value of their collateral, junior only to the superpriority administrative expense claim granted in favor of the Lenders, all subject to the Professional Fees Carve-Out and (2) adequate protection with respect to the "Tranche B-2 Term Lenders" (as defined in the Pre-Petition Credit Agreement), in the form of replacement liens on all Collateral, to the extent of diminution of value of their collateral, junior only to the liens in favor of the Agent and the Lenders and the adequate protection liens granted to the Tranche B-1 Term Lenders and the Professional Fee Carve-Out.  For the avoidance of doubt, all adequate protection granted to the Tranche B-1 Term Lenders and Tranche B-2 Term Lenders is subject to the priorities agreed to in the Pre-Petition Credit Agreement.

(c)        Upon the Effective Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Borrowers hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations other than as expressly set forth in the Interim Borrowing Order or the Final Borrowing Order.  For the avoidance of doubt, this SECTION 5.14(d) shall not prevent the Borrowers from seeking approval of a Replacement Credit Facility.

(d)        The Borrower shall promptly, punctually, and faithfully perform all and singular the terms and conditions of the DIP Orders.


ARTICLE VI

Negative Covenants

Until the Lending Commitments have expired or been terminated and the principal of and interest on each Term Loan and all fees payable hereunder and other Obligations shall have been paid in full, the Borrowers covenant and agree with the Agent and the Lenders that:

SECTION 6.01        Indebtedness and Other Obligations.

The Borrowers will not create, incur, assume or permit to exist any Indebtedness, except the following:

(a)    Indebtedness created under the Loan Documents;

(b)    Pre-Petition Indebtedness;

(c)    Pre-Petition Liabilities to the extent such Pre-Petition Liabilities constitute Indebtedness; and

(d)    Any amounts incurred by Borrowers Pre-Petition in connection with any accounts payable in the ordinary course to the extent constituting Indebtedness.

SECTION 6.02    Liens.

The Borrowers will not create, incur, assume, or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)    Liens created under the Loan Documents;

(b)    Permitted Encumbrances; and

(c)    any Lien existing Pre-Petition on any property or asset of the Borrowers set forth in Schedule 6.02, provided that (i) such Lien shall not apply to any other property or asset of the Borrower and (ii) such Lien shall secure only those obligations that it secures as of the Petition Date.

SECTION 6.03    Fundamental Changes.

(a)    Subject to the Effect of Bankruptcy, the Borrowers will not merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with any Borrower, or liquidate or dissolve without the written consent of the Lenders.

(b)    Subject to the Effect of Bankruptcy, the Borrowers will not engage to any material extent in any business other than businesses of the type conducted by the Borrowers on the Effective Date and businesses reasonably related thereto.

SECTION 6.04    Investments, Loans, Advances, Guarantees and Acquisitions.

The Borrowers will not purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any capital stock, evidences of Indebtedness, or other securities (including any option, warrant, or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, guarantee any obligations of, or make or permit to exist any Investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except:

(a)    Investments existing on the Effective Date; and

(b)    Investments received in connection with the bankruptcy or reorganization of, or

settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business.

SECTION 6.05    <u>Asset Sales.</u>

Absent approval of the Bankruptcy Court, Borrowers will not sell, transfer, lease or otherwise dispose of any asset, including any Investments except for sales in the ordinary course of business; <u>provided</u>, that all sales, transfers, leases and other dispositions permitted hereby shall be made at arm's length and for cash or cash equivalent consideration and for fair value; and further <u>provided</u> that the authority granted for sales in the ordinary course of business may be terminated in whole or in part by the Agent (upon the authorization of the Required Lenders ) upon the occurrence and during the continuance of any Event of Default.

SECTION 6.06    <u>Certain Payments of Indebtedness.</u>

The Borrowers will not make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation, or termination of any Indebtedness, except payment of regularly scheduled interest, principal payments, and other charges, as and when due in respect of (i) any Indebtedness permitted hereunder incurred Post-Petition and (ii) Pre-Petition Liabilities in accordance with the terms hereof and the DIP Orders (including all adequate protection payments on account of the Pre-Petition Liabilities).

SECTION 6.07    <u>Transactions with Affiliates.</u>

The Borrowers will not sell, lease, or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions in the ordinary course of business that are at prices and on terms and conditions not less favorable to the Borrowers than could be obtained on an arm's-length basis from unrelated third parties, (b) as may be consistent with past practices, (c) salaries, fees and business bonuses to the employees of the Borrowers as are usual and customary in its business, and (d) those described on <u>Schedule 6.07</u> hereto.

SECTION 6.08    <u>Restrictive Agreements.</u>

Other than as set forth in the DIP Orders, the Borrowers will not directly or indirectly enter into, incur, or permit to exist any agreement or other arrangement that prohibits, restricts, or imposes any condition upon (a) the ability of the Borrowers to create, incur, or permit to exist any Lien upon any of Borrowers' property or assets or (b) the ability of any subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or other ownership interests or to make or repay loans or advances to the Borrowers or any Subsidiary or to guarantee Indebtedness of the Borrowers or any Subsidiary, <u>provided</u> that (i) the foregoing shall not apply to restrictions and conditions imposed by Applicable Law or by any Loan Document, (ii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, and (iii) clause (a) of

the foregoing shall not apply to customary provisions in leases restricting the assignment or subleasing thereof.

SECTION 6.09    Amendment of Material Documents.

Without the prior written consent of the Agent (upon the authorization of the Required Lenders), the Borrowers will not amend, modify or waive any of their rights under (i) each Borrower's certificate of incorporation, certificate of formation, bylaws, limited liability company agreement, or other organizational documents, or (ii) any other instruments, documents or agreements in each case to the extent that such amendment, modification or waiver would be materially adverse to the interests of the Lenders.

SECTION 6.10    Additional Subsidiaries.

The Borrowers will not create any additional Subsidiaries.

SECTION 6.11    Fiscal Year.

The Borrowers shall not change their fiscal year without furnishing prior written notice to the Agent.

SECTION 6.12    Bankruptcy Related Negative Covenants.

The Borrowers will not seek, consent to, or permit to exist any of the following:

(a)    Any modification, stay, vacation, or amendment to the DIP Orders to which the Agent (upon the authorization of the Required Lenders) has not consented in writing;

(b)    A priority claim or administrative expense or unsecured claim against any Borrowers (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331,  364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Lenders in respect of the Obligations, except with respect to the Professional Fee Carve Out;

(c)    Any Lien on any Collateral (other than Permitted Prior Liens) having a priority equal or superior to the Lien securing the Obligations;

(d)    Any order that authorizes the return of any of the Borrowers' property pursuant to Section 546(h) of the Bankruptcy Code;

(e)    Any order that authorizes the payment of any Indebtedness (other than the Pre-Petition Liabilities) incurred Pre-Petition, other than payments permitted by this Agreement and approved by the Bankruptcy Court; or

(f)    Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents;

provided, however, that clauses (b) and (c) shall not prohibit Borrowers from seeking approval of any Replacement Credit Facility.

ARTICLE VII

Events of Default

SECTION 7.01    Events of Default.

If any of the following events ("Events of Default") shall occur:

(a)    the Borrowers shall fail to pay any principal of any Term Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrowers shall fail to pay any interest on any Term Loan or any fee or any other amount (other than an amount referred to in clause (a) of this SECTION 7.01) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable and such failure continues for five (5) days;

(c)    any representation or warranty made or deemed made by or on behalf of any of the Borrowers in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement, or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)    any Borrower shall fail to observe or perform any covenant, condition, or agreement contained in any Loan Document, and such failure shall continue unremedied for a period of ten (10) days after notice thereof from the Agent (upon the authorization of the Required Lenders) to the Borrowers;

(e)    any Borrower shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness incurred Post-Petition when and as the same shall become due and payable (after giving effect to the expiration of any grace or cure period set forth therein);

(f)    any event or condition occurs that results in any Material Indebtedness incurred Post-Petition becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any such Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(g)    one or more Post-Petition judgments for the payment of money in an aggregate amount in excess of $150,000 shall be rendered against any one or more Borrowers and the same shall remain undischarged for a period of forty-five (45) consecutive days during which execution shall not be effectively stayed by the Bankruptcy Court, or any action shall be legally

taken by a judgment creditor to attach or levy upon any material assets of the Borrowers to enforce any such judgment;

(h)     any challenge by or on behalf of any Borrower to the validity, priority, perfection, or enforceability of any Loan Document, or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or that seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto;

(i)     a Final Order is entered sustaining any challenge by or on behalf of any other Person to the validity of any Loan Document or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which directly seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto;

(j)     any Lien purported to be created under any Loan Document shall cease to be, or shall be asserted by any Borrower not to be, a valid and perfected Lien on the applicable Collateral, with the priority required by the applicable Loan Document, except as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents;

(k)     the occurrence of any uninsured loss to any material portion of the Collateral;

(l)     the indictment of, or institution of any legal process or proceeding against, the Borrowers, under any federal, state, municipal, and other civil or criminal statute, rule, regulation, order, or other requirement having the force of law where the relief, penalties, or remedies sought or available include the forfeiture of any material property of the Borrowers or the imposition of any stay or other order, the effect of which could reasonably be to restrain in any material way the conduct by the Borrowers, taken as a whole, of Borrowers' business in the ordinary course or could reasonably be likely to have a Material Adverse Effect;

(m)     the entry of an order in the Chapter 11 Cases that stays, modifies (in any manner adverse to the Agent and the Lenders), or reverses any DIP Order or that otherwise materially adversely affects, as determined by the Agent in its reasonable discretion and upon the authorization of the Required Lenders, the effectiveness of any DIP Order without the express written consent of the Agent;

(n)     either (i) the appointment in the Chapter 11 Cases of a trustee or of any examiner having expanded powers to operate all or any part of the Borrowers' business, or (ii) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(o)     the failure of the Bankruptcy Court to enter a Final Borrowing Order, in form and substance satisfactory to the Agent and the Lenders, within thirty (30) days after the Petition Date;

(p)     the entry of any order that provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits any creditor to (i) realize upon, or to exercise any right or remedy with respect to, any Collateral, or (ii) to

terminate any license, franchise, or similar agreement, where the exercise of such right or remedy or such realization or termination would reasonably be likely to have a Material Adverse Effect;

(q)     the filing of any application by Borrowers without the express prior written consent of the Agent (upon the authorization of all Lenders) for the approval of any super-priority claim in the Chapter 11 Cases that is *pari passu* with or senior to the priority of the claims of the Lenders or the Agent for the Obligations, or there shall arise any such super-priority claim under the Bankruptcy Code;

(r)     the payment or other discharge by the Borrowers on any Pre-Petition Indebtedness, except as expressly permitted hereunder, under any DIP Order, or in the Approved Budget, or by order in the Chapter 11 Cases to which order the Lenders have provided their written consent;

(s)     the entry of any order in the Chapter 11 Cases that provides adequate protection, or the granting by the Borrowers of similar relief in favor of any one or more of the Borrowers' Pre-Petition creditors, contrary to the terms and conditions of any DIP Order or the terms hereof;

(t)     the failure of the Borrowers to comply in all material respects with each and all of the terms and conditions of any DIP Order, the Cash Management Order, or any other order of the Bankruptcy Court;

(u)     the filing of any motion by the Borrowers seeking, or the entry of any order in the Chapter 11 Cases: (i) (A) permitting working capital or other financing (other than ordinary course trade credit, unsecured debt) for the Borrower from any Person other than the Agent (unless the proceeds of such financing are used to pay all Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) in full , (B) granting a Lien on, or security interest in (other than a Permitted Encumbrance) any of the Collateral, other than with respect to this Agreement (unless such Liens are granted in connection with a Replacement Credit Facility), (C) except as permitted by this Agreement and the DIP Orders, permitting the use of any of the Collateral pursuant to Section 363 of the Bankruptcy Code without the prior written consent of the Agent (upon the authorization of such percentage of the Lenders as is required by Section 9.02), (D) subject to entry of the Final Borrowing Order, permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (E) dismissing the Chapter 11 Cases or (ii) the filing of any motion by any party in interest or any Creditors' Committee appointed in the Chapter 11 Cases) seeking any of the matters specified in the foregoing clause (i) that is not dismissed or denied within sixty (60) days of the date of the filing of such motion (or such later date agreed to in writing by the Agent upon the authorization of the Required Lenders);

(v)     the filing of a motion by the Borrowers seeking approval of a Disclosure Statement and a Plan of Reorganization, or the entry of an order confirming a Plan of Reorganization, that does not require repayment in full in cash of all Obligations on the Consummation Date of such Plan of Reorganization; or

(w)      the filing of any pleading by the Borrowers challenging the validity, priority, perfection, or enforceability of the claims or Liens under the Pre-Petition Credit Agreement, or any claim under or Lien granted with respect to the Pre-Petition Credit Agreement is determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Chapter 11 Cases, including, without limitation, the Creditors' Committee; or

(x)      with respect to the Borrowers' sale process under Section 363 of the Bankruptcy Code:

(i)      A sale motion establishing procedures for the sale of All Assets, and reasonably acceptable to the Required Lenders, is not filed with the Bankruptcy Court by March 27, 2019;

(ii)      An Order of the Bankruptcy Court establishing bidding procedures for the sale of All Assets that are reasonably acceptable to the Required Lenders (the "Bidding Procedures Order") is not entered on or before April 17, 2019;

(iii)      One or more qualified bids (as established in the Bidding Procedures Order) has not been received for the Books Assets on or before the bid deadline established in the Bidding Procedures Order, which date shall be no later than May 20, 2019;

(iv)      An Order of the Bankruptcy Court approving the sale of the Books Assets, which Order shall be in a form reasonably acceptable to the Required Lenders, is not entered on or before May 24, 2019;

(v)      Closing of the sale on the Books Assets does not occur on or before May 30, 2019;

(vi)      One more qualified bids has not been received for the Other Assets (or in the alternative, a portion of the Other Assets otherwise reasonably acceptable to the Required Lenders) on or before the bid deadline established in the Bidding Procedures Order, which date shall be no later than May 28, 2019;

(vii)      An Order of the Bankruptcy Court approving the sale of the Other Assets, which Order shall be in a form reasonably acceptable to the Required Lenders, (or in the alternative, a portion of the Other Assets otherwise reasonably acceptable to the Required Lenders) is not entered on or before June 4, 2019;

(viii)      Closing of the sale on the Other Assets (or in the alternative, a portion of the Other Assets reasonably acceptable to the Required Lenders) does not occur on or before June 10, 2019; or

(ix)      The Borrowers shall fail to file a plan within one hundred and twenty (120) days of the Petition Date, which the plan and all associated documents are in a form reasonably acceptable to the Required Lenders;

then, subject to the terms of the DIP Orders, and in every such event, and at any time thereafter

during the continuance of such event, the Agent (i) at the request of the Required Lenders shall, by notice to the Borrowers, terminate the Lending Commitments, and thereupon the Lending Commitments shall terminate immediately, or (ii) at the request of the Required Lenders shall, by notice to the Borrowers declare the Term Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal amount of the Term Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by the Borrowers.

SECTION 7.02    When Continuing.

For all purposes under this Agreement, each Default and Event of Default that has occurred shall be deemed to be continuing at all times thereafter unless it either (a) is cured or corrected to the reasonable written satisfaction of that percentage of the Lenders as is required by SECTION 9.02, or (b) is waived in writing by that percentage of the Lenders as is required by SECTION 9.02.

SECTION 7.03    Remedies on Default.

In case any one or more Events of Default shall have occurred and be continuing, and whether or not the maturity of the Term Loans shall have been accelerated pursuant hereto, and subject to the DIP Orders, the Agent (upon the authorization of the Required Lenders) may proceed to protect and enforce its rights and remedies under this Agreement, the Notes, or any of the other Loan Documents by suit in equity, action at law, or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Agent or the Lenders. No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

SECTION 7.04    Application of Proceeds.

After the occurrence of an Event of Default and the Agent's enforcement of any of its rights and remedies under SECTION 7.03 as a result thereof, all proceeds realized from the Borrowers or on account of any Collateral shall be applied in the manner set forth in SECTION 2.11.

ARTICLE VIII

The Agent

SECTION 8.01    Administration by Agent.

Each Lender hereby irrevocably designates Fortress Credit Co. LLC as Agent under this

Agreement and the other Loan Documents.  The general administration of the Loan Documents shall be by the Agent.  The Lenders each hereby irrevocably authorize the Agent (i) to enter into the Loan Documents to which the Agent is a party and to perform its duties and obligations thereunder and (ii) at the Agent's discretion (upon the authorization of that percentage of the Lenders as is required by SECTION 9.02), to agree and consent to all of the provisions of the Loan Documents and to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents and the Notes as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto.  All Collateral shall be held or administered by the Agent (or its duly-appointed agent) for Agent's benefit and for the ratable benefit of the Lenders.  Any proceeds received by the Agent from the foreclosure, sale, lease, or other disposition of any of the Collateral and any other proceeds received pursuant to the terms of the Loan Documents shall be paid over to the Agent, for application as provided in SECTION 2.11.  Notwithstanding anything to the contrary herein, the Agent shall not exercise any discretionary rights or powers or take any discretionary actions under the Loan Documents unless Agent shall have first received authorization from that percentage of the Lenders as is required by SECTION 9.02.

SECTION 8.02    Agreement of Required Lenders.

Upon the occurrence of an Event of Default, the Agent shall (subject to the provisions of SECTION 9.02) take such action with respect thereto as may be reasonably directed by the Required Lenders pursuant to SECTION 7.03; provided that unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action as it shall deem advisable in the best interests of all of the Lenders.  In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that the Agent's compliance with such directions would be unlawful.

SECTION 8.03    Liability of Agent.

(a)      The Agent, when acting on behalf of the Lenders may execute any of its respective duties under this Agreement by or through any of its respective officers, agents and employees, and neither the Agent nor its directors, officers, agents or employees shall be liable to the Lenders or any of them for any action taken or omitted to be taken in good faith, or be responsible to the Lenders or to any of them for the consequences of any oversight or error of judgment, or for any loss, except to the extent of any liability imposed by law by reason of such Agent's own gross negligence or willful misconduct.  The Agent and its directors, officers, agents and employees shall in no event be liable to the Lenders or to any of them for any action taken or omitted to be taken by them pursuant to instructions received by them from the Required Lenders, or in reliance upon the advice of counsel selected by it.  Without limiting the foregoing, the Agent and its directors, officers, employees, or agents (A) shall not be responsible to any Lender for the due execution, validity, genuineness, effectiveness, sufficiency, or enforceability of, or for any recital, statement, warranty, or representation in, this Agreement, any Loan Document or any related agreement, document, or order, (B) shall not be required to ascertain or to make any inquiry concerning the performance or observance by the Borrowers of any of the terms, conditions, covenants, or agreements of this Agreement or any of the Loan Documents,(C) shall not be responsible to any Lender for the state or condition of any properties of the Borrowers or any other obligor hereunder constituting Collateral for the Obligations of the

Borrowers hereunder, or any information contained in the books or records of the Borrowers, (D) shall not be responsible to any Lender for the validity, enforceability, collectibility, effectiveness, or genuineness of this Agreement or any other Loan Document or any other certificate, document, or instrument furnished in connection therewith, or (E) shall not be responsible to any Lender for the validity, priority or perfection of any lien securing or purporting to secure the Obligations or the value or sufficiency of any of the Collateral.

(b)     The Agent may execute any of its duties under this Agreement or any other Loan Document by or through its agents or attorneys-in-fact, and shall be entitled to the advice of counsel concerning all matters pertaining to its rights and duties hereunder or under the Loan Documents.  The Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by them with reasonable care.

(c)     The Agent and its directors, officers, employees, or agents shall not have any responsibility to the Borrowers on account of the failure or delay in performance or breach by any Lender (other than by the Agent in its capacity as a Lender) of any of their respective obligations under this Agreement or the Notes or any of the Loan Documents or in connection herewith or therewith.

(d)     The Agent shall be entitled to rely, and shall be fully protected in relying, upon any notice, consent, certificate, affidavit, or other document or writing believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon the advice and statements of legal counsel (including, without, limitation, counsel to the Borrowers), independent accountants, and other experts selected by the Agent.  The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless the Agent shall first receive such advice or concurrence of the Required Lenders as the Agent deems appropriate or the Agent shall first be indemnified to the Agent's satisfaction by the Lenders against any and all liability and expense that may be incurred by them by reason of the taking or failing to take any such action.

SECTION 8.04     Notice of Default.

The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Agent has actual knowledge of the same or have received notice from a Lender or the Borrowers referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Agent obtains such actual knowledge or receive such a notice, the Agent shall give prompt notice thereof to each of the Lenders.  The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders.  Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as they shall deem advisable in the best interest of all of the Lenders.

SECTION 8.05     Lenders' Credit Decisions.

Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender, and based on the financial statements prepared by the Borrowers and

such other documents and information as it has deemed appropriate, made its own credit analysis and investigation into the business, assets, operations, property, and financial and other condition of the Borrowers and has made its own decision to enter into this Agreement and the other Loan Documents.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in determining whether or not conditions precedent to closing any Term Loan hereunder have been satisfied and in taking or not taking any action under this Agreement and the other Loan Documents.

SECTION 8.06    Reimbursement and Indemnification.

Each Lender agrees (a) to reimburse (i) the Agent for such Lender's Lending Commitment Percentage of any expenses and fees incurred by the Agent for the benefit of the Lenders under this Agreement, the Notes, and any of the Loan Documents, including, without limitation, counsel fees and compensation of agents and employees paid for services rendered on behalf of the Lenders, and any other expense incurred in connection with the operations or enforcement thereof not reimbursed by the Borrowers (with the Borrowers and their respective estates being the first recourse, subject only to reasonable and timely collection efforts) and (ii) the Agent for such Lender's Lending Commitment Percentage of any expenses of the Agent incurred for the benefit of the Lenders that the Borrowers have agreed to reimburse pursuant to SECTION 9.03 and have failed to so reimburse and (b) to indemnify and hold harmless the Agent and any of its directors, officers, employees, or agents, on demand, in the amount of such Lender's Lending Commitment Percentage, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any of them in any way relating to or arising out of this Agreement, the Notes, or any of the Loan Documents or any action taken or omitted by it or any of them under this Agreement, the Notes, or any of the Loan Documents to the extent not reimbursed by the Borrowers (except such as shall result from its gross negligence or willful misconduct).  The provisions of this SECTION 8.06 shall survive the repayment of the Obligations and the termination of the Lending Commitments.

SECTION 8.07    [Intentionally Omitted].

SECTION 8.08    Notice of Transfer.

The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Term Loans for all purposes, unless and until, and except to the extent, an Assignment and Acceptance shall have become effective as set forth in SECTION 9.04(b).

SECTION 8.09    Successor Agent.

The Agent may resign at any time by giving five (5) Business Days' written notice thereof to the Lenders and the Borrowers.  Upon any such resignation of the Agent, the Required Lenders shall have the right to appoint a successor Agent, which so long as there is no Default or Event of Default, shall be reasonably satisfactory to the Borrowers (whose consent shall not be unreasonably withheld or delayed).  If no successor Agent shall have been so appointed by the

Required Lenders and shall have accepted such appointment, within thirty (30) days after the resigning Agent's giving of notice of resignation, the resigning Agent may, on behalf of the Lenders appoint a successor Agent which shall be a Person capable of complying with all of the duties of the Agent, hereunder (in the opinion of the resigning Agent and as certified to the Lenders in writing by such successor Agent) which, so long as there is no Default or Event of Default, shall be reasonably satisfactory to the Borrowers (whose consent shall not be unreasonably withheld or delayed). If, notwithstanding the foregoing, a successor Agent has not been appointed within thirty (30) days after the resigning Agent's giving of notice of such resignation, such resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Agent hereunder until such time, if any, the Required Lenders appoint a successor agent as provided above. Upon the acceptance of any appointment as Agent by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the resigning Agent and the resigning Agent shall be discharged from its duties and obligations under this Agreement. After any resigning Agent's resignation hereunder as such Agent, the provisions of this ARTICLE VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was such Agent under this Agreement.

SECTION 8.10    Reports and Financial Statements.

Promptly after receipt thereof from the Borrowers, the Agent shall remit to each Lender copies of all financial statements and other notices (excluding Borrowing Requests and other routine communications in the ordinary course of business) required to be delivered by the Borrowers hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent.

ARTICLE IX

Miscellaneous

SECTION 9.01    Notices.

Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by e-mail of a PDF document, or sent by telecopy, as follows:

(a)    if to the Borrowers, to [_____], with a copy (that will not constitute notice) to Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 N. King Street, Wilmington, Delaware 19801, E-mail:    cgrear@ycst.com, Attention: Craig D. Grear;

(b)    if to the Agent, to Fortress Credit Co. LLC c/o Fortress Investment Group, 1345 Avenue of Americas, 46th Fl., New York, NY 10105, Attn: General Counsel – Credit Funds, Facsimile No.: 917-639-9672, Email: gc.credit@fortress.com; with a copy (that will not constitute notice) o Halperin Battaglia Benzija, LLP, 40 Wall Street, 37th Floor, New York, NY 10005, Email: ahalperin@halperinlaw.net, Attn: Alan

D. Halperin

     (c)    if to any Lender, to it at its address (or telecopy number or electronic mail address) set forth on the signature pages hereto or on any Assignment and Acceptance for such Lender; with a copy (that will not constitute notice) to Halperin Battaglia Benzija, LLP, 40 Wall Street, 37th Floor, New York, NY 10005, Email: ahalperin@halperinlaw.net, Attn: Alan D. Halperin.

Any party hereto may change its address, telecopy number, or electronic mail address for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt, or, in the case of e-mail, on the date sent by e-mail if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient.

     SECTION 9.02    Waivers; Amendments.

     (a)    No failure or delay by the Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this SECTION 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Term Loan shall not be construed as a waiver of any Default, regardless of whether the Agent or any Lender may have had notice or knowledge of such Default at the time.

     (b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Agent and the Borrowers that are parties thereto, in each case with the consent of the Required Lenders, provided that no such agreement shall (i) increase the Lending Commitment of any Lender without the consent of such Lender, (ii) reduce the principal amount of any Term Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the consent of each Lender affected thereby, (iii) postpone the scheduled date of payment of the principal amount of any Term Loan, or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive, or excuse any such payment, or postpone the scheduled date of expiration of the Lending Commitments, or the Maturity Date, without the consent of each Lender affected thereby, (iv) change any of the provisions of this SECTION 9.02 or the definition of the term "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend, or modify any rights thereunder or make any determination or grant any consent thereunder, without the consent of

each Lender, (v) release any Borrower from its obligations under any Loan Document, or limit its liability in respect of such Loan Document, without the consent of each Lender, (vi) except for sales described in SECTION 6.05 or as permitted in the DIP Orders, release any material portion of the Collateral from the Liens of the Loan Documents, without the consent of each Lender, or (vii) subordinate the Obligations hereunder, or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be, without the prior consent of each Lender, and provided, further that no such agreement shall amend, modify, or otherwise affect the rights or duties of the Agent without the prior written consent of the Agent.

(c)    No notice to or demand on the Borrowers shall entitle the Borrowers to any other or further notice or demand in the same, similar, or other circumstances.  Each holder of a Note shall be bound by any amendment, modification, waiver, or consent authorized as provided herein, whether or not a Note shall have been marked to indicate such amendment, modification, waiver, or consent and any consent by a Lender, or any holder of a Note, shall bind any Person subsequently acquiring a Note, whether or not a Note is so marked.  No amendment to this Agreement or any other Loan Document shall be effective against any Borrower unless signed by such Borrower.

SECTION 9.03    Expenses; Indemnity; Damage Waiver.

(a)    The Borrowers shall pay (i) all reasonable out-of-pocket expenses incurred by the Agent and the Lenders, including the reasonable fees, charges, and disbursements of counsel for the Agent and the Lenders, outside consultants for the Agent, appraisers, for commercial finance examinations in connection with the closing of the credit facilities, to the extent applicable and as provided for herein, the preparation and administration of the Loan Documents or any amendments, modifications, or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) as well as the one-time, disclosed administrative fee of the Agent (which amount shall not exceed $15,000), and (ii) all reasonable out-of-pocket expenses incurred by the Agent or any Lender, including the reasonable fees, charges and disbursements of any counsel and any outside consultants for the Agent or any Lender, for appraisers and commercial finance examinations in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this SECTION 9.03, or in connection with the Term Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Term Loans; provided that the Lenders who are not the Agent shall be entitled to reimbursement for no more than one counsel representing all such Lenders (absent a conflict of interest in which case the Lenders may engage and be reimbursed for additional counsel) and the Agent shall be entitled to one counsel representing itself.

(b)    The Borrowers shall indemnify the Agent, the Lenders, and each Related Party of the Agent and the Lenders (the Related Party being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, settlement payments, obligations, liabilities, claims, actions, or causes of action, and related costs and expenses incurred, suffered, sustained, or required to be paid by an Indemnitee, including the reasonable and documented fees, charges and disbursements of any counsel for any Indemnitee and other costs of investigation or defense including those incurred upon any appeal, incurred by or

asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the transactions contemplated by the Loan Documents, or any other transactions contemplated hereby, (ii) any Term Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by any Borrower or any Environmental Liability related in any way to any Borrower, or (iv) any actual claim, litigation, investigation, or proceeding relating to any of the foregoing, whether based on contract, tort, or any other theory and regardless of whether any Indemnitee is a party thereto (in all such litigation, or the preparation therefor, the Indemnitee shall be entitled to select their own counsel), provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, or related expenses resulted from the gross negligence or willful misconduct of such Indemnitee or any Affiliate of such Indemnitee (or of any officer, director, employee, advisor, or agent of such Indemnitee or any such Indemnitee's Affiliates).

(c)    To the extent that the Borrowers fail to pay any amount required to be paid by the Borrowers to the Agent under paragraph (a) or (b) of this SECTION 9.03, each Lender severally agrees to pay to the Agent, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability, or related expense, as the case may be, was incurred by or asserted against the Agent.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its Lending Commitment Percentage at the time.

(d)    To the extent permitted by Applicable Law, the Borrowers shall not assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential, or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated by the Loan Documents, any Term Loan, or the use of the proceeds thereof.

(e)    All amounts due under this SECTION 9.03 shall be payable promptly after written demand therefor.

SECTION 9.04    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrowers may not assign or otherwise transfer any of the Borrowers' rights or obligations hereunder without the prior written consent of each Lender (and any such attempted assignment or transfer without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Agent and the Lenders) any legal or equitable right, remedy, or claim under or by reason of this Agreement.  Any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its

Lending Commitment and the Term Loans at the time owing to it).

(b)      In the event the Agent or any Lender assigns or otherwise transfers all or any part of the Obligations, the Agent or any such Lender shall so notify the Borrowers and the Borrowers shall, upon the request of the Agent or such Lender, execute new Notes in exchange for the Notes, if any, being assigned.  Subject to acceptance and recording thereof pursuant to paragraph (c) of this SECTION 9.04, from and after the effective date specified in each Assignment and Acceptance the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of SECTION 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (e) of this SECTION 9.04.

(c)      The Agent, acting for this purpose as an agent of the Borrower, shall maintain at its offices in New York, NY a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Lending Commitment of, and principal amount of the Term Loans owing to each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive and the Borrowers, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)      Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the processing and recordation fee referred to in paragraph (b) of this SECTION 9.04 and any written consent to such assignment required by paragraph (b) of this SECTION 9.04, the Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)      Any Lender may, without the consent of the Borrowers or the Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Lending Commitment and the Term Loans owing to it), provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation in the Lending Commitments, the Term Loans shall provide that such Lender shall retain the sole right to enforce the Loan Documents

and to approve any amendment, modification or waiver of any provision of the Loan Documents, provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to SECTION 9.02(e) that affects such Participant.

(f)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to any of the twelve Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341, and this SECTION 9.04 shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 9.05      Survival.

All covenants, agreements, representations, and warranties made by the Borrowers in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Term Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Term Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Lending Commitments have not expired or terminated. Furthermore, this Agreement shall remain in full force and effect and continue to be effective should a receiver or trustee be appointed for all or any significant part of the Borrower's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to Applicable Law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned. The provisions of SECTION 9.03, this SECTION 9.05 and ARTICLE VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Term Loans, the expiration or termination of the Lending Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06      Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all contemporaneous or previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in SECTION 4.01, this

Agreement shall become effective when it shall have been executed by the Agent and the Lenders and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic mail shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.07    Severability.

Any provision of this Agreement held to be invalid, illegal, or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability without affecting the validity, legality, and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08    Right of Setoff.

If an Event of Default shall have occurred and be continuing, each Lender and each of their Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrowers against any of and all the obligations of the Borrowers now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this SECTION 9.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender may have.  No Lender will exercise its rights under this Section 9.08 without the consent of the Required Lenders.  ANY AND ALL RIGHTS TO REQUIRE THE AGENT TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL THAT SECURES ANY OF THE OBLIGATIONS PRIOR TO THE EXERCISE BY ANY LENDER OF ITS RIGHT OF SETOFF UNDER THIS SECTION ARE HEREBY KNOWINGLY, VOLUNTARILY, AND IRREVOCABLY WAIVED.

SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF AND THE BANKRUPTCY CODE.

(b)    The Borrowers agrees that any suit for the enforcement of this Agreement or any other Loan Document may be brought in the Bankruptcy Court for the District of Delaware, or in the courts of the State of Delaware or any federal court sitting therein and consent to the non-exclusive jurisdiction of such courts.  The Borrowers hereby waive any objection that Borrowers may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum.

(c)    Each party to this Agreement irrevocably consents to service of process in the

manner provided for notices in SECTION 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10    WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11    Headings.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12    Interest Rate Limitation.

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Term Loan, together with all fees, charges and other amounts that are treated as interest on such Term Loan under Applicable Law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Term Loan in accordance with Applicable Law, the rate of interest payable in respect of such Term Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Term Loan but were not payable as a result of the operation of this SECTION 9.12 shall be cumulated and the interest and Charges payable to such Lender in respect of other Term Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.13    Additional Waivers.

(a)    To the fullest extent permitted by Applicable Law, the obligations of the Borrowers hereunder shall not be affected by (i) the failure of the Agent or any Lender to assert any claim or demand or to enforce or exercise any right or remedy against the Borrowers under the provisions of this Agreement, any other Loan Document, or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this

Agreement, any other Loan Document, or any other agreement, including with respect to the Borrowers of the Obligations under this Agreement, or (iii) the failure to perfect any security interest in, or the release of, any of the security held by or on behalf of the Agent or any Lender.

(b)    The obligations of the Borrowers hereunder shall not be subject to any reduction, limitation, impairment, or termination for any reason (other than the indefeasible payment in full in cash of the Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) after the termination of all Lending Commitments to the Borrowers under any Loan Document), including any claim of waiver, release, surrender, alteration, or compromise of any of the Obligations, and shall not be subject to any defense or set-off, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of the Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of the Borrowers hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any Lender to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of the Borrowers or that would otherwise operate as a discharge of any of the Borrowers as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of all Lending Commitments to the Borrowers under any Loan Document).

(c)    To the fullest extent permitted by Applicable Law, the Borrowers waive any defense based on or arising out of the unenforceability of the Obligations or any part thereof from any cause, other than the indefeasible payment in full in cash of all the Obligations.  The Agent and the Lenders may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise, or adjust any part of the Obligations, without affecting or impairing in any way the liability of the Borrowers hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and performed in full after the termination of all Lending Commitments to the Borrowers under any Loan Document.  Pursuant to Applicable Law, the Borrowers waive any defense arising out of any such election even though such election operates, pursuant to Applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of the Borrowers, or any security.

SECTION 9.14    Press Releases and Related Matters.

The Borrowers consent to the publication by the Agent of customary trade advertising material in tombstone format relating to the financing transactions contemplated by this Agreement using the Borrowers' names, logos, and trademarks.  The Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

SECTION 9.15    Patriot Act.

Each Lender hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot

Act"), it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender to identify the Borrowers in accordance with the Act.  The Borrowers are in compliance, in all material respects, with the Patriot Act.  No part of the proceeds of the Term Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

SECTION 9.16     Foreign Asset Control Regulations.

Neither the advance of the Term Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).  Neither the Borrowers nor their Affiliates (a) are or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act, or the Foreign Assets Control Regulations or (b) engage or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

SECTION 9.17     Relationship with DIP Orders.

In the event of any inconsistency between the terms of the DIP Orders and the Loan Documents, the terms of the DIP Orders shall control.

**[SIGNATURE PAGES FOLLOW]**

01:24256166.1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[Signature pages in separate file]

Schedule 1.01

LENDERS AND LENDING COMMITMENTS

| Lenders | Lending Commitment | Lending Commitment Percentage |
|---|---|---|
| EF Corporate Holdings LLC | $131,589.83 | 1.644873% |
| Ellington Credit Opportunities, Ltd. | $275,573.59 | 3.444670% |
| CION Investment Corporation | $774,016.08 | 9.675201% |
| PBB Investments III, LLC | $1,897,490.71 | 23.718634% |
| New F+W Media M Holdings Corp LLC | $1,719,680.76 | 21.496010% |
| Drawbridge Special Opportunities Fund LP | $3,201,649.02 | 40.020613% |
| Total: | $8,000,000.00 | 100% |