**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| F+W MEDIA, INC., *et al.*,[1] | Case No. 19-10479 (KG) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 13, 42 & 64** |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION AND
REQUEST FOR ADJOURNMENT CONCERNING THE MOTION OF DEBTORS FOR
ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A)
OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL; (II)
GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS;
(III) PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (IV)
SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of F+W Media, Inc. *et
al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and
through its proposed undersigned counsel hereby objects (the "Objection") to the *Motion of
Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition
Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition
Secured Lenders; (III) Providing Superpriority Administrative Expense Status; (IV) Scheduling a
Final Hearing; and (V) Granting Related Relief* [D.I. 13] (the "DIP Motion").[2]  In support of this
Objection, the Committee respectfully states as follows:

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification
number, are:  New Publishing Holdings, Inc. (4101); F+W Media, Inc. (5953); F+W Subscription Services, LLC
(3663); F+W Trade Show & Events, LLC (0268); F+W OH e-Commerce, LLC (3762); Former Quilting Inc. (7854);
The Writers Store, Inc. (6951); F & W Media International Limited (UK Registered No. 04003207); and F+W NH e-
Commerce, LLC (9731).  The headquarters for the above-captioned Debtors is 1140 Broadway, 14th Floor, New York,
New York 10001.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion and
Executed Debtor-in-Possession Credit Agreement [D.I. 64].

## PRELIMINARY STATEMENT

1.       The proposed lenders (the "DIP Lenders") consist of certain prepetition secured lenders of the Debtors, including several that are also equity holders of the Debtors' ultimate parent company.   Although the Committee acknowledges that the Debtors have a legitimate business need to obtain postpetition financing, the Committee is concerned that the sole purpose of this proposed financing (the "DIP Facility") is to fund a hasty foreclosure sale of the Debtors' assets for the exclusive benefit of the DIP Lenders (and equity holders) rather than the estates as a whole. If the DIP Lenders want to use the chapter 11 process to liquidate their collateral, they must fund a process that is fair and equitable to all parties in interest, not just the DIP Lenders.   Otherwise these cases should be converted to chapter 7 cases or dismissed.

2.       The DIP Lenders have linked various Events of Default to any failure by the Debtors to meet a strict (and brief) timeline for completing two separate sale and marketing processes. The Debtors' motions seeking approval of the bid procedures, which generally incorporate the expedited timeline, are not scheduled to be heard until April 16th (the "April 16th Hearing").  If the DIP Motion is approved prior to that hearing, the result will be a *de facto* approval of the bid procedures motions because any dissonance between the DIP Facility and bid procedures will create substantial risks of default and disruption of the sale process and these chapter 11 cases. Therefore, the Committee requests that the final hearing on approval of the DIP Motion be adjourned for approximately one week to be heard at the April 16th Hearing in conjunction with the hearing on the Debtors' bid procedures motions.[3]

---

[3] While the Committee's professionals are still evaluating whether the proposed sale timeline is workable and will maximize value to the estates, it is clear that premature approval of the milestones through the DIP Facility is unnecessary and inappropriate.

3.      Even if the Committee can get comfortable with the proposed timeline for the cases prior to the April 16th Hearing, under the currently proposed DIP Facility, the DIP Lenders seek protections without allowing the unsecured creditors to maintain even the hope of any recovery or confirmation that all valid administrative claims will (ultimately) be paid.   Indeed, as proposed, the DIP Facility is in direct contravention of many Bankruptcy Code tenets and appears to put the Debtors' estates on a path towards administrative insolvency.  If the DIP Facility is approved in its current form, not only will it grant the DIP Lenders over-market fees but it will grant liens on all remaining unencumbered assets in favor of the DIP Lenders.  Further, the limited remaining cash balance at the end of the cash forecast attached to the Interim DIP Order (the "DIP Budget") appears to provide insufficient money to fund administrative claims, a wind-down process and exit plan for these chapter 11 cases.

4.      The only assets that would realistically be available for a distribution to general unsecured creditors in these cases are unencumbered assets as they existed on the Petition Date, which include chapter 5 Avoidance Actions, commercial tort claims, 35% of F&W UK's stock, and the Debtors' 50% interest in Burda FW Media, LLC.  The DIP Facility, however, proposes to grant liens and superpriority claims covering all of the unencumbered assets to the DIP Lenders (and to the prepetition lenders for any diminution in value).

5.      Moreover, the DIP Budget is deficient in fundamental respects.  The DIP Budget was filed with a gaping administrative hole for (i) section 503(b)(9) claims, (ii) postpetition trade payables, accrued expenses and professional fees, (iii) a wind-down post-closing budget, and (iv) the Committee's professional fees (the DIP Budget provides a line item for the Committee's professionals that is less than 10% of the total budget enjoyed by the Debtors and DIP Lenders). There is nothing in the DIP Motion nor the Debtors' cash forecast that contemplates payment of

503(b)(9) claims or any administrative claims outstanding at the time any potential sale closes. Instead, administrative claimants must bear the risk that they will be paid at the end of a case through a plan that may or may not occur.  Yet the Debtors are required to grant a permanent section 506(c) waiver for all prepetition lenders who are proposed to be immunized now from any surcharge at any time in these cases, leaving the estates with no ability to fund the unpaid administrative costs of maintaining and disposing of any remaining assets.

6.      Without material modifications, the Committee urges the Court to deny the DIP Motion.

## REQUEST FOR ADJOURNMENT

7.      It is against the backdrop of an imbalanced process being driven by the DIP Lenders, that the Committee and DIP Lenders have been negotiating and attempting to reach a global settlement.  While the Committee believes progress has been made and a potential framework for settlement developed, the parties have yet to reach a deal.  As a result, the Committee requests that the Court continue the hearing on the DIP Motion until the April 16th Hearing.  The Committee believes adjournment will provide the Committee with additional time to understand the true impact of the proposed sale and case milestones embedded into the DIP Facility and allow the parties to continue settlement discussions.  Based on the Debtors' budget and financial performance since the commencement of the bankruptcy, a one-week adjournment of the hearing on the DIP Motion will not result in any harm to the Debtors' cash-flow needs or result in any diminution of value to the estates.  Moreover, if a resolution cannot be reached, the Committee believes a joint hearing on the DIP Motion and the bid procedures is appropriate as certain of the issues are interrelated and a joint hearing will promote judicial economy and preservation of the already limited estate resources.

## **OBJECTION**

8.      In the event the Debtors decide to move forward with a hearing on the DIP Motion

as proposed, the Committee requests that the DIP Motion be denied unless certain material

modifications to the DIP Facility and the DIP Budget are made.  Even in cases where sale proceeds

are limited, a DIP facility must nonetheless satisfy the legal and equitable standards appropriate

for debtor-in-possession financing.[4]

9.      The Committee highlights the following provisions of the DIP Facility that are

objectionable and warrant either modification or elimination:

> **The Grant of Liens and Superpriority Claims on Avoidance Actions and Other
> Unencumbered Assets is Inappropriate**. (Interim DIP Order ¶¶ 6-7; DIP Credit
> Agreement § 2.13).  The superpriority liens and superpriority claims granted to the DIP
> Lenders should not attach to the unencumbered assets of the Debtors' estates, including the
> proceeds of Avoidance Actions, commercial tort claims, 35% of F&W UK's stock, and
> 50% interest in Burda FW Media, LLC, as currently proposed in the Interim DIP Order.
> *See* Interim DIP Order ¶ 6-7; DIP Credit Agreement § 2.13.  This proposed "protection" is
> inappropriate and contrary to the interests of unsecured creditors.  The Avoidance Actions,
> commercial tort claims, and proceeds thereof are an important potential source of recovery
> for general unsecured creditors.  Avoidance actions are aimed at ensuring equality of
> distribution to creditors and reversing "something for nothing" transactions such as
> fraudulent transfers.  *See Cullen Ctr. Bank & Tr. v. Hensley (In re Criswell)*, 102 F.3d
> 1411, 1414 (5th Cir. 1997).  The intent behind the avoidance power is to allow the debtor-
> in-possession to recover certain payments on behalf of all creditors.[5]  The Debtors'

---

[4] *See Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (noting that debtor-in-possession financing should not be approved if its purpose is simply to "pervert the reorganization process from one designed to accommodate all classes of creditors and equity interests to one specifically created for the benefit of the [secured lender] and the Debtors' principals who guaranteed its debt.") (internal citations omitted); *see also In re MidState Raceway*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing agreements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition leader."); *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 567-70 (Bankr. D.N.H 1989) (finding an onerous and one-sided financing arrangement violated debtor's fiduciary duties to the estate and its creditors).

[5] *See Mellon Bank (East), N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all of the creditors, has a right to recover payments made as preferences); *see also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer."); *In re Sweetwater*, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . . .").

unsecured creditors, who may not receive a meaningful distribution in these cases, should not be a source of recovery for the DIP Lender.[6]

**The DIP Fees Should Be Reduced**. (DIP Credit Agreement §§ 2.05-2.07).  The proposed fees to be paid to the DIP Lenders should be closely scrutinized given the short-term liquidity being provided to fund sales that are primarily—if not exclusively—for the benefit of the DIP Lenders.  The DIP Lenders are already receiving generous interest at the Eurodollar Base Rate plus 10% per annum.  In addition to this, however, the DIP Lenders seek a Closing Fee of 10% and an Unused Line Fee of 2% per annum.  Even with the initial reduction of the Closing Fee from the patently exorbitant 20% to 10%, the facts and circumstances here warrant further reduction of the Closing Fee to 5% and the striking of the Unused Line Fee.

**No Wind-Down Budget Proposed**.  The proposed DIP Facility does not provide a wind-down budget, which is needed to confirm a liquidating plan after the sales occur.  The DIP Lenders' unwillingness to fund the wind-down combined with the provisions requirement immediate paydown of the DIP Facility upon the closing of the sales (*See* DIP Facility § 2.09), unmasks their intent to utilize the chapter 11 cases for their sole benefit by rushing the sale of assets, immediately scooping the sale proceeds, and then forcing the Debtors to convert to chapter 7 without any hope for a recovery by unsecured creditors.  That is unacceptable. The DIP Budget must be increased to properly fund the wind down and exit of the chapter 11 cases through a liquidating plan prior to the turnover of cash proceeds.

**Restriction on Section 503(b)(9) Claims**. (Interim DIP Order ¶ 5(c); DIP Credit Agreement § 6.12; DIP Budget).  The DIP Lender seeks to restrict the Debtors' ability to use any Cash Collateral or DIP Financing proceeds to pay administrative expense claims under section 503(b)(9) of the Bankruptcy Code. The Interim DIP Order enforces that restriction.  As a result, the DIP Budget does not presently account for any payment of section 503(b)(9) claims, despite accounting for other administrative expenses such as the DIP Lenders' professional fees. There is no basis for this disparity in treatment among holders of administrative expense claims.  The restriction on payment of section 503(b)(9) claims should be removed and the DIP Budget should be updated to provide for payment in full of all such claims.

**Budget and Professional Fee Inequity**. (Interim DIP Order ¶ 16; DIP Budget; DIP Motion, § 5.11(b)).  The proposed budget for the Committee's professionals as compared to the Debtors' professionals is inadequate and imbalanced.  The Committee should be

---

[6] Numerous courts severely restrict a DIP's ability to pledge avoidance actions as security for post-petition financing. *See, e.g.*, *In re Roblin Indus., Inc.*, 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) (DIP financing not approved where a condition of extending loan was debtor's waiver of avoidance actions against lenders in violation of fiduciary duties); *Official Comm. of Unsecured Creditors v. Goold Elecs. Corp.*, No. 93 C 4196, 1993 WL 408366, at *3–4 (N.D. Ill. Sept. 22, 1993) (vacating bankruptcy court order approving postpetition financing "to the extent that the order assigned to the bank a security interest in the debtor's preference actions"); *see also In re Gymboree Group, Inc.*, No. 19-30258 (KLP), Docket No. 348 at ¶¶ 5, 7, 15, 18 (Bankr. E.D. Va. Feb. 15, 2019) (excluding avoidance actions, commercial tort claims, and proceeds from adequate protection liens and claims); *In re Weinstein Company Holdings LLC*, No. 18-10601 (MFW), Docket no. 267 at ¶¶ 10-12 (Bankr. D. Del. Apr. 19, 2018) (excluding avoidance actions and commercial tort claims from adequate protection liens and claims).

allocated appropriate resources to compensate its professionals for services rendered in furtherance of the Committee's statutory duties to general unsecured creditors. The proposed DIP Budget provides the Committee's professionals with $154,000 for the 13-week period—compared to $1,415,000 for the Debtors' professionals and $308,000 for the DIP Lenders' professionals. The Committee requests that the Committee's professionals' budget be increased to $600,000 so that the Committee may carry out its statutory duties on behalf of all unsecured creditors.

Further, the DIP Facility provides that not more than $25,000 (the "Investigation Budget") may be used by the Committee to investigate the validity, enforceability, perfection, priority or extent of prepetition liens. *See* Interim DIP Order ¶ 16. This amount is grossly insufficient for the Committee to complete even a cursory review of the liens and claims in these cases. It is critical that the Committee's professionals be equipped with the necessary resources to investigate the validity, enforceability, perfection, priority or extent of prepetition liens. The $25,000 investigation budget is not appropriate for cases of this size and complexity, and the Committee asserts that the investigation budget should be increased to $50,000.

**The Section 506 Waiver is Inappropriate**. (Interim DIP Order ¶ 9; DIP Credit Agreement §§ 2.13, 6.12(b), 7.01(u)). The DIP Budget fails to provide for all administrative expenses necessary to operate these cases. In particular, the Debtors fail to provide for any payment of 503(b)(9) claims. Other administrative claims (such as the Debtors' professional fees) are accounted for in the DIP Budget and do not have to wait until the end of the case to be assured payment. The proposed waiver of 506(c) surcharge rights would eliminate an important avenue of recovery for the estates and will increase the risk that the costs of the sale and liquidation will be borne by unsecured creditors rather than the secured creditors that already are the primary or sole beneficiaries of the process. This contravenes the essential purpose of section 506(c). *See Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325–26 (3d Cir. 1995) (discussing the Congressional Record, 124 Cong. Rec. 32,398 (cum. ed. Sept. 28, 1978) (statement of Rep. Edwards). The estates should retain their right against the lenders' collateral, particularly where, as here, the Committee has not yet been provided with evidence that the DIP Budget is adequate to fund the administrative costs of these cases. Therefore, the 506(c) waiver and the corresponding Event of Default triggered by the prosecution of a surcharge claim must be stricken.

**The Prohibition Against Marshalling Should be Stricken**. (Interim DIP Order ¶ 17). The waiver of the equitable doctrine of marshaling is also inappropriate and should be stricken. *See* Interim DIP Order ¶ 17. In the event that a lien is avoided and preserved for the benefit of the estate, unsecured creditors should be entitled to seek such marshaling. *See, e.g., Official Comm. of Unsecured Creditors v. Lozinski (In re High Strength Steel, Inc.)*, 269 B.R. 560, 574 (Bankr. D. Del. 2001) (holding that chapter 7 trustee, as hypothetical lien creditor, had standing to bring an action for marshaling). Alternatively, the prepetition secured parties should be required to satisfy their claims from encumbered collateral and look to unencumbered assets (such as avoidance actions) last. *In re Frank Theatres Bayonne/South Cove, LLC*, Case No. 18-35672 (SLM) Docket No. 212 at ¶9

(Bankr. D. N.J. Jan. 28, 2019); *In re Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW), Docket No. 352 at ¶ 7 (Bankr. D. Del. March 12, 2018).

**The Sale Related Termination Events and Events of Default Must be Stricken**. (Interim DIP Order ¶ 8(c)(v); DIP Credit Agreement § 7.01(x)). The Interim DIP Order contains a number of inappropriate protections for the DIP Lenders. Specifically, the DIP Facility provides that the loan will accelerate and become due and payable if (a) an order establishing bidding procedures is not in place by April 17, 2019; (b) qualified bid have not been received for the Book Assets by May 20, 2019 or Other Assets by May 28, 2019; (c) a closing of the sale of Book Assets does not occur by May 30, 2019; and (d) a closing of the sale of Other Assets does not occur by June 10, 2019. If the Debtors fail to meet one of these tight deadlines, they will be in default under the DIP Facility and the DIP Lenders could then take adverse actions that would interfere with the sales and, ultimately, the successful resolution of these cases. Indeed, the very fact that these possibilities exist could discourage other parties from participating in the bidding process. Therefore, these provisions must be stricken.

**Automatic Remedial Rights**. (Interim DIP Order ¶ 8. The DIP Lenders should not be permitted to freeze collateral or exercise other remedial remedies automatically upon the occurrence of an Event of Default or other Specified Event. [7]  *See* Interim DIP Order ¶ 8. If the DIP Lenders believe they are entitled to stay relief, they should be required to file a motion and give proper notice, following which, a hearing should be held to determine whether and to what extent stay relief is appropriate.

## RESERVATION OF RIGHTS

The Committee reserves the right to raise further and other objections to the DIP Order prior to or at the hearing thereon in the event the Committee's objections raised herein are not resolved prior to such hearing or in the event that any further changes to the DIP Order are proposed.

---

[7] The only hearing mechanism prior to foreclosure on the DIP Collateral appears to pertain only to the issue of whether a Termination Date has occurred—not whether or the extent to which stay relief is even appropriate under section 362(d) of the Bankruptcy Code. Further, that mechanism is only engaged if a party objects within a mere five (5) calendar days of notice of the Termination Date. There is no requirement that the notice contain any substantive information about the Specified Event which might form the basis of a potential objection—only that a Termination Date has occurred.

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court either deny the DIP Motion or, alternatively, enter the DIP Order in a manner consistent with the proposed modifications set forth herein, and grant such other and further relief as the Court deems just and proper.

Dated:  April 2, 2019

**MORRIS JAMES LLP**

/s/ Brya M. Keilson
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com

and

Robert M. Hirsh, Esquire
Jordana L. Renert, Esquire
Arent Fox LLP
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
E-mail: robert.hirsh@arentfox.com
E-mail: jordana.renert@arentfox.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*