**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| F+W MEDIA, INC., *et al.*,[1] | Case No. 19-10479 (KG) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No.  13, 103** |

**DIP LENDERS' REPLY TO THE OBJECTION OF THE COMMITTEE
OF UNSECURED CREDITORS TO THE ENTRY OF A FINAL ORDER
AUTHORIZING THE DEBTORS TO (A) USE CASH COLLATERAL,
(B) GRANT ADEQUATE PROTECTION, (C) OBTAIN
POST-PETITION FINANCING AND (D) FOR RELATED RELIEF**

TO THE HONORABLE KEVIN GROSS,
UNITED STATES BANKRUPTCY JUDGE:

The lenders (the "DIP Lenders") under that certain Debtor in Possession Credit

Agreement dated on or about March 13, 2019 (the "DIP Agreement") hereby submit this reply to

the Objection of the Committee of Unsecured Creditors (the "Objection") to the Debtors' motion

for entry of a final order authorizing the Debtors to use cash collateral, grant adequate protection,

obtain post-petition financing and for related relief (the "Motion").[2]  In support of the reply, the

DIP Lenders respectfully represent:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  New Publishing Holdings, Inc. (4101); F+W Media, Inc. (5953); F+W Subscription Services, LLC (3663); F+W Trade Show & Events, LLC (0268); F+W OH e-Commerce, LLC (3762); Former Quilting Inc. (7854); The Writers Store, Inc. (6951); F&W Media International Limited (UK Registered No. 04003204); and F+W NH e-Commerce, LLC (9731).  The headquarters for the above-captioned Debtors is 1140 Broadway, 14th Floor, New York, New York 10001.

[2]  Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Motion.

## PRELIMINARY STATEMENT

1.      In 2013, the lenders[3] made an initial loan to the Debtors' business of $125 million to replace the Debtors' existing credit facility.  Unsecured creditors were left unimpaired.  In 2017, following defaults under the Pre-Petition Credit Agreement, the lenders agreed to a restructuring of the Debtors' debt structure whereby they forgave $66 million of the $99 million outstanding secured debt in exchange for equity and invested a fresh $15 million.  Unsecured creditors were again left unimpaired.  Subsequently, both later in 2017 and throughout 2018, the Lenders consented to multiple sales of their collateral and use of the vast majority of those sale proceeds by the business rather than substantially paying down the secured facility, as was their right.  Unsecured creditors were again left unimpaired.

2.      Against this backdrop, the Debtors and the DIP Lenders negotiated the DIP Agreement in order to keep the Debtors' business alive and avoid the devastating consequences that would come with a liquidation of the business -- the loss of more than 300 jobs and the elimination of a crucial trading partner that accounts for millions of dollars in sales volume for the Debtors' vendors each year.  The DIP loan was the only lifeline available to the Debtors, and it enables them to market and sell the business as a "going concern," in an orderly manner thus furthering the goal that the Committee ought to share -- saving jobs and preserving a trading partner for many of the Committee's constituents.  The sale process that has been filed with the Court contemplates that this business will survive and provides the potential for many employees to be rehired by the eventual buyer or buyers, and for numerous leases and contracts to be assumed.

3.      With those facts in mind, all parties in interest – the Debtors, the DIP Lenders and the Committee – must be focused on the economic realities of these cases.  As is

---

[3] The Pre-Petition Lenders and the DIP Lenders substantially overlap.

evidenced by the resolution of the dispute over the fees to be paid to the Debtors' financial advisors (whereby the Committee sought to entirely renegotiate the fee structure without input from the Debtors or the DIP Lenders), rather than spending precious dollars fighting over a relatively small -- and, in the DIP Lenders' view, necessary -- subset of administrative fees, the Pre-Petition Lenders agreed to reduce their secured claim by the amount in dispute.[4]  The obvious inference here is that no reasonable party believes the assets in this case have any realistic chance of satisfying the secured debt in these cases.  Rather, this is a case where, due to the amorphous nature of the collateral (largely copyrights and other intangibles) the DIP Lenders have real risk as to repayment of the DIP Loan.  Though all parties are optimistic that there will be a robust sale process, there is no stalking horse bidder and no guarantee whether or what quantum of bids will be generated.  In fact, the only certainly is that even if the sale process exceeds expectations many times over, the lenders' secured debt will still not be satisfied in full.

4.    Turning to the Objection, even with the grim financial outlook of these cases in terms of the lenders' lost investments, potential recoveries to secured creditors and, of course, unsecured creditors, the DIP Lenders acknowledge the statutory role of the Committee in this and every Chapter 11 case.  Though the DIP Lenders vehemently dispute the Committee's characterization that the DIP Lenders want the benefits of Chapter 11 without carrying the burdens -- implying that a foreclosure or liquidation under Chapter 7 might be preferable to

---

[4] The Committee objected to the payment of reasonable fees, negotiated at arm's length, for professionals crucial to the successful sale of assets, arguing that it created a higher bar for unsecured creditor recovery, despite the fact that over $70M of secured debt would have to be repaid before funds could flow to unsecured creditors.  Recognizing the absurdity of the position, the lenders simply agreed to reduce their claims by the amount in dispute given that all parties are aware that the likelihood of sale proceeds being sufficient to repay all secured debt is minimal.  The Committee has taken this same approach of challenging issues at every turn on matters that do not impact recoveries to their constituency (informal quests to restructure the KEIP/KERP, renegotiating the terms of both the FTI and Greenhill retentions, objections to the most mundane of ordinary course DIP protections such as the grant of liens on unsecured pre-petition debtor collateral), all without consulting the Debtors or the DIP Lenders.  In order to save fees, akin to the resolution of the financial advisory fees, the Pre-Petition Lenders are prepared to resolve any KEIP/KERP issues in this same manner, rather than wasting precious resources and detracting from the sale process.

seeking to preserve the business as a going concern under new ownership -- the dispute is over what the Committee's role (or, rather, that of their chosen counsel) should be.

5.    At its core, the Committee's issue is not about whether the DIP Lenders should get a lien under Section 364(c)(2) of the Bankruptcy Code on unperfected assets.  It is not about whether the DIP Lenders should take liens on avoidance actions, should be awarded a waiver under Section 506(c), or any of the other laundry list of issues listed in the Objection, virtually all of which are common relief afforded to lenders in far less risky situations than the lenders face here.  The subject of the dispute is very clearly and simply about how much money the Committee's two large law firms and one national financial advisory firm should reasonably be funded from the lenders' collateral where their constituency has no reasonable hope of realizing a recovery from the asset sale.

6.    The DIP Lenders acknowledge that the Committee must have sufficient funds to conduct a thorough lien review of the liens granted under the Pre-Petition Credit Agreement and have agreed to the Committee's request to increase the lien review budget from $25,000 to $50,000.  The DIP Lenders agree that counsel should be present and give input into major case developments, including the exit strategy of the cases (which can only be determined after the results of the sale process are known).  Indeed, the DIP Lenders understand that the Committee has the right to select its own professionals.  However, the DIP Lenders dispute that it is reasonable for the Committee to demand a budget that well exceeds that of Debtors' counsel or DIP Lenders' counsel.[5]  In fact, the DIP Lenders are hard pressed to come up with a single

---

[5] The Committee's attempts to justify an increase in its professional fee allocation by pointing to the pro rata allocation of fees provided under the Budget to the Debtors' combined professionals is misguided.  Not only do certain professionals assisting the Debtors not have a counterpart on the Committee side, but there is alsoa significant disparity in the anticipated amount and type of work required from those Debtors' professionals that do have a counterpart on the Committee side. The Committee does not require the assistance of a CRO or investment banker, and Committee counsel will not be tasked with advising on multiple sale processes while handling the day-to-day administration of these chapter 11 cases. Therefore, the aggregate amount allocated in the Budget to the Debtors' professionals is an artificial and unreliable point of reference for purposes of a Committee budget

instance, even in cases where the unsecured creditors would fare better than here, where the fees of Committee counsel outpace that of the Debtors or DIP Lenders' professionals.  The DIP Lenders initially proposed a meaningful 13-week budget for Committee professionals of $231,000.  In the spirit of trying to work these issues out, the DIP Lenders consent to raise that proposal to $300,000, yet incredibly the parties are nowhere close to consensus on budget.

7.     Though the DIP Lenders would rather resolve outstanding issues with respect to the DIP loan consensually with the Committee and will continue to endeavor to do so, it does not appear that will be possible without the Court's involvement.  Nonetheless, the DIP Lenders consent to adjourning the Final DIP Hearing to April 16, 2019, in order to make every effort at resolution.  As stated above, the DIP Lenders' goals are to maximize the asset values for the Debtors' assets, which will also preserve as many jobs and trading partners as possible through a sale of the business.  The DIP Lenders submit that the Committee should be focused on issues that potentially affect its constituency.  Otherwise, the only parties that benefit are the professionals and not the parties whom they represent, which is an inequitable use of the lenders' collateral.  Accordingly, the DIP Lenders submit that a 13-week budget of $300,000, with an increase from $25,000 to $50,000 for dedicated lien review is more than sufficient.

## DISCUSSION

8.     As stated above, the DIP Lenders believe that the Objection is almost entirely based on the issue of the Committee's carve-out budget and that few, if any, of the remaining issues cannot be resolved among the Debtors, the DIP Lenders and the Committee. Nonetheless, the DIP Lenders' position on the issues raised in the Objection follow.

---

allocation, and the Committee's attempt to justify its exorbitant fee request by pointing to this figure should be rejected.

A.  ***Grant of Liens on Unencumbered Assets and Ability to Marshal***.

9.      After a loss of well over $65 million (plus collateral proceeds left behind to allow the Debtors to operate), the DIP Lenders are again loaning fresh funds to the Debtors, this time to accommodate a sale process in Chapter 11.  Notably, the DIP Lenders did not seek a roll-up of their pre-petition debt into the DIP loan.  Thus, asking the DIP Lenders to forego the most basic and customary protections of Section 364(c)(2) for new money lent, as well as any limitation on the ability to recover from those assets by any application necessary, is wholly unreasonable.  These requests might make sense in a case where pre-petition debt is being rolled up, or where collateral values indisputably over-secure the loan; however, in the circumstances at hand, these fundamental protections were core to the DIP Lenders' consent to lend.[6]

10.      Nonetheless, under the structure of the DIP loan, which was carefully considered by the Debtors and the DIP Lenders, as long as the sale is successful enough to satisfy the DIP obligations (and the Pre-Petition Credit Agreement, solely to the extent of diminution in value), assets such as Chapter 5 actions and proceeds therefrom will inure to the benefit of the estates and their unsecured creditors.  This is an inherently reasonable approach to the issue of liens on avoidance actions and their proceeds.  The DIP Lenders are not seeking to secure the entirety of the pre-petition loans by this collateral – only to protect the new money and process being implemented pursuant to the DIP Agreement.

---

[6] The issue of marshaling was vetted as the U.S. Trustee asked the DIP Lenders to forego their marshaling rights as part of the Interim Order.  The U.S. Trustee ultimately consented to the provision upon the DIP Lenders' explanation of the financial realities of these cases, in addition to resolution of all other issues raised by the U.S. Trustee.  Additionally, unlike many protections at issue in the Committee's Objection, the effectiveness of the marshaling provision was not limited to entry of the Final Order and the DIP Lenders are, thus, entitled to rely on the provision with respect to the interim amount.  Given that the interim financing already advanced likely exceeds the value of any previously unsecured collateral, the issue is effectively moot.

**B. The DIP Fees, Sale Termination Events and Collateral Rights.**

11.     Proposed counsel to the Committee was present telephonically for the Interim DIP Hearing and is aware of the DIP Lenders' initial position on the DIP Fees and the accommodations the DIP Lenders made at the Court's direction as part of the Interim Order. The fees were and continue to be integral to the DIP Lenders' loan commitment and the vast majority of the amount in issue (i.e. the Closing Fee) was earned in full upon funding.  The dispute over the Unused Line Fee is one of many examples where the Committee would have been well-served to consult with the Debtors prior to wasting resources.  Though the Unused Line Fee is important to the DIP Lenders for internal reasons, from the estates' perspective, this issue is not likely to have a cash value over $15,000 in total over several months -- an amount that was negotiated by the DIP Lenders, but is not meaningful to the estates or the process.

12.     Likewise, in keeping with the Committee's strategy of shoot first (objecting) and ask questions later, the Committee failed to consult with the Debtors or the DIP Lenders as to the origin and purpose of the sale termination events.  The concept of sale termination events were integral to the DIP loan and the DIP Lenders' consent to the Chapter 11 process, going back to the initial term sheet.  However, it was the Debtors, not the DIP Lenders, who proposed the actual trigger dates, based on a careful analysis undertaken with the Debtors' marketing professionals.  These dates were accommodations by the DIP Lenders to the Debtors' best business judgment (recognizing that this is a delicate sale process whereby too much time may be as harmful as too little, in terms of realizing the best value for the estates), are supported by the DIP Lenders, and are integral to the DIP loan commitment.  The DIP Lenders' rights to access their collateral in the event the sale milestones are not achieved are equally integral to the process.

### C. *Wind-Down Budget.*

13.     The DIP Lenders agree with the Committee that discussions among the
DIP Lenders, the Debtors and the Committee regarding a wind-down budget will be necessary.
In fact, the DIP Lenders submit that it is the goal of all parties-in-interest to see a plan of
liquidation confirmed following a successful sale of the Debtors' assets.  However, the
framework for the wind-down budget cannot be reasonably delineated until the sale process has
advanced.  The precise exit strategy for these cases is not ripe until it is known whether the sale
is successful and, if so, to what degree.  Further, to publicly calculate a potential wind-down
budget may inadvertently chill bidding by putting expectations as to asset valuations in the
public domain during the due diligence phase of the sale process.  As already noted, with no
stalking horse there is no clarity at this time as to what of the secured debt will be repaid or
when.

### D. *Section 503(b)(9) and 506(c).*

14.     The DIP Lenders have indicated to the Committee that as part of an
overall consensual resolution, they are prepared to take out the alleged prohibition[7] against
payment of Section 503(b)(9) administrative expenses.  It was never the intent of the DIP
Lenders to treat Section 503(b)(9) claims disparately from other administrative claims.  In
connection with a global resolution of all issues raised in the Objection, the DIP Lenders are
prepared to modify the prior form of Final Order to delete the Section 503(b)(9) reference and to
the extent such claims comport with the Approved Budget, which does forecast adequate funding
for such claims.[8]  In such circumstances, provided such claims are allowed and undisputed, the

---

[7] The proposed language in the Final Order did not prohibit payment of 503(b)(9) claims; it required the consent of the DIP Lenders prior to payment.

[8] The DIP Lenders consent to allowing Section 503(b)(9) claims (that are allowed and undisputed) to be paid from line items for other pre-petition payments, such as critical and foreign vendors.  Upon consultation with the Debtors' financial advisors, sufficient funds are available to satisfy all such claims.

DIP Lenders will grant their consent that the Debtor is authorized but not directed to make such payments.

15.    Likewise, though the DIP Lenders believe that the waiver of Section 506(c) is reasonable and appropriate, if the parties reach a global resolution of all issues raised in the Objection, the DIP Lenders are willing to consent to the Committee's request that the waiver be stricken from the proposed Final Order.  This is another example (akin to the attempt to renegotiate the Debtors' financial advisor fees, or the DIP Lenders' Unused Line Fee) where the Committee's efforts are at odds with the realities of these cases.  Section 506(c) does not afford the Committee, its constituents, or even a successor trustee with any true advantage (just as allowing the waiver does not deny them any advantage).  The collateral at issue here is almost entirely intangibles, such as copyrights and licenses.  As Section 506(c) only affords the estate – not its creditors -- with the ability to surcharge the collateral for costs of preservation of the collateral, and given they type of assets and proposed disposition at issue, the DIP Lenders do not see a reasonable likelihood of charges to which Section 506(c) may reasonably apply.  The DIP Lenders requested the waiver simply to minimize future litigation wherever possible; however, the DIP Lenders are equally willing to forego the waiver at the request of the Committee in connection with a global resolution due to the particular facts of these cases and the nature of the collateral.

## CONCLUSION

16.    The DIP Lenders are hopeful that the parties will be able to reach a consensual resolution on the outstanding issues prior to the Final DIP Hearing.  Now that the Committee has quantified its objections, the DIP Lenders strongly believe that the fundamental issue in dispute is the Committee's budgeted and carved-out fees, given that the remaining issues raised by the Committee are common to nearly every case and customarily resolved.  The DIP

Lenders will work diligently with the Committee to seek to resolve this issue prior to the Final

DIP Hearing, while acknowledging that the parties have very different views of reasonableness

based on the financial posture of these cases.

17. Given the protections afforded to the DIP Lenders in the Interim Order,

including reliance on the sale milestones as integral to the DIP Lenders' commitment, and given

the DIP Lenders' desire to accommodate the Committee wherever practicable, the DIP Lenders

consent to adjourning the Final DIP Hearing to April 16, 2019. The DIP Lenders consent shall

not be viewed as a waiver of their position that certain issues were fixed by the Interim Order;

but, rather, as a desire to make every effort to resolve these issues consensually, without the

Court's intervention.

18. There is no other funding available to these Debtors and the estates and

their professionals need to focus their full attention on the sale process without the burden of

uncertainty as to their financing facility. At the Final DIP Hearing, the DIP Lenders respectfully

submit that the Objection should be overruled and that a final Order approving their DIP

financing and cash collateral use should be entered, including fixing reasonable budgeted fees for

the Committee at $300,000.

**BIELLI & KLAUDER, LLC**

Dated: April 5, 2019        */s/ David M. Klauder*
      Wilmington, Delaware        David M. Klauder (No. 5769)
                                        1204 N. King Street
                                        Wilmington, DE 19801
                                        Phone: 302-803-4600
                                        Fax: 302-397-2557
                                        dklauder@bk-legal.com

                                        -and-

Alan D. Halperin, Esq.
Walter Benzija, Esq.
Julie Dyas Goldberg, Esq.
**Halperin Battaglia Benzija, LLP**
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
Facsimile: (212) 765-0964
Email: ahalperin@halperinlaw.net
Email: wbenzija@halperinlaw.net
Email: jgoldberg@halperinlaw.net

*Counsel to the DIP Lenders*